# EXHIBIT D

**Berlamino, Betty Ellen**

11/2/08

Note to File......

I met with Karen Scott on November 2 and informed her that, "Her job was in jeopardy" given the current results of the news department. We discussed the extremely low ratings on the 10pm news and I explained to her that there was no room for excuses and that in spite of the lead-in we expected to do a higher number and expected to be the #2 news at 10pm and not the #3 news. I also explained to her that news was operating in a negative deficit mode and projected to operate similarly next year given the dismal numbers. I told her that I thought our 10pm product lacked consistency and that some days it was quite good and other days it was not. I told her that while her job was not in jeopardy today, or in fact tomorrow, we needed to see an immediate correction in both the product and the numbers and needed to return to a profitable situation. I told her that she would be given time, but, not, all the time in the world. I suggested to her that she change her hours so that she is here throughout the late broadcast and that she re-examine all the people that are working for her to be sure that they are the right people to do the job. She said that she understood and that she would change her hours immediately and continue to look for changes and solutions to our product to orchestrate a quick turn around.



EXHIBIT
PENGAD 800-631-6989
Berlamino 7
3-7-2011

1



EXHIBIT

Berlamino 9
3-2-2011

PENGAD 800-631-6989

The ratings for the news are a deep cause for concern and the lack of viewers in both the morning and the evening are putting the News Department into a serious deficit mode. Unfortunately, this is not something that happened over night, but rather the ratings for our newscasts have been declining for over four years. Karen has not been proactive in responding to the ratings erosion and has not taken on the proper leadership role as the Department Head, to correct the situation. She has been continually asked to examine her staff both in front of and behind the camera to make sure that we have the best people available working for us. With the ratings in such severe decline, she is expected to be pro-active in her role, offer solutions, changes and be willing to honestly evaluate people and take on the task of corrective and disciplinary action that would be expected to result in a change of behavior and/or a dismissal. She has not done any of these things on a consistent basis, but rather, sporadically, and only when I continually and repeatedly coach her and/or simply tell her that my requests are no longer requests, but rather, "directives."

The first example, is an e-mail that we sent to Karen on November 15, 2004 (attached). In this memo I state that, "our news ratings are an immediate cause for concern. We've discussed our late news numbers and some strategies to turn them around but so far nothing has really changed." "If we don't turn the situation around quickly, we will be in jeopardy of retaining the same staffing levels and previously budgeted expenses for next year. In other words, we will have to initiate lay-offs and budget reductions." "Before you blame the LPM's, please consider both shows. Do you REALLY think that they are both as good and/or better than our competitors? Do we have THE RIGHT people in front of the camera? Do we have THE RIGHT people behind the camera? We've gone along with these failing numbers and all of the personnel have remained intact." Also, when I look at most of the files of the personnel behind the scenes, they basically have good reviews. However, if everyone was really working hard to that skill level, don't you think our numbers would be higher?" "However, we continue to lose ratings and viewers and yet be (sic) are not holding enough people accountable." "I really need your leadership and guidance in this crisis situation."

Karen's response to this memo was to 1. Upgrade our writers  2. Add a fourth reporter on the weekend (no estimated cost was supplied)  3. Add a 10a-6pm crew (her estimated cost of $100k)  4. Add medical team (her estimated cost of $300K)  5. Add a weather producer to the 10pm show (estimated cost of $40K)  6. Add a planning Editor (estimated cost of $50k)  7. Get a new set (no cost supplied)   8. Get new graphics (no cost supplied) 9. Upgrade LI and NJ for live shots   10. Consider a male anchor change

Her suggestion was to add personnel and approximately which would cost approximately $700,000 per year when I was clear that revenue/cost was an issue.  Additionally, there were no writers who were let go after this action plan to upgrade writers.

In February, 2005 I sent Karen a memo that addressed the declines in the morning news (at this time we were seeing improvement at 10pm).  The last line in the first paragraph summed things up as follows." You're responsible for the news, so I'm asking you to please take a HARD LOOK at what we're doing and make some difficult decisions.  Everyone's future is on the line here; I need you to take a leadership role here and get us back on track before it's too late."

On May 23, 2005 I sent Karen an e-mail stating that we needed to discuss Bob Pronovost, the Director of the 10pm News. I stated that, "there are apparantly issues that continue to surface and we need to deal with them. Here's my issue, I believe that he is having a negative impact on the newscast and I am concerned about the overall performance of the late news." " We continue to lose money in the newscast with no real visible plan of improvement.  For whatever reason (skill? Personality?), Bob does not garner the support of the staff and we need to look very closely at every negative element that involves news." This was after nine people went to HR to voice their concerns about Bob. This situation was also discussed with Mike Gano, the Engineering Director at the time, who concurred that Bob was a problem and an impediment to our telecast. Karen vehemently defended him; he remains here to this day as the late news

director and in my opinion (and several people who have voiced their concerns to me downstairs), is an impediment to the show because he does not have the skill to implement new directional changes.

On September 21, 2005 I sent Karen an e-mail that stated, "our news is actually losing money this year and projected to lose money next year if things don't turn around quickly." Therefore, it is imperative that we put on the highest quality product possible with the most skilled people in their respective positions. We can not afford to keep people that contribute to the negative perception and implementation of our product. Needless to say, the appeal of our in-air (sic) talent is crucial, as well as those behind the scenes. The producing, directing and writing are equally, if not even more important that (sic) the people delivering the message." "we really need to start making a difference in both shows."

I sent you an e-mail on September 26, 2005 as a follow-up to one of our strategy meetings, where I stated, "we talked about getting Kaity and Jim into the field and either enterprising some stories and/or reporting on some big ones. I still haven't seen any evidence of this. Where does this initiative stand?" Karen followed up with a phone call and stated that we didn't have enough crews to do. We finally started to occasionally do this in 2009 and in my opinion, it works, and we should do more of it.

On October 20, 2005 I sent Karen an e-mail stating that, "I'm deeply concerned about the direction of the News At Ten." And I stated, "Karen, ultimately you're the one responsible for the look, the ROI and the ratings of the newscast. And while I understand that you want to give John, Tim and Lauren as much freedom as possible, you need to over-see both," but in the mean time, we are routinely being beaten by both UPN and FOX and we have to change our destiny before it's too late."

On October 28,2005 I sent you an e-mail at 9:21am addressing the disappointing ratings from the 10pm show the previous night. I asked Karen to call because I stated in the e-mail, "I'd like to set up a meeting this afternoon to discuss the future." Karen did not respond to this e-mail on this date and I had to call her on Monday to follow-up.

On November 2, 2008 I met with Karen in my office. Here is the note that I put in the file..I met with Karen Scott on November 2 and informed her that "Her job was in jeopardy" given the current results of the news department. We discussed the extremely low ratings on the 10pm news and I explained to her that there was no room for excuses and that in spite of the lead-in we expected to do a higher number and expected to be the #2 news at 10pm and not the #3 news. I also explained to her that news was operating in a negative deficit mode and projected to operate similarly next year given the dismal numbers. I told her that while her job was not in jeopardy today, or in fact tomorrow, we needed to see an immediate correction in both the product and the numbers and needed to return to a profitable situation> I told her that she would be given time, but, not, all the time in the world. I suggested to her that she change her hours so that she is here throughout the late broadcast and that she re-examine all the people that are working for her to be sure that they are the right people to do the job. She said that she understood and that she would change her hours immediately and continue to look for changes and solutions to our product to orchestrate a quick turnaround.

On November 3, 2008 I sent an e-mail to Karen Scott and Noreen Lark regarding the weekend news numbers after a weekend where we had tremendous tune-out in our numbers and delivered a "0" in the last quarter hour of the Saturday telecast and a 0.1 in the Sunday telecast. It said the following, "people started watching, but then they tuned over to another station when they decided they didn't want to watch us anymore. We need to make these shows better so that they retain our audiences." "Please take a hard look at the product you're putting on the air and what causes people to tune-out."

CONFIDENTIAL

On November 19, 2008 I sent Karen my first e-mail regarding my concerns about Tim Armstrong as the Executive Producer (though we had already had several discussions about him). I stated, "We need to discuss a change at 10pm. While I really like Tim, the numbers are simply working against him. I'm afraid that we need to take these numbers seriously and move in a different direction."

On December 30, 2008 I sent Karen another e-mail regarding Tim Armstrong and it was titled, "we seriously need to talk about Tim." There was a protest right outside our building. I asked him if he was going to film it, he said no and I literally MADE him go outside and do it. He stated him "everyone was busy." He finally decided to send Peter (who did a great job) after we disagreed for several minutes. I stated in the e-mail that Tim "is not aggressive enough to win this war for us."

Karen did not move on Tim's dismissal until April 27, 2009 when I basically "demanded" that she do so. AT the point that Tim was dismissed, the news was delivering a 0.3 RA25-54.

On December 1, 2008 I sent a breakout of the November Late News ratings to Karen, John Houseman and Tim Armstrong, where we lost 42% of our ratings in A25-54 and finished behind WWOR in last place. My final words on that memo were, "Please let me know how you plan to change this devastating slide around."

On December 1, 2008 I sent a breakout of the November Morning News ratings to Karen, John Houseman and Amy Growick, where we lost 60% of our A25-54 ratings at 430am, 40% at 5am, 37% at 6am and 33% at 7am. I commented as follows, "Needless to say, this is devastating. I look forward to your "game plan" and your thoughts and ideas about what you're going to do going forward."

On December 12, 2008 I sent an e-mail to Karen, John Houseman and Tim Armstrong regarding the dismal performance of the previous evening's newscast. I also reminded them that WWOR beat us in November and they were in the process of killing us in December. In the memo I stated, "Let me be blunt...we are running out of time."

On February 17, 2009 I sent an e-mail to Karen and John Seminerio with the subject being: Growing our 10pm News Product It stated, "It is IMPERITIVE that we GROW our 10pm news product. We need to focus on growing our revenue as well as our AUR and can not accomplish this until we grow ratings." It went on to address the unacceptable level of technical errors in the 10pm show and stated that, "Every time human error is to blame for a problem, the person committing the error must be written up immediately." "We are on a quest to grow our ratings, increase our revenue and employ the best people possible who take pride in their work." If there are people that need additional training, we will train them. If however, they have been properly trained and are still making mistakes, we need to communicate that this is unacceptable. This way we will either make an effort to improve, or we will take the necessary steps to replace them."

On March 3, 2009 I sent an e-mail to Karen, John Houseman, Amy Growick, Tim Armstrong and John Seminerio with the subject: Being The Best. It said, "I am asking each of you to challenge yourselves and the people that report to you to RISE TO THE NEXT LEVEL. This means that breaking news must be covered thoroughly and immediately. This means that every map, graphic and crawl must be correct in both the information and the spelling. This means that technical errors must be avoided at all costs and all live shots must be in HD" You need to make sure that you have a staff that supports the goals and missions of the station, which is simply to GROW NEWS NUMBERS AND COMPETE ON A MUST HIGHER LEVEL THAN WE HAVE IN THE PAST...if you don't have people that either support this mission and/or are capable of supporting it (because of skill levels), then it is your job to manage them out and get the appropriate people here to support our quest to be the best. PLEASE, I can't stress this enough...we (including myself) are being held accountable (as we should)...."

WPIX000334

On March 11, 2009 I sent Karen, John Houseman, Amy and Tim Armstrong an e-mail that stating, "I would like to start producing a weekly (I believe that is should eventually be daily) Dr. Steve medical report to start airing in the 10pm news" "You guys need to decide how...who...when you want to get it done, but I'd like to start doing this sooner rather than later." Nothing was done at the time and Wil Surrat, the new EP at 10pm has started to work with Amy (after I spoke directly to him) to get these medical segments done and they are now airing on a quasi-regular basis.

On June 24, 2009 Karen was asked to write a letter to Kaity Tong regarding the short term renewal that we were offering her on her contract. Kaity was already on a limited, six moth renewal because we were in the process of conducting research to ascertain how the market views all of our talent as well as the other 10pm news talent. When Karen gave her the first six-month contract, she did not explain to Kaity that her renewal was going to be short term because the ratings were very low, we were going to evaluate the product, including her on-air performance and conduct some market research. She instead told Kaity her first short term renewal was because the company was in bankruptcy. At no time was she told to say this as this was not the reason for her short term renewal. After conducting market-wide research, we learned that Kaity did not resonate as well as other 10pm talent in the market and finished very low on the evaluation. After learning, however from Karen herself that Kaity was not given the proper explanation for her short term renewal previously, we decided to offer her another short-term, six-month contract. Karen was asked to write the performance letter that would accompany the contract. The letter was so poorly written that the meeting scheduled for that day had to be cancelled so that HR could re-write the letter.

Most recently, there have been huge issues in morning news regarding the leadership skills and ability of Amy Growick, the morning news producer. I was not made aware of how bad the situation was, how unhappy people were and the alleged lack of leadership and professionalism that was growing amongst the morning news staff. As the news director, I expected Karen to inform me of what was going on before it became a huge HR issue and before five people went to HR to complain about Amy's lack of leadership and professionalism. On July 30th I received an e-mail from Emily Frances, the morning entertainment reporter regarding an incident that had happened between herself and the EP. The e-mail was addressed to Karen Scott and Jean Maye and Emily forwarded it to me. It made some strong allegations about Amy's lack of leadership skills. I immediately asked Karen how she had followed up on the incident. She talked to Amy and gave me a write up the next day on Amy's version of the incident. I was surprised, however that she hadn't immediately pulled both of them into her office together and confronted the situation. In the mean time, Emily had come to my office two other times to further discuss the situation that seemed to be deteriorating downstairs. At the same time I learned of a situation that was escalating between Amy and John Muller. I had to instruct Karen to bring them both into her office and mediate the situation. On August 4, 2009 I sent Karen an e-mail that stated, "You have an obvious situation developing in your department between Amy and Emily which you will need to get a handle on." "It is now time for you to step in and take control of the situation." We are basically delivering a 0.4 demo rating, so the lack of professionalism needs to cease immediately and you will need to unite the troops down there in a true team effort to improve the show and bring in more viewers."

On August 7, Jean Maye met with Karen, Amy and Emily for a mediation and coaching session. One of the issues that came to light was that Emily went to Karen on several occasions regarding her concerns, Karen agreed that she did come to her and Karen stated that she just thought the situation would get better.

In conclusion, in the most recent ratings sweep, we delivered a 0.5 RA25-54 in the late news and averaged a 0.4 in the morning news. Karen has repeatedly been warned that her performance is not up to par and she and I had a conversation (outlined above) in November where I told her that her job in is jeopardy. She is not a pro-active manager. She seldom comes to me with thoughts and ideas for change unless I push her to do so. She has not build a support staff that appears

WPIX000335

capable of growing the product and reversing the ratings slide.  She seldom "rocks the boat," which is a fine management style of you are delivering ratings and revenue.

CONFIDENTIAL

WPIX000336

**REDACTED**

**Myrna Ramirez** | VP/Human Resources | Tribune Broadcasting
Phone: 312/222-4472 | Fax: 312/527-8556

**From:** Berlamino, Betty-Ellen
**Sent:** Wednesday, June 17, 2009 11:32 AM
**To:** Ramirez, Myrna
**Subject:** FW: PLEASE READ...IMPORTANT....ATTORNEY/CLIENT PRIVELEDGE

**From:** Berlamino, Betty Ellen
**Sent:** Thursday, June 11, 2009 12:14 PM
**To:** Wilson, Ed; Charlier, Steve
**Subject:** PLEASE READ...IMPORTANT....ATTORNEY/CLIENT PRIVELEDGE

ATTORNEY/CLIENT PRIVELEGED INFORMATION

I am a huge supporter of research, and certainly appreciate the fact that we were able to spend money gathering information that will help us make some future decisions....BUT, before we make some drastic changes, I think we need to closer look as some of the research because, in my opinion, a lot of it is ambiguous......

Since they weren't able to get a truly representative sample, a lot of the information was weighted (part of the problem we have with Nielsen).....

-82% of the respondents (un-weighted) were 35-54 and only 18% were 25-34...   Not ideal....
-18% of the persons interviewed were African American, yet 31% of the total 10pm market news audience is AA...   Not ideal....
-49% of the people interviewed are regular FOX5 10pm news viewers, 10% are PIX viewers and 6% are WWOR viewers...35% of the respondents watch something else, most "thinking" that ABC, NBC and CBS air news at 10pm!......   Not ideal...

I tried to dissect everything in a more simplistic form...........

Popularity among the PIX VIEWERS:
-Mr G.   "280"
-Jim Watkins   "256"
-Kaity Tong   "255"
-Howard Thompson   "211"
NOTE: Jim & Kaity are in a virtual tie amongst our viewers

Popularity among WWOR VIEWERS:
-Mr G   "279"
-Howard Thompson   "288"
-Kaity Tong   "227"
-Jim Watkins   "192"
NOTE:  This MAY be particularly important IF the rumor is true that FOX is moving this news to 11pm!!!!  These



EXHIBIT
Berlamino 14
3-2-2011

CONFIDENTIAL                    WPIX000478

viewers MAY be up for grabs!

Popularity among FOX5 VIEWERS:
-Mr G      "186"
-Howard Thompson      "163"
-Jim Watkins      "157"
-Kaity Tong      "139"

Popularity among AFRICAN AMERICAN VIEWERS:
-Mr G   "244"
-Kaity Tong      "234"
-Howard Thompson      "227"
-Jim Watkins      "207"

Now.....the tougher part that I think could be an issue.....

Layoffs/job-eliminations of on-air talent in the past year:

| Glen Thompson | W/M | 40+ |
| Sal Marchiano | W/M | 40+ |
| Cathy Hobbs | B/F | 40+ |
| Vanessa Tyler | B/F | 40+ |

Slated for elimination:   Larry Hoff   W/M   40+

(Plus, Mary Murphy W/F 40+ was downgraded)

Now, we all know that these changes were solely based on performance, but I am simply relaying the facts under the attorney/client privileged information allowance......

MY SUGGESTION???????????????????????????????????

-Let's let WII FIX THE SHOW first.....stacking, story selection, reporter presentation, writing, teases, etc.......... IN MY EXPERIENCE, this is THE MOST IMPORTANT THING WE COULD DO.....and the single most important factor in attracting viewers
-Let's change our promotion immediately....let's get the anchors OUT of the promos and let's a DO A MR. G promo and beef up our HMH promos....let's buy some regional cable and promote to certain areas and zip codes.....
-Let's extend Kaity's contract until the end of the year at a $350-$375 level and tell her that she doesn't test particularly well in the research, but we're going to let the show breath until the end of the year and if things don't dramatically improve, we are going to go in a different direction....
-If WWOR moves to 11pm, she MAY be an asset for us (at least according to the research)
-We reduce our costs immediately
-We let her leave with grace and dignity
-_we are honest and upfront
-We give ourselves time to identify our future prospects...if we think we've found "nirvana," we make a move faster and pay out Kaity's contract
-We are not reactionary, but rather, we give ourselves time to get it ALL right!
-BTW....both Marvel and John are under 40 and so is Jackie Hyland

No need to fire off an e-mail blasting me....a productive discussion would be appreciated....whether you agree with me or not, I am simply doing what I perceive to be my job and operating in the best interest of WPIX and Tribune.........therefore, I hope you see "the above" as it is intended to be presented.........

CONFIDENTIAL



| | |
|---|---|
| **From:** | Ramirez, Myrna |
| **To:** | Berlamino, Betty Ellen |
| **Sent:** | 8/24/2009 1:50:36 PM |
| **Subject:** | First crack at a script for Karen |
| **Attachments:** | Scott, K. Term Script.doc |

Betty Ellen,

Attached is a suggested script for Karen. I have the separation agreement as well. I'll send that later. Let's chat when you can. I'm in Chicago.

**Myrna Ramirez** | VP/Human Resources | Tribune Broadcasting
Phone: 312/222-4472 | Fax: 312/527-8556

CONFIDENTIAL

### *Script for termination meeting with Karen*

- Karen, this an extraordinarily difficult conversation for me to have you. We have worked together for many years and you know I value you as a friend and colleague. But, I think you know why we're having this conversation.

- Our ratings have continued to deteriorate with no end in sight. This hasn't happened overnight, but over time, and as you and I have discussed many times, ultimately, you are responsible for the look, the ROI and the ratings of the newscast.

- And today, given the economy and the challenges our industry faces, I can no longer sit back and let the slide continue.

- I have dreaded having this conversation with you, but it's not the first, although it is the hardest.

▪ ██ I have spoken to you time and time again about being more responsive, more proactive, etc. ████████

REDACTED

- For all these reasons I've decided that it's time for us to part ways, and that I have no choice but to terminate you employment.

- Nevertheless, in recognition of your long service here, we want to publicly take the position, if asked, that you voluntarily resigned/retired for personal reasons, as long as you're ok with this, and we'd like to offer you the severance package authorized by the bankruptcy court. [hand her the agreement and any other documentation] You will see the package gives you X weeks in salary and benefit continuation, and that as drafted, it states that your termination is really a resignation. It allows you 21 days from today to think it over.

- We were thinking that you actual last day worked would be [████ as this will give you time to wrap things up and have a proper goodbye, since everyone here will miss you, including me. I know this is a lot to digest, so why don't you take this package home with you tonight and let me know tomorrow if you are ok with calling this a resignation or retirement publicly.

- If you are, please just be mindful of the fact that this Agreement requires that you do not talk about it or its contents with anyone (except of course your immediate family and attorney) and do not publicly speak about the Station in a "disparaging" way while you are considering whether or not to sign it.

- I'm sure you have questions, and if I can't answer them, I will get the answers for you.

CONFIDENTIAL

WPIX004721

9/4

### Script for termination meeting with Karen

- Karen, this an extraordinarily difficult conversation for me to have you. We have worked together for many years and you know I value you as a friend and colleague. But, I think you know why we're having this conversation.

- Our ratings have continued to deteriorate with no end in sight. This hasn't happened overnight, but over time, and as you and I have discussed many times, ultimately, you are responsible for the look, the ROI and the ratings of the newscast.

- And today, given the economy and the challenges our industry faces, I can no longer sit back and let the slide continue.

- I have dreaded having this conversation with you, but it's not the first, although it is the hardest.

- I have spoken to you time and time again about being more responsive, more proactive, etc. [Betty Ellen –

REDACTED

- For all these reasons I've decided that it's time for us to part ways, and that I have no choice but to terminate you employment.

Nevertheless, in recognition of your long service here, we want to publicly take the position, if asked, that you voluntarily resigned/retired for personal reasons, as long as you're ok with this, and we'd like to offer you the severance package authorized by the bankruptcy court. [hand her the agreement and any other documentation] You will see the package gives you X weeks in salary and benefit continuation, and that as drafted, it states that your termination is really a resignation. It allows you 21 days from today to think it over.

We were thinking that you actual last day worked would be [date], as this will give you time to wrap things up and have a proper goodbye, since everyone here will miss you, including me. I know this is a lot to digest, so why don't you take this package home with you tonight and let me know tomorrow if you are ok with calling this a resignation or retirement publicly.

- If you are, please just be mindful of the fact that this Agreement requires that you do not talk about it or its contents with anyone (except of course your immediate family and attorney) and do not publicly speak about the Station in a "disparaging" way while you are considering whether or not to sign it.

- I'm sure you have questions, and if I can't answer them, I will get the answers for you.

CONFIDENTIAL

WPIX004722

# EXHIBIT E

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    10-CIV-4622(WHP)

5    --------------------------------------x

6    KAREN SCOTT,

7                    Plaintiff,

8            vs.

9    WPIX, INC.,

10                   Defendant.

     --------------------------------------x

11

12

                      March 24, 2011

13                    5:55 p.m.

14

15          Videotaped Deposition of JEAN MAYE,

16    held at the offices of Haynes and Boone, LLP, 30

17    Rockefeller Plaza, New York, New York, before

18    Francine Sky, a Notary Public of the State of New

19    York.

20

21

22

23

24

25

Jean Maye

1
2   Q.    Yes.
3   A.    450 33rd Street.
4   Q.    Is that in New York?
5   A.    It is.
6   Q.    How long have you been employed by
7   the Associated Press?
8   A.    Nine days.
9   Q.    What position do you have with the
10  Associated Press?
11  A.    Director of Human Resources.
12  Q.    Prior to being employed by
13  Associated Press, who was your employer?
14  A.    WPIX Tribune.
15  Q.    How long were you employed by WPIX?
16  A.    8-1/2 years.
17  Q.    Can you give me the approximate
18  dates of your employment with WPIX?
19  A.    February 22, 2002, to June 22nd or
20  23rd of 2010.
21  Q.    Was your employer WPIX or the
22  Tribune?
23  A.    The parent company is Tribune.  The
24  business unit is WPIX.
25  Q.    You were actually employed by WPIX;

Jean Maye

1
2   Department at WPIX and the Human Resources
3   Department at the Tribune?
4   A.    They were a corporate resource, so,
5   you know, if I needed information on benefits I
6   call the Benefits Department, if I needed --
7   pretty much that was it.  From a satellite
8   office, if I worked with Tribune Corporate
9   Human Resources, if you will, it would be more
10  on benefits.  I mean, or compensation or
11  attorneys, but those were pretty much the only
12  divisions.
13  Q.    Did the Tribune get involved in
14  employee matters on the WPIX level?
15  A.    Did they get involved?
16  Q.    Correct.  If you had an employee
17  that was either being terminated or being
18  hired, would you have to go to the Tribune and
19  talk to them about that issue?
20  A.    I wouldn't necessarily have to talk
21  to them -- it's a couple of different questions
22  you're asking.  If it was -- let's say if it
23  was a high level, because I had a dotted line
24  relationship to the head of HR for
25  Broadcasting.

Jean Maye

1
2   Q.    I'm sorry, who was that?
3   A.    Myrna Ramirez.  So as an FYI, I
4   might say, you know, This person is being
5   terminated, whatever.  It wasn't necessarily a
6   mandate, just as an FYI.
7         So in terms of -- the only other
8   thing we had to go through on hiring freezes, if
9   we wanted to hire someone when a freeze was in
10  place, we would fill out forms and it had to be
11  approved through corporate HR?
12  Q.    When, if at all, did the Tribune
13  Human Resources Department get involved in WPIX
14  employee matters?
15  A.    You know, again, you know, if it was
16  a high level kind of situation.  But, you know,
17  I was the head of HR for WPIX.  I managed Human
18  Resources for the staff, so corporate HR didn't
19  have responsibility necessarily to manage Human
20  Resources at WPIX.
21  Q.    Were there ever occasions where the
22  Tribune HR Department got involved in WPIX
23  employee matters without your involvement?
24  A.    Well, I guess, you know, outside of
25  the situation with Karen.

Jean Maye

1
2   instances?
3   A.    You know, we would have talent or --
4   specific example is a talent in an executive
5   producer employee relations issues.  You know,
6   work flow, interpersonal issues, one of the
7   parties saying they went to Karen to resolve it
8   and it didn't get resolved, so they escalated it
9   to Human Resources.
10  Q.    Do you recall how many employees
11  were under Karen's supervision?
12  A.    I don't have those rosters.
13  Q.    Can you give me a rough estimate?
14  A.    A hundred.
15  Q.    Would it surprise you if it was 150
16  to 200 people?
17  A.    Probably over the 8-1/2 years I was
18  there, sure.  The company went through several
19  downsizes.
20  Q.    I'm talking about at any one time
21  how many employees do you recall Karen having
22  supervisory responsibility over?
23  A.    Again, you're asking me to guess and
24  I'm not comfortable with guessing.
25  Q.    But it was more than a hundred or

Jean Maye

1
2  between August 26, 2009, and the date she
3  actually left the offices?
4        A.   I don't recall.
5        Q.   Did you speak with Ms. Berlamino on
6  August 26, 2009, about Karen's termination?
7        A.   I'm sure I did.  I can't remember
8  the contents, but I'm sure I did.
9        Q.   Do you recall any specific
10 conversation that you had with Ms. Berlamino
11 about Ms. Scott's termination?
12       A.   I can't recall the conversation.  I
13 mean, I was shocked, so I'm sure I probably
14 said something like, Oh, my gosh, what happened
15 or something.
16            But I cannot recall it all for you
17 what the conversation was.
18       Q.   Prior to the time that Ms. Ramirez
19 advised you that Ms. Scott was being
20 terminated, did it ever come to your attention
21 that Ms. Scott was -- strike that.
22            Prior to the time that Ms. Ramirez
23 told you that Ms. Scott was being terminated,
24 did it ever come to your attention that
25 Ms. Scott's job may be in jeopardy?

Jean Maye

1
2        A.   I think it was implied, but, you
3  know -- I think it was implied, I think
4  frustration was implied.
5        Q.   I'm talking about before that date,
6  August 26, 2009, did anyone ever tell you that
7  Ms. Scott may be terminated?
8        A.   In those words, no.
9        Q.   Did anybody ever tell you before
10 August 26, 2009, that Ms. Scott's job status is
11 in peril or is in jeopardy?
12       A.   Anybody ever tell me that?  Again, I
13 think it was implied.  I just can't remember if
14 someone said those exact words that you just
15 mentioned.
16       Q.   Or words to that effect, did
17 anybody ever tell you words similar to the fact,
18 before August 26, 2009, that Karen Scott may be
19 fired or she may lose her job?
20       A.   I don't recall.
21       Q.   And when you say it was implied,
22 tell me what you mean by that, how was it
23 implied?
24       A.   I think it was implied just by the
25 frustration of the numbers, you know, the

Jean Maye

1
2  ratings and, you know, just not being able to
3  turn around that News product.
4        Q.   For what period of time do you
5  recall there being a frustration about the
6  ratings?
7        A.   I mean, it was frustrating for a
8  while because the numbers were low.  But I think
9  -- you know, I guess -- so if Karen was
10 terminated in August, I would say the
11 frustrations really started heating up, I don't
12 know, maybe -- maybe the spring, maybe the end
13 of the winter/spring.
14       Q.   Of 2009?
15       A.   Was that the year that she was
16 terminated?
17       Q.   She was terminated August 26, 2009.
18       A.   Yeah, so again, this is all
19 guesstimate.
20       Q.   Were you involved in the meetings
21 where promotional efforts for the News were
22 discussed?
23       A.   Promotional efforts?
24       Q.   Promotional.  I'm sorry, I have a
25 cold.  My words are getting lost.

Jean Maye

1
2  distribution list with respect to ratings?
3        A.   No.
4        Q.   Do you know why you received this
5  document?
6        A.   Well, yeah, because, again, we
7  would get ratings -- what I was talking to you
8  about was daily ratings.  As you can see, my
9  name is here so -- for the most part, the
10 people that get daily ratings would get this
11 kind of an analysis.
12       Q.   Got you.  Basically, any sort of
13 summary or other item that Mr. Schussel or his
14 department was putting up about ratings you
15 would be on the distribution list for?
16       A.   Yes.
17       Q.   To the best you can recall, how did
18 it come to your attention, aside from looking
19 at the daily or weekly ratings reports, that
20 there was a growing frustration with ratings?
21       A.   Again, on our weekly staff meetings,
22 we discussed ratings.
23       Q.   Overall, what was your opinion of
24 Karen Scott's job performance?
25            MS. CABRERA:   Objection.

Page 46

```
 1               Jean Maye
 2          You can answer.
 3      A.    My opinion mirrors the list that I
 4  gave you in the beginning of the deposition.
 5      Q.    Well, I think the list you gave me
 6  were issues that came to your attention
 7  regarding her performance.  But I'm talking
 8  about overall, do you feel she did a good job
 9  as a News Director, bad job, no opinion
10  whatsoever?
11      A.    My opinion mirrors the list I gave
12  you.
13      Q.    Again, that list was not your
14  opinion, that list were issues that came to your
15  attention regarding her performance.  I'm asking
16  overall --
17      A.    And I agree.  I agree.
18      Q.    Do you feel that overall she did a
19  good job as News Director, a bad job, you don't
20  have any opinion?
21      A.    I don't have an opinion.
22      Q.    Did people respect Karen?
23          MS. CABRERA:    Objection.
24          You can answer.
25      A.    I think with any organization, I
```

Page 48

```
 1               Jean Maye
 2  it.
 3          (Witness reviews document.)
 4      A.    I'm finished.
 5      Q.    Do you know what the Edward R.
 6  Murrow Award is?
 7      A.    Yes.
 8      Q.    To your understanding, what's that
 9  award?
10      A.    Awards that's given out in the
11  broadcasting industry for excellence in
12  broadcasting.
13      Q.    In general, did Ms. Berlamino place
14  any importance on the News Division receiving
15  awards?
16          MS. CABRERA:    Objection.
17          You can answer.
18      A.    I mean, you know, it was good, it
19  was nice, it was a motivator, but it wasn't a
20  driving factor that we have to go get awards.
21  So no, I mean, it wasn't a driving force to our
22  business.
23      Q.    Did you agree with Ms. Berlamino's
24  assessment that this award was the most
25  prestigious award in journalism?
```

Page 50

```
 1               Jean Maye
 2      Q.    And were you given, aside from the
 3  Separation Agreement, any documents in
 4  connection with Ms. Scott's termination?
 5      A.    No.
 6      Q.    At any point did Ms. Berlamino tell
 7  you when the decision to terminate Ms. Scott had
 8  been made?
 9      A.    Could you repeat that?
10          (The record was read.)
11      A.    No.
12      Q.    At any point before August 26, 2009,
13  did you personally have any opinion that
14  Ms. Scott was going to be terminated?
15      A.    At any time during 2009?
16          MR. RUBINSTEIN:    Fran, could you
17  please read back the question?
18          (The record was read.)
19      A.    I had an opinion that the new
20  leadership that came in, perhaps, wasn't, you
21  know, very pleased.
22      Q.    When did new leadership come in?
23      A.    I think probably sometime in 2008 is
24  when -- don't ask me when.  I have no idea.
25      Q.    When you say they weren't pleased,
```

Page 51

```
 1               Jean Maye
 2  with Ms. Scott or things in general?
 3      A.    Both.
 4      Q.    And why did you have the opinion
 5  they weren't pleased with Ms. Scott?
 6      A.    Just sort of analysis of, you know,
 7  that was done, and questions that were asked,
 8  and, you know, the time spent, you know, at the
 9  Business Unit.
10      Q.    And can you tell me what questions
11  that were asked in particular you're referring
12  to?
13      A.    I remember being at a -- we were in
14  negotiations, union negotiations, and I just
15  remember someone asking Karen about the contract
16  and asking Karen about work practices and, you
17  know, just sort of lots of questions, and just,
18  you know, not necessarily receiving a detailed
19  or career kind of an answer.
20          And in my opinion, it just seemed --
21  it was just frustrating.
22      Q.    Anything else you can recall that
23  led you to form an opinion that the new
24  management was looking to make changes?
25      A.    Well, changes were being made all
```

Page 53

Jean Maye

1
2      A.      Just what I've just shared with
3  you.
4      Q.      Were you ever asked to review
5  Karen's personnel file in connection with her
6  termination?
7      A.      Was I ever asked?
8      Q.      Yes.
9      A.      No.
10     Q.      To the best of your recollection,
11 was there anything in Karen's personnel file
12 that reflected negatively on her performance?
13     A.      In my 8-1/2 years, no.
14     Q.      Are you familiar with Performance
15 Improvement Plans?
16     A.      I am.
17     Q.      And tell me what your understanding
18 of the Performance Improvement Plan is?
19     A.      That an employee is given an outline
20 of the things they're not doing, that's then
21 detailed about what needs to be done to improve
22 their time, improve their performance and/or
23 behavior, and they have a time period in which
24 to do so.
25     Q.      Do you know if any Performance

Page 79

Jean Maye

1
2      Q.      So you don't know what this sentence
3  refers to?
4      A.      I don't.
5      Q.      You can put it away.
6              While you were Director of Human
7  Resources did anybody ever make any complaints
8  to you about Ms. Berlamino's conduct?
9      A.      No.
10     Q.      While you were the Director of Human
11 Resources at WPIX, did anyone ever tell you
12 that Ms. Berlamino made inappropriate comments
13 about people's age?
14     A.      No.
15     Q.      While you were with WPIX, did
16 anybody ever remark to you that they had issues
17 with Bill Carey's conduct?
18     A.      Yes.
19     Q.      Tell me who lodged any complaints
20 with you about Mr. Carey's conduct?
21     A.      Emily Francis.
22     Q.      Anyone else?
23     A.      Who lodged a complaint to me?
24     Q.      About Mr. Carey's conduct.
25     A.      She was the only one that came to

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK.

KAREN SCOTT,                          )

     Plaintiff,                    )

     Vs.                           ) No. 10 CV 4622

WPIX, INC.,                          )

     Defendants.                   )


    The discovery deposition of STEVEN CHARLIER, taken in the above-entitled cause, before Angela C. Loisi, a notary public of Cook County, Illinois, on the 29th day of March, 2011, at the hour of 11:02 at 321 North Clark Street, Suite 800, Chicago, Illinois, pursuant to notice.

               (Proceedings ended at
               1:15 p.m.)


Reported by:  Angela C. Loisi, CSR, RPR

License No:  084-004571

Page 6

1      A. Correct.
2      Q. Is that a uni- -- Tribune Broadcasting?
3      A. It's not.
4      Q. Do you know who owns Local TV, LLC?
5      A. Oak Hill Capital Partners.
6      Q. What, if any, affiliation is there
7   between Local TV, LLC and Tribune Broadcasting?
8      A. There's a management services agreement
9   to share my job duties.
10     Q. Do you have a separate title with Local
11  TV, LLC?
12     A. Same.
13     Q. And how long have you been the senior
14  vice president of news operations?
15     A. Roughly three years and two months.
16     Q. So you began, if my math is correct,
17  sometime in early 2008?
18     A. Correct.
19     Q. And what, if any, employment did you
20  have before that time?
21     A. I was the VP of news and operations for
22  KOVRKMAX in Sacramento.
23     Q. And how long did you hold that position?
24     A. Three years, roughly three years.

Page 9

1      Q. And where?
2      A. Several freelance TV positions.
3      Q. And what's the --
4      A. All over the country.
5      Q. For how long did you do freelance work?
6      A. Off and on through college, roughly
7   three and a half years.
8      Q. Where did you attend college?
9      A. University of Iowa.
10     Q. And did you graduate?
11     A. Yes.
12     Q. In what year?
13     A. '92.
14     Q. What was your degree?
15     A. Broadcast communications.
16     Q. Can you describe for me what your duties
17  are as a senior vice president of news and
18  operations for the Tribune?
19     A. I work with -- between the -- with
20  Tribune, I work with all of their television
21  stations affiliations, with an emphasis on news,
22  growing news ratings, finding operational
23  efficiency.
24        I am responsible for writings growth,

3 (Pages 6 to 9)

Page 10

1   and partially responsible for making sure we
2   stay on the air and providing good product.
3       Q. In 2008 approximately, or if you know
4   the exact number, how many TV stations were you
5   responsible for?
6       A. Roughly 42 call letters total between
7   the two companies.
8       Q. Explain to me what a call letter is.
9       A. KOVRK max is a call letter, so those
10  would be two. So the call letter is assigned to
11  each transmitter.
12      Q. So when you say call letter, do you mean
13  individual station?
14      A. Individual stations with separate
15  transmitters, yeah. Some are duopoly, so they
16  might be in the same facility or building, but
17  they are separate stations with separate
18  product.
19      Q. So approximately 42 stations?
20      A. Yes.
21      Q. And currently how many stations are you
22  responsible for?
23      A. I believe it's the same.
24      Q. Was WPX one of those stations you had

Page 11

1   responsibility over in 2008?
2       A. Yes.
3       Q. At the time you became the senior vice
4   president of news and operations, who was the
5   general manager of WPIX?
6       A. Betty Ellen Berlamino.
7       Q. And who is currently the general
8   manager?
9       A. Eric Meyrowitz.
10      Q. Do you know when Ms. Berlamino left the
11  employment of WPIX?
12      A. It was the end of 2010.
13      Q. And why did she leave, if you know?
14      A. It was a separation agreement between
15  Betty Ellen and the company.
16      Q. Did she leave voluntarily or was she
17  asked to leave?
18      A. I don't know the details.
19      Q. Were you involved in discussions that
20  led to her separation?
21      A. Yes.
22      Q. And what were the details surrounding
23  her separation, why did she leave?
24      A. It's my understanding that she and my

Page 13

1   station and her job.
2       Q. And what's your understanding as to why
3   the station did not want her to stay?
4       MR. CERASIA: Objection. You can answer.
5       THE WITNESS: Performance.
6   BY MR. RUBINSTEIN:
7       Q. And what performance issues are you
8   aware of?
9       A. That would be ratings and revenue.
10      Q. Have you ever seen her administration
11  agreement?
12      A. No.
13      Q. Are you aware if Ms. Berlamino made any
14  claims against the station surrounding her
15  termination?
16      A. I'm not aware of anything.
17      Q. I'm sorry, the person who took over is
18  named Eric Meyrowitz?
19      A. Meyrowitz, yes.
20      Q. Meyrowitz.
21      In your position as the senior vice
22  president of news and operations, what oversight
23  do you have over WPIX?
24      And let's deal with 2008. When you came

4 (Pages 10 to 13)

**Page 14**

1 in, what oversight did you have over WPIX?
2    MR. CERASIA: Objection, form.
3      You can answer.
4    THE WITNESS: It's a role of consultant,
5 provide ideas, motivation, growth opportunities.
6 Ultimately by my boss, held accountable for
7 ratings growth and the company as it pertains to
8 news.
9 BY MR. RUBINSTEIN:
10    Q. Who was your boss in 2008?
11    A. Ed Wilson.
12    Q. And when did Mr. Kersting become your
13 boss?
14    A. Approximately a year ago.
15    Q. And let's deal with 2008 and 2009,
16 because that's more of what's important to us
17 here.
18      Was Mr. Wilson your boss in 2008 and
19 2009?
20    A. Yes.
21    Q. Do you know what his title was in 2008
22 and 2009?
23    A. I believe he was president of Tribune
24 Broadcasting. I don't know things...

**Page 15**

1    Q. Was Mr. Wilson the person that you
2 directly reported to?
3    A. Yes.
4    Q. In 2008 and 2009, which office did you
5 work out of, what location?
6    A. The Tribune Tower.
7    Q. In Chicago?
8    A. Yes, and I shared an office in Fort
9 Wright, Kentucky with Local TV.
10    Q. Why did you have an office in Kentucky?
11    A. Because of my role with both companies,
12 there were occasions that I would work a day or
13 so out of their corporate office, and a day or
14 so out of his corporate office.
15    Q. Is Oak Hill's offices in Kentucky?
16    A. It would be Local TV, not Oak Hill.
17    Q. That's what I meant.
18      Is Local TV's offices in Kentucky?
19    A. Yeah.
20    Q. What does Local TV do?
21    A. They're a television broadcasting
22 company, media company.
23    Q. And just so I understand how they work
24 within the Tribune, do they provide a management

**Page 16**

1 services over the TV stations for the Tribune?
2    A. No.
3    Q. So can you explain to me what they do on
4 behalf of the Tribune?
5      I know you said they were management
6 services, can you explain to me what they do?
7    A. Separate ownership from Tribune,
8 separate finances. There were few roles within
9 the company, news, operations, engineering that
10 some programming roles that the two groups share
11 in an effort to share resources, gain leverage
12 and negotiations, share ideas.
13    Q. Does Local TV also service other
14 broadcasting companies aside from the Tribune,
15 or are they just working for the Tribune?
16    A. They don't work for the Tribune.
17    Q. I'm sorry, do they have a management
18 agreement with other companies, or is it just
19 solely with the Tribune?
20    A. Just with Tribune, as far as I know.
21    Q. What did you understand your
22 responsibilities to be with respect to WPIX?
23    A. At the time that I came to WPIX was to
24 get to know the people at the station, evaluate

**Page 17**

1 the station, and help grow the ratings, which
2 would in turn help grow the revenue.
3    Q. And that started right away when you
4 assumed the position as senior vice president in
5 early 2008?.
6    A. As far as my job description overall,
7 yes, but I wasn't spending a lot of time at PIX
8 early on.
9    Q. Do you recall when you started to spend
10 some time at WPIX?
11    A. Later in 2008.
12    Q. Can you describe for me what you did to
13 try to get to know what was going on with
14 respect to WPIX?
15      What did you start doing to become
16 integrated?
17    A. I pursued visits. We took tours of the
18 station, spent time with Betty Ellen, the
19 general manager. Karen was the news director, a
20 gentleman named Mike you know as the chief
21 engineer.
22      Evaluated the on-air product, the
23 technical product behind the scenes.
24    Q. And let's start from late in 2008 when

5 (Pages 14 to 17)

Page 18

1  you indicated you started to become more
2  involved there.
3      How often would you go to visit WPIX?
4      A. Maybe once every month or two months,
5  probably closer to once every two months.
6      Q. And when you weren't on site, what did
7  you do to keep abreast of what was going on
8  there?
9      A. I have the opportunity to watch their
10  broadcasts, either streaming on line or follow
11  their overnight ratings.
12      Q. How often would you watch the broadcast?
13      A. Not regularly. I would say once every
14  month or so you would check it and look at some
15  of the product.
16      Q. And would that be all the broadcast that
17  WPIX was doing?
18      A. No.
19      Q. Would you watch all the shows they were
20  broadcasting?
21      A. No.
22      Q. So what would you watch approximately
23  once a month?
24      A. You would take a look at a time period,

Page 19

1  whether it was the morning show or late news. I
2  had the WPIX broadcast in my office here in
3  Chicago.
4      Q. And you had it in 2008 and 2009?
5      A. Yeah.
6      Q. Who, if anyone, was your main point of
7  contact in WPIX in 2008 and 2009?
8      MR. CERASIA: Objection. You can answer.
9      THE WITNESS: Betty Ellen Berlamino.
10  BY MR. RUBINSTEIN:
11      Q. And with what regularity did you
12  communicate with Ms. Berlamino?
13      A. I would say monthly, and then more
14  frequently into 2009.
15      Q. Was there any set meeting or call you
16  had with Ms. Berlamino?
17      A. Not at -- no, not a set scheduled call.
18      Q. Was there any particular reporting that
19  she was required to give you?
20      A. No.
21      Q. Was there any reporting you got on a
22  regular basis from anyone at WPIX?
23      A. Only when I asked for something, and
24  then regular would be overnight television

Page 20

1  ratings.
2      Q. Did you receive the overnight ratings on
3  a daily basis?
4      A. Yes.
5      Q. Did you also receive monthly reports?
6      A. Monthly ratings reports, and I would
7  have an opportunity to look at revenue reports
8  as well.
9      Q. And who provided you with those reports?
10      A. Came through the finance off of Tribune
11  Broadcasting.
12      Q. The monthly ratings reports were given
13  to Tribune Broadcasting?
14      A. The ratings reports were overnight, and
15  then sweeps months, or specific months, those
16  would come through a research department within
17  Tribune Broadcasting.
18      Revenue reports I could request, or I
19  would get them occasionally through -- on a
20  monthly or quarterly basis through the finance
21  department of Tribune Broadcast.
22      Q. Was there anyone at WPIX that was
23  sending you regular reports?
24      A. No.

Page 21

1      Q. Did you get reports -- strike that.
2      Do you get rating reports from Steve
3  Silver?
4      A. Yes. Occasionally he would put together
5  a breakdown of their numbers, or a -- notes from
6  a specific night and forward them.
7      Q. Did he provide you with monthly rating
8  reports?
9      A. I don't -- I didn't get them regularly I
10  don't believe.
11      Q. Did you ever request them from him?
12      A. I did.
13      Q. Were you involved in personnel decisions
14  at WPIX?
15      A. Yes.
16      MR. CERASIA: Objection to form.
17      THE WITNESS: Yes.
18  BY MR. RUBINSTEIN:
19      Q. On all levels?
20      A. No.
21      Q. On what level would you be involved with
22  personnel decisions?
23      A. In respect to news and operations.
24      Q. And with respect to news and operations,

6 (Pages 18 to 21)

Page 25

```
 1      Q. Let's deal with 208.
 2      MR. CERASIA:  Objection, form...
 3      THE WITNESS:  In 2008, in respect to this
 4   E-mail or in general?
 5   BY MR. RUBINSTEIN:
 6      Q. In general with WPIX?
 7      A. More as a consultant to help and provide
 8   leadership or guidance in recruiting opinions.
 9      Q. If Ms. Berlamino wanted to hire or fire
10   a department head, did she need your approval?
11      A. No.
12      Q. And so looking at the first page of this
13   E-mail chain, if you will turn to it, there's an
14   E-mail from Ms. Berlamino to you on November 20
15   in the middle of the page, and the middle of
16   that E-mail, there's a paragraph that reads we
17   spoke to Brian Applegate for the morning job,
18   and he turned us down, but maybe night is
19   better.
20      I just need to get with an HR person on
21   this because there's nothing in Tim's file.  I
22   really can't point to anything that he's doing
23   wrong, and we'll need to come up with an exit
24   package, because we have no, open quote, real
```

7 (Pages 22 to 25)

Page 28

1    Ms. Scott as of November of 2008?
2       A.  Around this time we would have met
3    during my visits to the station.  I believe
4    there would -- we probably would have had some
5    newsroom setting meetings, whether they be
6    morning meetings or in the afternoon, or with
7    the managers.
8          We have had one-on-one meetings and
9    would have met with Ms. Berlamino, the three of
10   us.
11      Q.  Do you recall any specific meetings with
12   Ms. Scott as of November of 2008?
13      A.  I'm sure we had them, but I couldn't
14   recall anything specific.
15      Q.  Do you recall the first time you met
16   Ms. Scott?
17      A.  Yes.
18      Q.  And do you recall when that was?
19      A.  I couldn't tell you the date, no.
20      Q.  With what frequency did you communicate
21   with Ms. Scott?
22      MR. CERASIA:  Objection.  As to what time
23   period?
24   BY MR. RUBINSTEIN:

Page 27

1    other candidates out there who could focus on
2    the morning news and recommend some names.
3       Q.  Did you have any opinion one way or the
4    other in 2008 as to whether Mr. Armstrong should
5    be retained?
6       A.  No.
7       Q.  Do you recall any discussion with
8    Ms. Berlamino about Mr. Armstrong's retention in
9    November of 2008?
10      A.  Yes.
11      Q.  And what do you recall about those
12   discussions?
13      A.  That Ms. Berlamino and Ms. Scott were
14   not satisfied with the ratings, and that they
15   were thinking about making a change at that
16   point.
17         I had watched the morning news and felt
18   that there were things that we could do better,
19   but at that point, had never met Mr. Armstrong.
20         So from my standpoint it was a -- if I
21   can help you fill a position if there's an
22   opening, let me give you some names or make
23   other recommendations.
24      Q.  What interactions did you have with

Page 29

1       Q.  Let's deal with 2008.
2       A.  At that time it would have been weekly
3    conference calls that we initiated with all the
4    news directors and the company.
5          Occasional calls to check in with the
6    market, and occasional visits.
7       Q.  Did you have E-mail communications with
8    Ms. Scott?
9       A.  Yes.
10      Q.  On what base -- on what consistency,
11   what frequency?
12      A.  You know, I couldn't tell you.  If
13   not -- not -- I wouldn't say on a daily basis.
14   Some weeks if there was a specific story or an
15   issue more frequently, other times not.
16      Q.  And what was the general subject matters
17   of your E-mails with Ms. Scott?
18      A.  Ratings, quality of news cast, maybe if
19   there was a talent or a management opening,
20   something like that.
21              (Whereupon, Steven Charlier
22              Deposition Exhibit No. 2
23              was marked for
24              identification.)

8  (Pages 26 to 29)

Page 30

1    BY MR. RUBINSTEIN:
2         Q. Mr. Charlier, this document is marked
3    Charlier 2 for identification.  It is two pages,
4    Bates Numbered WPIX 478 and 479.
5         A. Mm-hmm.
6         Q. It's a couple of E-mails from June of
7    2009.
8             I ask you to take a look at the E-mail
9    that starts on the bottom of the first page from
10   Ms. Berlamino to yourself and Ed Wilson on
11   June 11, 2009, and let me know when you're
12   finished reviewing it.
13        A. Okay.
14        Q. Do you know what led Ms. Berlamino to
15   send this E-mail to you on June 11?
16        A. Yes.
17        Q. And what was that?
18        A. Likely a discussion about a research
19   project that we had just -- I believe it was
20   already back from the field at that point, and
21   several conversations about improving ratings on
22   both the morning and the late news at PIX.
23        Q. What research project are you referring
24   to?

Page 31

1         A. It was a quantitative study, overall
2    station news study about viewer attitudes toward
3    their content, as well as quantitative
4    information on our current talent at the
5    station.
6         Q. And on the second page in particular
7    Ms. Berlamino refers to certain layoffs or job
8    eliminations over the past year, and she
9    indicates, I think five or six people and their
10   ages.  Do you see that?
11        A. I do.
12        Q. Did you have any discussions with her
13   about the layoffs and job eliminations she's
14   referring to?
15        A. Yes.
16        MR. CERASIA:  Objection, but --
17   BY MR. RUBINSTEIN:
18        Q. And what, if any, discussion did you
19   have with Ms. Berlamino about the ages of the
20   people who were being laid off or job
21   eliminated?
22        A. We were -- it was -- as part of the
23   recession, and as Tribune was in bankruptcy, we
24   went through a series of expense reductions in

Page 32

1    our major markets.
2             We had asked PIX to put together a plan
3    for staffing eliminations, expense reductions.
4    And it appears, I believe, those were some of
5    the people who were terminated early on, some
6    may have been as a result of the staff
7    protections, others may have been a result of
8    changes in talent.
9             And her concern was that through those
10   reductions we had terminated enough members of
11   the staff that were over 40 that she was
12   concerned that there might be a fear of some
13   litigation if we were perceived to have been
14   laying off people that were at a protected
15   class, 40 plus.
16        Q. And the people that you list here, and
17   there's one, two, three, four -- six people.
18            Were these people either laid off or job
19   eliminated because of expense reductions?
20        A. Some I believe were.
21        Q. So let's just go through them, because I
22   have got many.
23            What was your understanding with regard
24   to Glen Thompson?

24 Seven Discovere
(312) 704-0247

Page 36

1  it took a producer, a live truck operator, a
2  photographer and Mr. Huff, so it was fairly
3  expensive to do the feature live shots.  And it
4  wasn't necessarily, in our belief, or at least
5  my belief, and I think Betty Ellen shared this
6  and Karen at the time, that it wasn't the
7  biggest ratings drive for the morning news.
8       So it was a combination I guess of
9  circumstances.
10      Q.  And what about Ms. Murphy, what was the
11  situation with her?
12      A.  Mary Murphy?
13      Q.  Yes.
14      A.  She had a contract that was coming up,
15  had been a weekend anchor.  I don't recall at
16  that point if she was still anchoring or not, a
17  contract that was coming up, and I believe there
18  was a discussion going on as to whether she
19  would remain an anchor, or she would go back to
20  a peer reporting role at the station.
21      Q.  And it indicates at least in this E-mail
22  she was downgraded, do you know what she was
23  downgraded from?
24      A.  I believe she was the weekend anchor at

Page 35

1  discussed possibly eliminating from a staff
2  production standpoint.
3      Q.  As of June 2009, do you know if she was
4  still employed by WPIX?
5      A.  I don't recall.
6      Q.  What about Mr. Tyler, what was the
7  situation with her?
8      A.  I don't recall who Vanessa Tyler was,
9  you would have to remind me if she was a
10  reporter or she was a producer.
11      Q.  Well, this is -- I am looking for your
12  information and knowledge --
13      A.  Then I don't recall.
14      Q.  Okay.  And what about Mr. Huff, do you
15  recall what the situation was with Mr. Huff was?
16      A.  Larry Huff?
17      Q.  Yeah.
18      A.  As we were looking at the -- again, the
19  quality of the content, the ratings performance
20  and the expense, we had a discussion during the
21  expense reductions whether it was the best way
22  for us to spend our money to do the feature live
23  shots that might not have been drawing viewers.
24      Every time we did a Larry Hoff live shot

Page 37

1  the time.
2      Q.  And what was she before that?
3      A.  I don't know.
4      Q.  Do you know what Ms. Berlamino's
5  referring to when she says that Ms. Murphy was
6  downgraded?
7      A.  You're on Page 1?
8      Q.  No, on the second page, right in the
9  middle there's the --
10      A.  Salary -- I believe it was a salary
11  reduction.
12      Q.  Not a position reduction?
13      A.  I don't recall at the time.  I know at
14  one point she was the weekend anchor, and then
15  was moved to a reporter-only position.
16      It may have been at that time the
17  position and the salary, but I don't recall.
18      Q.  Mr. Charlier, in your opinion, what are
19  the factors that are important to generating
20  ratings?
21      MR. CERASIA:  Objection to form.
22      You can answer.
23      THE WITNESS:  The key factor is relevant
24  content.

10 (Pages 34 to 37)

Page 38

1    BY MR. RUBINSTEIN:
2       Q. That would be the content of the show?
3       A. Mm-hmm.
4       Q. I'm sorry, you have to say yes or no.
5       A. Yes.
6       Q. What are other key factors?
7       A. Relevant content, breaking news
8    coverage, quality of the on-air performers, the
9    promotion that surrounds the product.
10      Q. Anything else?
11      A. There are a long list of little things,
12   but those are the key factors that were --
13   there's a -- blocking and tackling which we
14   would call -- which would be meter strategy,
15   where you place your commercial breaks,
16   research, monitoring the Nielsen sample, make
17   sure we're getting credit for all the meters in
18   the market, targeting a specific audience
19   through the content choices we make in an effort
20   to help grow those specific ratings or
21   demographics.
22      Q. What importance, if any, does lead-in
23   programming have on the news?
24      A. I would say it's important, but becoming

Page 39

1    less relevant by the day.
2       Q. And why is that?
3       A. Because of computers, BlackBerries,
4    iPads, our viewers have a lot of ways to find
5    entertainment programming, so they no longer
6    appointment view three stations at night, and
7    then stick with whatever comes on next.
8       Q. You say it's becoming less relevant.
9    How relevant in your opinion was it in 2008?
10      A. Very much declining at that time as
11   compared to what it would have been in the
12   1990s, even more from the 80s, 70s, 60s, et
13   cetera.
14      Less relevant at that time, but it's
15   always good to have -- a good lead in is a great
16   benefit, but not necessarily to have a
17   successful newscast.
18      Q. And let's deal with the time period that
19   you're more involved with WPIX that's relevant
20   to us, which I would say is late 2008 through
21   summer of 2009.
22      Do you recall what the ratings for the
23   lead-in programming for the news was in that
24   time period?

Page 41

1    And I felt that as a general manager you needed
2    to prioritize what her promotional priorities
3    were with the station so that we could create a
4    cohesive plan to grow in those priority areas.
5       Q. Do you know who was the head of the
6    promotional department?
7       A. John Ziegler.
8       Q. Is he still the head of the promotional
9    department today?
10      A. Yes.
11      Q. And let's just take the other factors
12   that you mentioned, which was relevant -- one
13   which was relevant content.
14      What was your opinion as to the relevant
15   content for the evening news again from late
16   2008 through summer of 2009?
17      A. You're talking -- when you say evening
18   news, you're talking about the 10:00 p.m.
19   newscast?
20      Q. Yes, I'm sorry.
21      A. It could have been much more relevant.
22      Q. And what about with respect to the
23   breaking news coverage?
24      A. I -- in my opinion we weren't in the

11 (Pages 38 to 41)

Page 42

1   breaking news game at all.
2       Q. And with respect to on-air performance,
3   what was your opinion of the on-air performance.
4       A. Our talent was under performance -- they
5   were very poor.
6       Q. And let's flip now to the morning news.
7   With respect to the morning news, what was your
8   opinion as to the promotional efforts?
9       A. Not strong.
10      Q. Was it the same as you mentioned --
11      A. Probably the same, yeah.
12      Q. And with respect to the content and the
13  on-air performance, was that the same opinion
14  you had of the evening news?
15      A. Slightly better in the morning than the
16  evening.
17      Q. In what way?
18      A. I think our talent was stronger, and we
19  were a little more creative in how we produced
20  the content in the morning than in the late
21  news.
22      Q. And with respect to -- strike that.
23      Was that a factor with respect to the
24  morning news?

Page 44

1       A. Very little.
2       Q. And what, if anything, did Mr. Ziegler
3   have to do with lead-in programming?
4       A. He could have an effect through
5   promotion.
6       Q. And with respect to the promotions, who,
7   if anyone, did you discussed promotional efforts
8   with at WPIX?
9       A. Betty Ellen, Karen and John.
10      Q. What, if anything, did Karen have to do
11  with the promotional efforts?
12      A. Karen and I had spoke about increasing
13  promotion for news, and I had also spoke with
14  Karen about building a better relationship with
15  John Ziegler. It didn't seem like the creative
16  department and the news department were talking
17  as much as I would like.
18      And then I was also critical of Karen
19  and her department about providing better
20  content for the creative department to promote.
21  So it's a give and take, they both have to...
22      Q. Was there a cause associated with
23  promotional efforts?
24      A. Yes, off air.

Page 45

1       Q. I'm sorry?
2       A. Off-air promotion there is.
3       Q. Do you know who was responsible for
4   allocating funds for off-air professional
5   efforts at WPIX?
6       A. I believe it would have been Betty Ellen
7   Berlamino.
8       Q. Did you ever have any discussion with
9   her about the amount of funds allocated for
10  off-air promotional efforts?
11      A. Not a lot at that time. We were mostly
12  concerned with the content and whether it was
13  ready to promote.
14      There were some discussions about what
15  the budget -- during budget time what we were
16  allocating for specific periods in the plan, and
17  whether we would need to increase those.
18      But as we described, there was a process
19  that we wanted to like our content better before
20  we promoted it stronger.
21      And I had expressed on a couple of
22  occasions that I felt maybe we were wasting some
23  of our money on the promotion in the field
24  through bus boards, and specific promotions that

12  (Pages 42 to 45)

Page 46

1    I had seen. We were putting billboards up in
2    the lobby of the building that I didn't think
3    were effective.
4        I felt there were times that money was
5    better saved for a later date when we improved
6    our content and had something to -- better to
7    promote.
8        Q. Did you ever review any operating plans
9    with respect to the dollars spent on promotional
10   efforts?
11       A. I would have seen them during the plan
12   review for the year coming, and we may have had
13   a conversation at a time whether there were
14   dollars available in the future to promote a
15   specific initiative or talent.
16       Q. Do you recall any conversations about
17   the dollar spent on promotional efforts after
18   reviewing an operating plan?
19       MR. CERASIA: Objection, form.
20           You can answer.
21       THE WITNESS: Not specific, no.
22   BY MR. RUBINSTEIN:
23       Q. In other words, did you ever review an
24   operating plan, see the line item for promotion

Page 48

1    Ms. Berlamino to hold off on promoting specific
2    people or initiatives until we had made final
3    decisions on the talent promotion, not knowing
4    what talent would be with us in the future with
5    the contracts up, and based upon the research
6    results we had, I was encouraging the station to
7    make more drastic changes in the content, and
8    hold off on promotion until we liked the content
9    better.
10       Q. Do you know what she's referring to when
11   she says HMH promos?
12       A. I don't.
13       Q. Is that a Help Me Howard?
14       A. Yes, thank you.
15       Q. And she indicates, at least her thought
16   is to buy regional cable and promote to certain
17   areas and ZIP codes. Did you agree with that
18   suggestion?
19       A. At the time we -- the research told us
20   that Mr. G and Howard Thompson were probably the
21   two stronger things we had to promote.
22       I wasn't in agreement with buying the
23   regional promotion, specifically. But we had a
24   discussion that those were two safe things we

Page 49

1    could promote based upon the research that we
2    knew were positives we would be moving forward
3    with.
4        Q. As of the date of this E-mail, which was
5    June 11, 2009, had you had any discussions with
6    Ms. Berlamino about Karen Scott's job status?
7        A. Yes.
8        Q. And what do you recall having discussed
9    with Ms. Berlamino as of the date of this
10   E-mail?
11       A. By the date of this E-mail, I was
12   spending more time at PIX evaluating the
13   product. The ratings were declining, the
14   current management of Tribune, my boss and Ed
15   Wilson and Randy Michaels had discussed with me
16   that they weren't happy with the product that
17   they had seen.
18       In my visits, I was growing impatient
19   with what I was learning -- you know, was going
20   on behind the scenes in the news and the
21   operational side.
22       We had had trouble making the expense
23   reductions and finding a way to find expense
24   reductions, and I played a part in helping carry

13  (Pages 46 to 49)

24 Seven Discovere
(312) 704-0247

Page 50

1  that out. And there were, at this point,
2  probably I would say a handful of conversations
3  about if Karen was the right person for the job
4  to handle this and move the station forward.
5      Q. And when is the first time you recall
6  having that discussion with Ms. Berlamino about
7  whether Ms. Scott was the right person?
8      A. I couldn't tell you an exact date, but I
9  would say -- I would say midway through. I
10  would say early to midway through 2009.
11     Q. When did you first start thinking about
12  whether Karen was the right person?
13     A. On my first trip to the station.
14     Q. And what is your initial opinion of
15  Ms. Scott?
16     A. Could you be more specific?
17     Q. I mean, it's your opinion. I can't be
18  more specific.
19     A. An opinion on what?
20     Q. What was your first impression as to
21  Ms. Scott's competence to be the news director?
22     A. I found a newsroom that was in
23  disrepair, and that's what struck me first. As
24  I walked into the newsroom, there was a lot of

Page 51

1  garbage, it was in disarray.
2      That, to me, is a first sign that we
3  probably could do better at the station. As I
4  watched the on air, I saw what I call TV 101,
5  things that we weren't accomplishing, whether it
6  was a meter strategy promotion, and our topical
7  promotion, what we were doing, the stories we
8  were choosing to promote communications with
9  other departments and those things concerned me,
10 those were early on.
11     Q. And did you communicate your opinions to
12 Ms. Berlamino?
13     A. Yes.
14     Q. And what, if anything did she say to
15 you?
16     A. At the -- early on she was defensive.
17     Q. Defensive about the station or defensive
18 about Karen in particular?
19     A. Both.
20     Q. And let's deal with Karen in particular.
21     What, if anything, did she say to you
22 about Karen?
23     A. She felt Karen was the right person for
24 the job.

Page 52

1      Q. And did there come a time when that
2  opinion changed?
3      A. Yes.
4      Q. And when was that?
5      A. Shortly before her termination in a
6  meeting that I had with Betty Ellen.
7      Q. Do you recall when that was, and
8  we'll -- we're going to agree that the
9  termination came on August 26, 2009 if that
10 helps --
11     A. It was likely in July, I couldn't tell
12 you a specific date, but it was likely in July.
13     Q. Do you keep any calender or other
14 documents that would reflect -- we'll get there
15 in a second.
16     What happened in July with respect to
17 Ms. Berlamino's opinion changing regarding Karen
18 Scott?
19     A. I had spent more time at the station, we
20 conducted research, we had gone through expense
21 reductions, the ratings were still declining.
22     I had been documenting more of the
23 things I saw. I had been spending a lot more
24 time with Betty Ellen at Wilson and Randy

Page 53

1  Michaels discussing our lack of growth in New
2  York compared to how we were growing some of the
3  other stations.
4      And I had asked for a meeting with Betty
5  Ellen to discuss the changes that I felt we
6  needed to make.
7      And at that point I became more
8  assertive as to what Karen's future role would
9  be, and expressing that I didn't think she was
10 the person to take the product forward to make
11 the changes we needed to make to build the
12 station up and grow the ratings, the revenue.
13     Q. And what did Ms. Berlamino say to you?
14     A. She told me at that time she felt I was
15 right.
16     Q. And you're not sure when in July this
17 was, early, late, mid?
18     A. No.
19     Q. Any documents you have or calendars you
20 have that would reflect when that conversation
21 took place?
22     A. I likely have an Outlook calendar that
23 could tell me if I was visiting the station,
24 what my visit dates were.

14 (Pages 50 to 53)

## Page 54

1  Q. This was an in-person meeting with
2  Ms. Berlamino?
3  A. Yes.
4  Q. Can you tell me about the conversation
5  after Ms. Berlamino indicated to you that you
6  were right about Ms. Scott?
7  A. She told me that she had been thinking
8  about the discussions that we had had prior.
9  She went back and had reviewed some of her notes
10 over the past few years and decided that maybe
11 it was time that she not hold on so tight and
12 that we try and find somebody else who could
13 come in with some ideas to maybe adapt to some
14 of the things that we were talking about in our
15 discussions and the recommendations that I was
16 making or Ed Wilson or Randy Michaels from a
17 company standpoint.
18 Q. Can you discuss the timing of
19 Ms. Scott's termination?
20 A. Yes.
21 Q. And what was discussed about the timing?
22 A. I had asked her to circle around with
23 Myrna Ramirez and let Myrna work from an HR
24 standpoint to determine the best way to handle

## Page 55

1  whatever we decided moving forward at that time.
2  Q. Did Ms. Berlamino indicate during that
3  meeting that it would take place sooner rather
4  than later?
5  A. The meeting with Karen Scott?
6  Q. Right. Or let me just get it straight.
7  At that meeting you discussed with
8  Ms. Berlamino -- you discussed the termination,
9  correct?
10 A. Yes.
11 Q. And Ms. Berlamino indicated that she
12 should be terminated, correct?
13 A. Yes.
14 Q. Okay. Did -- at that point, did you and
15 Ms. Berlamino discuss when it was going to
16 happen, that week, the next week, the next
17 month?
18 A. No, at that point she asked me if
19 instead of termination we should consider a
20 performance improvement plan to see if there
21 wasn't a way that we could salvage the
22 situation, and coach Karen up to maybe be able
23 to take the step forward.
24 Q. And what did you say?

## Page 56

1  A. I told her that -- you know, depending
2  on how much she had documented and coached Karen
3  in the past, my gut told me that it probably
4  wasn't a situation that we could save through a
5  performance improvement plan.
6  And that my recommendation would be to
7  meet with Myrna Ramirez to better determine
8  that, whether we had met the obligations in
9  training and helping Karen perform better.
10 Q. To your understanding, what was a
11 performance improvement plan?
12 A. Documenting the goals for improvement at
13 the station, and holding a person accountable
14 for either meeting those goals or departure if
15 they couldn't achieve them.
16 Q. As of the date of that meeting with
17 Ms. Berlamino, had you ever reviewed Ms. Scott's
18 personnel file?
19 A. Yeah.
20 Q. As of the date of that meeting, had you
21 ever looked at any E-mails, memos or other
22 evaluations with respect to Ms. Scott's
23 performance?
24 A. I received E-mails from Betty Ellen

## Page 57

1  about ratings, performance, issues that we had
2  at the -- in our newscast that we're referring
3  back to the management and -- you know, in
4  general, Karen's leadership in the newsroom.
5  Whether we were progressing the product
6  forward, a lot of E-mails over time about
7  ratings performance. If she saw a bad number in
8  the morning, she would occasionally fire off an
9  E-mail.
10 Q. And let's just deal with Ms. Scott's
11 performance in particular, aside from obviously
12 the ratings.
13 What, if any, issues did Ms. Berlamino
14 raise with you regarding Ms. Scott's
15 performance?
16 A. Specifically it would be failure to make
17 changes to improve the ratings.
18 Q. Any examples?
19 A. Specific examples I couldn't recall at
20 this time. You know, in general it would be as
21 we watch ratings decline, it would be a
22 dissatisfaction with the content.
23 At some point Betty Allen had admitted
24 and had come around to some of my criticisms

Page 58

1  that we were kind of doing the same thing, I had
2  been doing the same show for multiple years and
3  hadn't really evolved.
4      She admitted, I believe in conversation,
5  down the road, then as I explained to her
6  specific meter strategies and promotional
7  strategies that we weren't executing.
8      And as I spent more time with Betty
9  Ellen teaching her about what I saw and taking
10  notes, she seemed to, I guess learn a little bit
11  more of the process and how she would
12  have valued Karen's performance as well, I
13  think.
14      Q. Were there any suggestions you made to
15  improve the ratings on the new shows that were
16  not implemented by Karen?
17      A. Yes.
18      Q. And what were they?
19      A. We -- after a repeat of visits, we still
20  had problems hitting specific meter strategies
21  to where you go to commercial breaks.
22      We hadn't made a decision on the sports
23  department yet, we're still hanging out there.
24      I had made a recommendation that we move

Page 59

1  on from Kaity Tong after we had seen research.
2  I know that was something that both Betty Allen
3  and Karen did not agree with and didn't carry
4  out.
5      There was to be a meeting with Kaity
6  over a contract extension.  It became a -- kind
7  of a contentious subject after research that we
8  were going to extend Kaity for months and see if
9  we can help improve her status as an anchor.
10      And Karen was to have met with Kaity and
11  sat down in detailed specific performance issues
12  with her so she could either improve her work on
13  the desk, or we could do a lot at the end of the
14  six months.
15      I don't believe that was carried out,
16  and that was a fairly large issue that we talked
17  about quite a bit as it pertained to a long-time
18  anchor in the market.
19      That could have -- if we handled it
20  poorly, it could hurt the ratings of the station
21  and be litigious if we didn't handle it the
22  right way.
23      Improving the relationship with the
24  creative services department I thought was key

Page 60

1  for me, because to promote the product, we've
2  got to make sure they have good content and a
3  good relationship to work together.
4      We had discussed moving the web
5  department down and making them more active in
6  the newsroom.
7      We had discussed being more aggressive
8  on breaking news.  I think we had some
9  improvement on that over the few months, but
10  still were lacking in general where I thought we
11  needed to be in the station.
12      There were several discussions on
13  cleaning up the newsroom for my initial visit.
14  Those fell on engineering -- the engineering
15  department as well as Karen and her employees
16  making a better work environment.
17      There were labor issues, a part of labor
18  negotiations that we discovered that Karen
19  wasn't as well versed in her own labor contracts
20  and following the rules of the contract.
21      Those got better over time as we
22  renegotiated contracts and educated Karen on
23  what was there, but they were still not followed
24  to the T.

24 Seven Discovere
(312) 704-0247

**Page 62**

1  Q. Okay. With respect to Kaity Tong, was
2  Karen in favor of her removal, or did she want
3  to keep Ms. Tong?
4  A. I don't believe she was in favor of it.
5  Q. Of what?
6  A. She was not in favor of her removal.
7  Q. Is Mr. Tong still employed with WPIX?
8  A. Yes.
9  Q. And with regard to hitting meter
10  strategies what, if anything, did you suggest to
11  her that she did not implement?
12  A. I believe there were discussions where
13  we laid out the meter strategies at times on a
14  piece of paper. We discussed it on news
15  director calls with the entire group.
16      But still, coming back to the market you
17  would watch the show and find out that we were
18  going into commercial breaks when we should have
19  been coming out and on air at that point to get
20  the best benefit to Neilsen meters.
21  Q. And with respect to the sports
22  department that we mentioned before with regard
23  to Sal Marciano, or eliminating the sports
24  department?

**Page 64**

1  Q. And the other thing you mentioned was
2  the budgetary cuts for the newsroom?
3  A. Mm-hmm.
4  Q. In what way did Ms. Scott not implement
5  what you had suggested?
6  A. I -- as we originally came in to our
7  larger markets and asked the markets to make a
8  specific dollar amount of cuts or come back to
9  us with a suggestion, I had a hard time in our
10  news department with Karen coming up with
11  specific cuts.
12      And at one point, I had weighed in and
13  made recommendations of cuts that were objected
14  to that we felt were easily obtainable without
15  affecting the content.
16      In most of our markets, the general
17  manager, or the news director, or the creative
18  service director, or engineering manager
19  depending on the department, would come back
20  with their recommendations, but we didn't really
21  get many recommendations from the news
22  department or the managers at PIX.
23  Q. Okay. Let's go back now to the meeting
24  that you had with Ms. Berlamino in July.

**Page 65**

1      With respect to Mr. Scott's job status,
2  what resulted from that meeting with
3  Ms. Berlamino?
4  A. Can you be more specific?
5  Q. Was there any decision reached at the
6  meeting with Ms. Berlamino with respect to
7  Ms. Scott's job status?
8  A. The -- what I left -- that she would
9  either be terminated, or possibly put on a
10  performance improvement plan, though I told
11  Ms. Berlamino that I didn't think that was the
12  right way to go at this point.
13  Q. And what was the next communication you
14  had with Ms. Berlamino about Ms. Scott's job
15  status after that meeting?
16  A. I believe it was a -- probably a phone
17  call that said that she had spoken with Myrna
18  Ramirez. They had reviewed the documentation
19  and the circumstances and decided to go ahead
20  with the termination, and she was informing me
21  when she would meet with Karen and discussed
22  that with her.
23  Q. How long after your in-person meeting
24  did that call take place?

17 (Pages 62 to 65)

Page 66

1    A. It might have been a week, I don't
2    recall specifically.
3    Q. Do you recall if it was a short time
4    period after the meeting, or a longer time
5    period?
6    A. I'm guessing a week.
7    Q. Did you have any E-mail communications
8    with Ms. Berlamino about Ms. Scott's
9    termination?
10    A. I don't believe so.
11    Q. What about with Ms. Ramirez, did you
12    have any E-mail communication with her about
13    Ms. Scott's communication?
14    A. Not E-mail.
15    Q. I'm sorry?
16    A. Not E-mail, no.
17    Q. Prior to your meeting with Ms. Berlamino
18    in July, had you ever had any discussions with
19    Ms. Scott about her job security?
20    MR. CERASIA: Objection to form.
21    You can answer.
22    THE WITNESS: I think as it got in 2009 and
23    the ratings were declining Ms. Scott felt a
24    little less secure about her job security.

Page 67

1    There were more people from the corporate
2    standpoint, myself, an engineering chief who was
3    spending more time at the station, Randy
4    Michaels had been a little more vocal about the
5    content we had on air to Ms. Berlamino.
6    And I believe Ms. Berlamino was also
7    sending more E-mails to Ms. Scott about the
8    ratings and the quality of the programming.
9    And we had had discussions at that
10    point about whether Betty Ellen was
11    micromanaging or pushing Karen to achieve, or --
12    you know, how we would improve, and what -- how
13    Ms. Scott would play into that.
14    BY MR. RUBINSTEIN:
15    Q. Okay. I think my question was: Did you
16    personally have any discussions with Ms. Scott
17    about her job status prior to your July meeting
18    with Ms. Berlamino?
19    MR. CERASIA: Objection to form.
20    You can answer.
21    THE WITNESS: What I just told you would
22    have been conversations that tied to that. It
23    was Karen Scott trying to determine how she
24    stood with Betty Ellen in the new process moving

Page 68

1    forward.
2    BY MR. RUBINSTEIN:
3    Q. I'm sorry if my question wasn't clear.
4    A. That's okay.
5    Q. My question was: Did you personally
6    have any discussion with Karen Scott about her
7    job status?
8    A. No, meaning whether I was going to
9    terminate her, or whether Betty Ellen was going
10    it terminate her?
11    Q. No. Just about her job status in
12    general. You talking to Ms. Scott about her job
13    status with the company.
14    MR. CERASIA: Objection to form.
15    You can answer.
16    THE WITNESS: Conversations that we needed
17    to improve the ratings, and that more changes
18    would be coming, and there was tremendous
19    pressure from Randy Michaels to improve the
20    product.
21    BY MR. RUBINSTEIN:
22    Q. And you had those conversations with
23    Ms. Scott?
24    A. Yes.

Page 69

1    Q. Orally or through E-mail?
2    A. Orally.
3    Q. When?
4    A. It would have been leading up in the
5    spring and summer of July, probably as we got
6    closer to the July date.
7    Q. Did you have any conversations with
8    Ms. Scott, specifically with respect to the fact
9    that if things didn't change or improve she was
10    going to be fired?
11    A. I would never say that.
12    Q. Did you have any conversations with
13    Ms. Scott that discussed whether or not she was
14    going to continue in her position as news
15    director?
16    A. I don't think we had anything that
17    specific, no.
18    Q. Anything in general that mentioned her
19    continuing employment with WPIX?
20    A. I believe that Ms. Scott was concerned
21    for her employment due to Ms. Berlamino's
22    actions, and because of the changes that the
23    company was requesting, and because of the
24    downturn in the ratings.

18 (Pages 66 to 69)

Page 74

1    that I took to the station, and then a follow
2    up.  So the first notes would have been the
3    original bullet points in dark, the parenthesis
4    would have been updated after another visit,
5    that would have likely come either a few weeks
6    later.  And the first list would have been
7    something I believe that Ed, Karen, Betty Ellen
8    and myself would have all seen the parenthesis
9    were likely an update for Mr. Wilson.
10       Q.  And do you know how long after the
11   initial bullet points were created that
12   parentheticals went into the document?
13       A.  I believe it was likely less than a
14   month, three to four weeks.  It might have gone
15   into June.
16          But these were, at that point I was
17   doing more frequent visits.  And so we were --
18   the point of this E-mail was to create an action
19   plan and hit a time line so that we could make
20   more progress moving forward.
21          It was felt by myself and Ed, and
22   Mr. Michaels that we just weren't moving forward
23   or making changes at the station.  We were
24   holding on to doing the same thing we were

Page 75

1    doing, and the ratings were continuing to
2    decline.
3        Q.  It references on the second bullet point
4    that Will Surratt was fired as the 10:00 p.m.
5    executive producer, do you see that?
6        A.  Mm-hmm.
7        Q.  I'm sorry, is that a yes or no?
8        A.  Yes.
9        Q.  Do you know who found Will Surratt?
10       A.  I believe that Karen and Betty Ellen
11   presented him to me, and that they had both
12   known him as being a previous producer and
13   executive producer within the company.
14       Q.  Did you meet with Mr. Surratt before he
15   was hired?
16       A.  I did.
17       Q.  Were you in favor of his hiring?
18       A.  I was.
19       Q.  Is he still employed by WPIX?
20       A.  Yes.
21       Q.  What's his current position?
22       A.  He is an executive producer.
23       Q.  For the 10:00 p.m. --
24       A.  Assigned to the late news, yes.

Page 77

1    a need to turn the ratings around and move the
2    product forward.
3        Q.  But specifically with respect to if such
4    and such didn't happen, you're going to be
5    fired, did you ever have that kind of discussion
6    with her?
7        A.  No, my discussion -- were to gain the
8    confidence of myself and Mr. Michaels and
9    Mr. Wilson, and more than anything,
10   Ms. Berlamino.
11       Q.  If Ms. Berlamino was not in favor of
12   terminating Ms. Scott, could you have overruled
13   her?
14       MR. CERASIA:  Objection to form.
15       THE WITNESS:  Could you state that again?
16   BY MR. RUBINSTEIN:
17       Q.  Sure, I will rephrase the question.
18          If Ms. Berlamino had told you in your
19   July meeting that she did not want to fire
20   Ms. Scott, did you have the authority to still
21   go forward with Mr. Scott's termination?
22       A.  By that point, yes.  In the end it's --
23   yes, yes.
24       Q.  In the end what?

20 (Pages 74 to 77)

Page 78

1    A.  In the end it's a general manager's
2   station.  But at that point due to the crisis
3   and the issues we were having with the declining
4   ratings, I had been asked to take more
5   responsibility and a bigger lead, and was asked
6   to give -- spend more time there.
7        And we were having discussions with
8   Ms. Berlamino about making changes.  If she
9   wasn't -- whether she was in favor or not.  But
10  it was the company's television station, and we
11  were going to need to change the operations of
12  that station, whether she was on board with all
13  of them or not.
14   Q.  And just so I have it clear, in that
15  July meeting, did Ms. Berlamino tell you that
16  she's in favor of terminating Ms. Scott?
17   MR. CERASIA:  Objection, asked and answered.
18       You can answer.
19   THE WITNESS:  We talked about that earlier
20  that I had again made a recommendation to
21  terminate Ms. Scott.  And at that point she
22  decided, yes, that I was right, and that she was
23  ready to -- I believe her term was she was done
24  fighting me on that conversation.

Page 79

1        She had been adamant in the past that
2   they felt they could fix things as is and leave
3   the station as is.
4   BY MR. RUBINSTEIN:
5    Q.  After that meeting, did you have any
6   discussion with Ms. Ramirez about Ms. Scott's
7   termination?
8    A.  Yes.
9    Q.  And tell me what you said to her, and
10  what she said to you.
11   A.  Her -- remember coming back to Chicago
12  and meeting with Ms. Ramirez, I don't remember
13  if it was that week or the next week, our
14  offices are next to each other.
15       And I stopped by to give her an update
16  on my conversation with Betty Ellen, and to see
17  if Betty Ellen had reached out to Ms. Ramirez as
18  I had requested to begin seeing if we had the
19  grounds to terminate Ms. Scott and to have that
20  discussion.
21   Q.  And what did Ms. Ramirez say to you?
22   A.  She told me that she -- I don't
23  remember, she had an initial conversation with
24  Betty Ellen, but was planning to have a further

Page 80

1   conversation and look at some of the notes and
2   the documentation that Betty Ellen had.
3        And she understood my concern for the
4   station and the pressure to move forward.  And I
5   had told her that I would take her advice on the
6   direction we were going and the best way to
7   achieve it.
8    Q.  And did you have any follow-up
9   discussions with Ms. Ramirez after that initial
10  discussion?
11   A.  I can't recall a specific discussion.  I
12  remember I was notified by either Betty Ellen or
13  Ms. Ramirez that we decided to go ahead with the
14  termination, that there was a date.
15       But I don't remember if that came from
16  Ms. Ramirez specifically at a later date, or if
17  it was from Betty Ellen.
18   Q.  After Ms. Berlamino told you that the
19  termination was going to go ahead, what, if any
20  further discussions did you have with her about
21  the termination.
22   A.  Nothing.
23   Q.  What, if any, discussions did you have
24  with Ms. Scott about her termination?

24 Seven Discovere
(312) 704-0247

Page 89

1        All the stations that have Nielsen
2    meters placed in homes versus diary-only
3    markets, I don't have overnight viewing for
4    those.
5        For New York you would get the overnight
6    LPM meter ratings, plus a break out of demo
7    sheets as well, adults 25 to 54, 18 to 49, and
8    what's the third one?
9        Q.  Can't help you there.
10        A.  Sorry, I look at them every day, I can't
11    remember how they break them out.  But those
12    were the key.  I would usually look at the
13    households, and the adults 25 to 54, and the 18
14    to 49.
15        Q.  And you would get this on a daily basis
16    or just when you ask for it?
17        A.  No, I get it on a daily basis.
18        Q.  Now, I see Eric Meyrowitz is in the
19    distribution list.  As of November 2008, what
20    position did he hold?
21        A.  He was a general manager at WDCW,
22    Tribune's station in Washington D.C.
23        Q.  That's the same -- Eric Meyrowitz is now
24    the general manager of WPIX?

23  (Pages 86 to 89)

Page 98

1   decision made that she should be retained?
2       A.  Because she was a new manager, and I
3   remember there were discussions that we felt we
4   owed it to her to try and train her and teach
5   her how to be a better manager, and that we had
6   just made the hire at that point.
7       Q.  Who decided to retain her?
8       A.  Ultimately that would be Karen and Betty
9   Ellen's decision.
10      Q.  Do you recall ever having a discussion
11  with Betty Ellen where she told you that she
12  wanted to let her go?
13      A.  I had a discussion where she told me
14  that she had given Amy kind of a last and final
15  warning at that point.
16      Q.  Who replaced Ms. Scott as news director
17  of WPIX?
18      A.  A guy named Bill Carey.
19      Q.  Had you known Mr. Carey prior to
20  Ms. Scott's termination?
21      A.  Yes.
22      Q.  And where did you know him from?
23      A.  Through Local TV, LLC.
24      Q.  How did you come to know him through

Page 99

1   Local TV?
2       A.  I was introduced to him and received --
3   actually, I was introduced via E-mail from one
4   or two people who reached out to me that
5   recommended that I meet him.
6       It probably would have been sometime in
7   2008, early -- year -- probably later in 2008
8   that I should meet him, that he was looking for
9   work, and that if I had a news director job
10  open, I might consider hiring him.
11      So I had reached out on a trip and can't
12  remember where we first met.  We talked by phone
13  a couple of times.
14      Q.  That was in 2008?
15      A.  It would have been sometime, I'm
16  guessing, in -- yeah, it would have had to have
17  been in 2008, mid-to early 2008.
18      Q.  Was he employed at the time?
19      A.  He -- I don't know.  I don't believe he
20  was actively working in a station, but he may
21  have been employed at the time.
22      Q.  And at what point did you consider
23  Mr. Carey for the position as news director of
24  WPIX?

Page 100

1       MR. CERASIA:  Objection to form.
2       You can answer.
3       THE WITNESS:  When the position was opened
4   up, and we began looking at candidates.  He
5   threw his head into the ring and asked if I
6   would consider him.
7   BY MR. RUBINSTEIN:
8       Q.  Did he first get in touch with you, or
9   you get in touch with him?
10      A.  He reached out to me.
11      Q.  How did he know about the position?
12      A.  It was a public posting, and it was --
13  both companies knew the openings, and that we
14  did news director calls and shared content.
15      So we would tell people in the news
16  director calls if there was an opening out
17  there.
18      Q.  Were you in favor of hiring Mr. Carey as
19  news director?
20      A.  I was.
21      Q.  Was Betty Ellen?
22      A.  Not originally.  In the end she agreed
23  to hire him and came around on it.
24      Q.  Who did Betty Ellen want to hire?

26 (Pages 98 to 101)

Page 114

1    bankruptcy of the Tribune?
2         A.  I don't believe so.  There were raises
3    that were not given.  But from a resource, sheer
4    number of bodies or people or priority, no.
5         Q.  When you were discussing earlier efforts
6    made to reduce expenses, were any of those
7    efforts made as a result of the bankruptcy?
8         A.  I would say they were mostly made as a
9    result of the recession, and the fact that we
10   were close to not being profitable at the
11   station any longer.
12        Q.  I'm sorry.
13        A.  We were --
14        Q.  The last part.
15        A.  Our revenue was declining specifically,
16   and the concern was that station would not
17   remain profitable with the recession.  That was
18   the bigger impact more than what bankruptcy was.
19        Q.  Mr. Charlier, did you review any
20   documents to prepare for your deposition today?
21        A.  Yes.
22        Q.  What did you review?
23        A.  A folder full of E-mails pertaining to
24   the case, similar to what you've shown me today.

24 Seven Discovere
(312) 704-0247

# EXHIBIT G

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.: 10 CV 4622


KAREN SCOTT,

                Plaintiff,

vs.

WPIX, INC.,

                Defendant.
_____/


VIDEOTAPED DEPOSITION OF MYRNA RAMIREZ


TAKEN BY:       Attorney for Plaintiff

DATE:           Tuesday, March 22, 2011

TIME:           Commencing 9:07 a.m.

PLACE:          Holland & Knight
                100 North Tampa Street
                Suite 4100
                Tampa, Florida  33602
                (813) 227-8500

REPORTED BY:    Dawn Neukomm, RPR
                Registered Professional Reporter
                State of Florida at Large

7

```
1    Tribune prior to coming here today --
2        A.    No.
3        Q.    -- about Ms. Scott's case?
4        A.    No.
5        Q.    Did you speak or meet with anybody at WPIX
6    about your deposition here today?
7        A.    No.
8        Q.    Are you currently employed?
9        A.    No.
10       Q.    And what was the last form of employment you
11   held?
12       A.    I was the vice president of human resources
13   Tribune Broadcasting.
14       Q.    And for what period of time did you hold that
15   position?
16       A.    That position from 19 -- 1991 through June
17   2010.
18       Q.    And where did you work, in what location?
19       A.    In Chicago.
20       Q.    And why did you leave the Tribune in June of
21   2010?
22       A.    My position was eliminated.
23       Q.    As vice president of human resources, who did
24   you report to?
25       A.    I reported to -- I had a dual reporting
```

10

```
1        Q.    When Ms. Scott was employed by WPIX, what, if
2    any, role or involvement did you have with the
3    employees at WPIX?
4        A.    It's probably best to explain what my role --
5    I guess explain how my role played out within the
6    broadcasting group --
7        Q.    Sure.
8        A.    -- and how that related to the WPIX.  As the
9    group office VP of HR, I was responsible for the
10   overall HR function within the broadcasting group, you
11   know, and ensuring -- and I was the liaison between
12   corporate and broadcasting and the broadcasting to the
13   TV stations.  I was kind of the point person for the
14   local HR professionals as well as the general managers
15   for more complex matters in helping to do -- and that
16   job analyses, job descriptions, and overall employee
17   relation matters, the more complicated senior level
18   type employee relation matters, you know, issues that
19   could not be resolved locally, I basically was the
20   go-to person just to provide -- it was more providing
21   guidance within the HR realm more than anything else.
22       Q.    So when, for example, would you get involved
23   in personnel matters for WPIX?
24       A.    When they would call me.  If they needed my
25   advice or assistance, that's when I would get involved.
```

13

```
1    attention regarding Karen Scott?
2              MR. CERASIA:  Objection to form.  You can
3    answer.
4              THE WITNESS:  Prior to -- let's see.  Let me
5    think.
6    BY MR. RUBINSTEIN:
7        Q.    And just to set a time frame for you,
8    Ms. Scott was terminated at the end of August of 2009.
9        A.    Okay.  So any time in the year '09 is your
10   question?
11       Q.    Prior to 2009 --
12       A.    Prior to 2009.
13       Q.    -- had anything ever been brought to your
14   attention regarding Karen Scott?
15       A.    Yes.
16       Q.    And can you tell me what.
17       A.    What I recall the most basically is in terms
18   of the Tribune was looking at restructuring -- they had
19   had a different vision of what the news was going to
20   be.  And, you know, they were looking at all -- how to
21   restructure, how to introduce new concepts, things they
22   wanted done particularly at the PIX and the
23   conversations that had occurred and what was going on
24   within the newsroom at PIX, whether the vision was
25   being implemented or not, were things getting done the
```

14

```
1    way they -- when I say they, I'm talking corporate
2    senior management -- wanted, changes made, staff
3    reduced, the lack of not getting a staff analysis quick
4    enough in their -- in their eyes.  That was the crux of
5    what was discussed.  And then I know there was a
6    situation with Kaity when Kaity was -- contracts
7    expiring in terms of conversations that Karen may or
8    may not have had with Kaity.
9        Q.    Okay.  Let's deal specifically with mentions
10   of Karen Scott.  When you talk about corporate senior
11   management wanting changes, what in particular do you
12   recall being mentioned about Karen Scott?
13       A.    What I was recall was more the lack of -- let
14   me -- the difficulty of making decisions in terms of
15   who was going to be possibly eliminated as they looked
16   at -- at the news, at the news department overall, the
17   concern about accepting or understanding the vision.  I
18   can't explain to you what their vision exactly was for
19   the news.  But not understanding how the Internet
20   played with the new news.  I say new news, but that
21   probably doesn't sound right, but in terms of how the
22   Internet had a much stronger role, anything with the
23   Web.  It wasn't just on air anymore is how all those
24   things came together.  And what I heard was that Karen
25   was having a hard time grasping how all of that fit
```

16

```
 1    a whole lot of information except what I know from my
 2    interactions over the years, you know, with them.  But
 3    specifically, I mean, it was more related to what their
 4    mission was in changing the news and how news was being
 5    brought to the viewer.
 6         Q.   How did this discussion Mr. Charlier arise?
 7         A.   Our offices were next door to each other.
 8    You know, sometimes he would just pop in and say I'm
 9    heading to New York, and I still don't have the PNLs.
10    I don't still have the analysis.  I would say, well,
11    ask for it.
12         Q.   And you mentioned that this was a
13    conversation about the 12 or 13 news departments.  Were
14    those news departments underneath Tribune across the
15    country?
16         A.   Yeah.  All of the group office had, if you,
17    except for myself, the local -- the local individuals
18    had kind of dotted lines to each of us.  So the news
19    directors kind of had a dotted line, you know, into
20    Steve.  Although they reported to their general
21    managers, there was a dotted line to Steve as the -- as
22    a senior vice president of news.
23         Q.   So the discussion that you're talking about
24    involved Steve's vision for the entire Tribune news
25    broadcasting?
```

17

```
 1         A.   Uh-huh.
 2         Q.   I'm sorry.  You have to say yes.
 3         A.   I'm sorry.  Yes.
 4         Q.   Okay.  And just in particular, with respect
 5    to Karen, do you recall any specific discussion about
 6    Karen?
 7              MR. CERASIA:  Objection to form.  You can
 8    answer.
 9              THE WITNESS:  There were -- I mean he was
10    concerned.  Let me just say it -- they were -- it was
11    pop into my office.  It wasn't like there were formal
12    meetings to talk about -- to talk about Karen.  Those
13    meetings needed to happen at the local -- at the local
14    level.  You know, more so just the ratings aren't --
15    aren't getting better.  But a lot of it really was more
16    around I still need that staff analysis.  I still want
17    to -- we still need to look at how do we change that
18    news -- that newscast.  You know, how do we bring in
19    more viewers.  I'm not getting that.  And I'd always
20    say, well, ask for it.  You know, do you know anything
21    about this?  I said I don't know anything about
22    individual porters or individual -- her interactions.
23    I don't -- I can't speak to that.  I'm not there
24    day-to-day.  She doesn't report to me.
25    BY MR. RUBINSTEIN:
```

18

```
 1         Q.   And to the best of your recollection, when
 2    did these conversations begin?
 3         A.   You know what, probably '09, '09.
 4         Q.   And do you recall any communications with
 5    Mr. Charlier about this through E-mail?
 6         A.   I may have sent an E-mail if he sent --
 7    possibly.  I don't -- I don't remember sending him
 8    anything.  Could -- could I have?  Yeah, maybe I did.
 9    I don't -- but I don't remember right now.
10         Q.   What about him sending you E-mails about
11    these issues?  Do you recall any E-mails -- receiving
12    any E-mails from Mr. Charlier about these issues?
13         A.   He may have sent something to me, and I may
14    have responded.  Right now I don't -- it's been so
15    long, I don't remember exactly.
16         Q.   What was Mr. Charlier's position?
17         A.   He was senior vice president of news.
18         Q.   And to the best of your understanding, what
19    did that encompass?
20         A.   He was responsible for the overall news
21    operation within the TV stations, ensuring, that, you
22    know, they were implementing whatever their strategic
23    plans were for news and the vision that they had in
24    mind in changing the news, increasing their ratings,
25    doing things differently.  I used to hear that a lot,
```

19

```
 1    you know.  And to do things differently, I don't know
 2    exactly what all that meant, but that was his
 3    responsibility.
 4         Q.   Aside from these discussions with
 5    Mr. Charlier, was there ever an occasion that Karen's
 6    performance or conduct came to your attention?
 7              MR. CERASIA:  Objection to form.  You can
 8    answer.
 9              THE WITNESS:  Yes, he was concerned.
10    BY MR. RUBINSTEIN:
11         Q.   Let me just stop you there.  I said aside
12    from the conversations with Mr. Charlier --
13         A.   Oh, I'm sorry.
14         Q.   -- was there ever an occasion where Karen's
15    performance came to your attention?
16              MR. CERASIA:  The same objection.  You can
17    answer.
18              THE WITNESS:  Yes.  Betty Ellen and I did
19    have a conversation.
20    BY MR. RUBINSTEIN:
21         Q.   And do you recall when that was?
22         A.   Maybe in the summer, July, June, July.  I
23    can't pinpoint the exact date.
24         Q.   Of what year?
25         A.   '09.
```

24

1   look at your staff.  You know, are we operating in the
2   right -- in the right format.  Do we have the right --
3   do we have the right people.  That used to come up a
4   lot in terms of do we have the right people in the
5   right positions.  So --
6       Q.   What was the necessity for job eliminations
7   in 2009?
8           MR. CERASIA:  Objection to form.
9           THE WITNESS:  When you -- when you say
10  necessity, you know, certainly, you know, you're
11  talking about the need to eliminate individual's
12  positions more so -- and I think it was twofold for
13  Tribune, and -- and I think one was looking for a means
14  to save some dollars, if you will.  But in addition to
15  that, because they were trying to restructure and also
16  expand and change the news, not just news, creative
17  services and other areas, you know, some of those jobs
18  would be needed to be expand to expand, you know, the
19  news as -- as well.  Did that make sense?
20  BY MR. RUBINSTEIN:
21      Q.   And when you -- you mentioned a staffing
22  analysis.  Was that a formal analysis or just an
23  informal look at who was in what positions?
24      A.   It was my understanding that what -- what --
25  what the various departments were asked to do was to

25

1   look at their -- to layout their staff, to look at
2   their organizational charts because everyone had been
3   asked to submit charts as well.  And I kept a book of
4   the various charts of all the different departments.
5   So I probably would say initially it was looking --
6   look at your organizational charts and, you know,
7   determine do you have the right structure within your
8   department.
9           Now, once you get into an actual analyses,
10  then that means basically laying out every -- every
11  category within that department.  And since we're
12  talking about news, obviously more so to news.  You
13  know, all of your reporters, all of your writers, all
14  of your producers, all of your management.  You know,
15  management was included to a certain extent in that,
16  you know, as well, your engineers, your photographers,
17  looking at all of them by category because when you're
18  making a decision to eliminate -- eliminate a position,
19  you have to make sure that you're also as you -- that
20  you're making the right decision in terms of the job
21  that you're going to eliminate, but that you also are
22  not causing any type of adverse impact, you know, among
23  women or ethnicity or age.  So that was a much more
24  detailed analysis.
25          We have to actually lay it out and look at

29

1           THE WITNESS:  Probably August and July,
2   beginning of August.
3   BY MR. RUBINSTEIN:
4       Q.   I'm sorry.  End of?
5       A.   July '09, beginning of August.
6       Q.   And how did you become aware?
7       A.   Concerns -- once again, Steve would pop into
8   my office every so often -- that -- that Steve had,
9   that I knew he was having conversations with
10  Betty Ellen.  I was not involved directly in those
11  conversations, but I was aware that those conversations
12  were occurring.
13      Q.   How were you aware that those conversations
14  were occurring?
15      A.   Steve would fill me in sometimes.
16      Q.   When's the first time Mr. Charlier told you
17  that those conversations were occurring?
18      A.   You know, I really don't remember.  It could
19  have been once again related to July or -- or August.
20      Q.   And do you recall specifically what -- what
21  Mr. Charlier told you?
22      A.   I do remember him saying he wasn't sure if --
23  if Karen was the person to lead the newsroom to the
24  next -- to the next level -- I can't define for you
25  what he meant by next level -- more or less is what he

32

1           THE WITNESS:  No, I don't remember exactly.
2   It may have been in August of '09.
3   BY MR. RUBINSTEIN:
4       Q.   Do you recall if it was before or after you
5   spoke to Mr. Charlier?
6       A.   I don't remember.  You know, it may have been
7   after.  I think I had more conversations with Steve
8   than -- than with Betty Ellen.
9       Q.   Was it Steve that brought to your attention
10  that Ms. Scott was going to be terminated or was it
11  Ms. Berlamino?
12      A.   Steve did -- did make a mention I think we
13  need to make a change.  The pressure was on.  I mean --
14  and what I mean by that is every general manager was
15  really being pressured, you know, across -- across the
16  company.  I know the -- the news director at KTLA in
17  Los Angeles was -- was let go.  I know that probably at
18  that time or prior to that, the Dallas news director
19  was also let go.  So I mean the pressure was really on
20  to change the news, the news operation overall.  So
21  general managers were really under a lot of pressure,
22  you know, to make the changes based on the vision that
23  the new owners had for -- for the newsroom.
24      Q.   Well, specifically with respect to Ms. Scott,
25  who told you that she was going to be terminated?

34

```
 1            THE VIDEOGRAPHER:  We are now on the record
 2   at 10:37 a.m.
 3   BY MR. RUBINSTEIN:
 4       Q.   Ms. Ramirez, when were you told about the
 5   potential that Ms. Scott may be terminated?
 6       A.   Probably in August '09.
 7       Q.   And who communicated that to you?
 8       A.   I'm trying to think.  It was Steve or
 9   Betty Ellen.  Maybe Betty Ellen.  I don't --
10       Q.   Do you recall how that was communicated to
11   you, either on the phone --
12       A.   Maybe it was Betty Ellen in terms of the
13   possibility that there would be a termination, I
14   think.  And of course my question basically was what
15   are the grounds?  I mean what are the reasons why.
16       Q.   And what was the response?
17       A.   Ratings, performance.
18       Q.   And was this a phone conversation, in-person
19   meeting or by E-mail; do you recall?
20       A.   Phone.  I want to say phone.
21       Q.   Do you have any documents or records to
22   reflect when you had this conversation with
23   Ms. Berlamino?
24       A.   (No audible response.)
25       Q.   I'm sorry.  You have to say yes or no.
```

35

```
 1       A.   No.  I'm sorry, no.
 2       Q.   Okay.  And after this conversation with
 3   Ms. Berlamino, what happened next with respect to
 4   Ms. Scott?
 5       A.   I remember telling Betty Ellen I needed to
 6   look at -- if a termination I was possibility, I needed
 7   to see documentation in terms of what -- what were the
 8   reasons, you know, for -- for the termination.
 9       Q.   Did you ask to see Ms. Scott's personnel
10   file?
11       A.   No, I didn't.
12       Q.   Did you ask to see her assessment plans?
13       A.   Did I look at them?  I don't remember.
14       Q.   At the time of this conversation with
15   Ms. Berlamino, had you seen anything in writing with
16   respect to Ms. Scott's job performance?
17       A.   When I had told Betty Ellen, this is my
18   recollection, to the best of my knowledge, that I
19   needed to see documentation.  Of course I wanted a
20   summary.  I said, you know what, go back, look at all
21   your records, whatever you've documented and tell me so
22   I can concretely say it's viable or it's not.  She did
23   send me a summary of the various conversations that she
24   had -- that she had had.
25       Q.   How long after your conversation with
```

38

```
 1   been given a warning about her job security?
 2            MR. CERASIA:  Objection to the form.
 3            THE WITNESS:  I don't remember exactly.  I
 4   may have said, you know, once again, have you had any
 5   conversations with her, you know, regarding her
 6   performance.  I don't remember talking about a warning
 7   per se.
 8   BY MR. RUBINSTEIN:
 9       Q.   Did you discuss with Ms. Berlamino placing
10   Ms. Scott on a performance improvement plan?
11       A.   She -- yeah, we did after she sent me the
12   summary.
13       Q.   Had Ms. Scott ever been placed on a
14   performance improvement plan as of that time?
15       A.   A formal improvement plan, not that I'm aware
16   of.
17       Q.   Are you familiar with something called a
18   performance improvement plan?
19       A.   Yes.
20       Q.   And to your understanding, what was that?
21       A.   A performance improvement plan is basically
22   the -- an outline of what the expectations are of an
23   employee during a certain period of time.  The whole
24   goal is to help them improve their performance.  That's
25   it.
```

39

```
 1       Q.   To the best of your knowledge, as of August
 2   2009, had Ms. Scott ever been placed on a performance
 3   plan or been given a performance improvement plan?
 4       A.   Not that I'm aware of.
 5       Q.   You indicated that you discussed this after
 6   Ms. Berlamino gave you the summary?
 7       A.   Yes.
 8       Q.   And what was discussed?
 9       A.   In terms of whether -- when it came to senior
10   level managers, director levels and above, and I don't
11   want to say typically, but a conversation could occur
12   that I would say, well, at that level, do you provide a
13   performance improvement plan or excuse me the
14   expressional offence to anybody in the room or do you
15   have a come to Jesus meeting with the person.  You
16   know, you're a senior level manager, so you should be
17   able to converse and have a clear understanding of what
18   expectations are.  You may not always go through a
19   performance improvement plan.
20       Q.   With respect to Ms. Scott, what specifically
21   did you discuss with Ms. Berlamino about either a
22   performance improvement plan or a come to Jesus
23   meeting?
24       A.   What specifically did I discuss with her?  I
25   think her question to me is should we or shouldn't we.
```

40

```
1    Should it be a performance improvement plan or should
2    it be a conversation with her, a come to Jesus
3    meeting.  And then I said, well, if you've had these
4    conversations -- I seem to remember, if you've had
5    these conversations over the course of several months,
6    several years, whatever the case may be, it shouldn't
7    be a surprise to the individual that there are some
8    performance issues and that, you know, if you've had
9    those consistent conversations, you know, with -- with
10   that employee.
11          And I seem to remember telling her, well, if
12   you don't think -- if the decision basically is to
13   make -- to make a change and you feel that she's not
14   going to lead -- she's not the leader for that newsroom
15   looking at what the vision is moving forward, why put
16   her through that pain.  Why put her through a
17   performance improvement plan when you know that
18   basically management and senior management feels she's
19   not the leader for that newsroom.
20      Q.   Just so we're on the same page, when you say
21   a come to Jesus meeting, is that a meeting where you're
22   fired or where you're told if you don't improve, you're
23   going to be fired?
24      A.   You're told if you don't improve, you're
25   going to be fired, fired or probably your job is in
```

42

```
1    it on the facts that are presented to me -- had several
2    conversations about how things were going within the
3    newsroom and how the ratings kept dropping.  You know,
4    time and time over the year they just kept dropping and
5    dropping, that they had those types of conversations,
6    that she -- that she told her she needed things to
7    improve, time is running out, that because pressure --
8    once again, going back to a lot of pressure, new owners
9    wanted a lot of change, and she had conversations in
10   terms of what was expected to turn that newsroom
11   around.  I don't know if they were number three or four
12   in the market when they had been second in the market.
13      Q.   But specifically with respect to a come to
14   Jesus meeting, what did Ms. Berlamino tell you about
15   whether or not she had had that kind of meeting with
16   Ms. Scott prior to August of 2009?
17      A.   We didn't have a specific conversation about
18   a meeting that she may have had.  It was more a general
19   looking at that summary that she had presented to me of
20   the type of conversation she had had with Karen.
21      Q.   Okay.  We're going to get in a little more
22   detail on this meeting in a couple of minutes.  But I
23   just want to iron down a date for you so we can kind of
24   set time parameters.
25      A.   Uh-huh.
```

48

```
1    questions were.  Typically if I find something is vague
2    and I don't understand it, I'll ask.  But I don't
3    remember what I asked her.
4       Q.   Aside from the summary, did you request any
5    documents with respect to Ms. Scott?
6       A.   Not that I recall.
7       Q.   Did you request to see anything that was in
8    her personnel file?
9       A.   Not that I recall.
10      Q.   And after reviewing this summary, did you
11   request any of the documents that Ms. Berlamino
12   referred to in the summary?
13      A.   No.
14      Q.   Why not?
15      A.   I don't know.
16      Q.   Okay.  Why were you involved in those
17   discussions rather than Ms. Maye?
18      A.   Once again, when it comes to a senior level
19   manager, a business unit, director levels and above,
20   typically the general manager would call me, you know,
21   for -- for assistance.
22      Q.   And in this instance, did Ms. Berlamino ask
23   you to get involved or was it Mr. Charlier?
24      A.   It could have been both.  I mean I don't -- I
25   don't know exactly.  I'm trying to think who placed the
```

68

```
1    age?
2       A.   When I ask for data, and what I mean by that
3    is when I look at -- it's part of the analysis.  You
4    look at gender, race, ethnicity.  That's part of it.
5       Q.   Well, you knew Ms. Scott was approximately 60
6    years old?
7       A.   Uh-huh.
8       Q.   Correct?
9       A.   Uh-huh.
10      Q.   I'm sorry.  You have to say yes or no.
11      A.   Yes.  I'm sorry.
12      Q.   And did you have any discussions with anyone
13   at Tribune or WPIX about Ms. Scott's termination as
14   concerned her age?
15           MR. CERASIA:  Objection to form.  You can
16   answer.
17           THE WITNESS:  In-house counsel.
18   BY MR. RUBINSTEIN:
19      Q.   Did you have any discussions with Betty Ellen
20   about Ms. Scott's age when discussing her termination?
21      A.   Yeah.  I may have said -- because I look at
22   the -- look at the data that I'm provided, you know,
23   she's over 60 or she's over 40.  Let me rephrase that.
24   And I always did that with everyone, looking at -- that
25   would be leaving possibly the company, that whether
```

69

```
 1   they were over 40 or not.
 2        Q.   And tell me about the conversation that you
 3   had.
 4        A.   I don't remember the conversation.  You know,
 5   once again, it's looking at, you know, is there going
 6   to be an adverse impact, and whether it's gender, race,
 7   age, it all falls into that category.  So, you know,
 8   once again, PIX, the station overall had a lot of
 9   longevity, and many of the employees were over age 40.
10   How would that be perceived?
11        Q.   Prior to Ms. Scott's termination, had you
12   ever been involved in discussions with Betty Ellen
13   about the ages of people that were being terminated at
14   WPIX?
15             MR. CERASIA:  Objection.
16             THE WITNESS:  Yes.
17   BY MR. RUBINSTEIN:
18        Q.   And can you recall when that occurred?
19        A.   You know, I -- I remember around the time
20   that it probably was in the summer or something.  And
21   once again, it goes to, you know, looking at --
22   Kaity Tong keeps coming to mind because I know that
23   there was concerns about Kaity and looking at all of
24   the contracts and whose contract was going to be
25   renewed, who was not going to be renewed, and why
```

78

```
 1   keeping Kaity or in favor of letting Kaity go?
 2        A.   My recollection, I know Karen was struggling,
 3   you know, with it in terms of what -- she was trying to
 4   do the right thing.  And what I mean by that is once
 5   again corporate had a vision, Steve had a vision,
 6   wanted some changes made.  And I think Karen was trying
 7   to do her best to try to make the decision -- the best
 8   decision as possible.
 9        So I think -- I can't speak exactly how she
10   felt, but I think she was struggling with it like any
11   department head would struggle when they're told you
12   need to make a change or you need to turn this around.
13   You know, she's not attracting the right audience,
14   whatever that may mean.  Once again, I wasn't privy to
15   the conversations between Karen, Steve, and
16   Betty Ellen.  But my assumption would be she was under
17   a lot of pressure as well to turn things around.
18        Q.   And what discussions do you recall with
19   respect to Ms. Tong's age?
20             MR. CERASIA:  Objection to form.
21             THE WITNESS:  I don't remember.
22   BY MR. RUBINSTEIN:
23        Q.   Well, again, correct me if I'm wrong, I
24   thought you had indicated this E-mail, Ramirez 2, came
25   about because of issues involving Kaity Tong, so I'm
```

85

```
 1        Q.   Do you recall if you had a conversation with
 2   Karen sometime prior to June 18, 2009 about the ages of
 3   the employees being eliminated, terminated or demoted
 4   at WPIX?
 5        A.   Not that I recall until -- not that I recall.
 6        Q.   Ms. Ramirez, were you present when Ms. Scott
 7   was terminated?
 8        A.   Yes, I was.
 9        Q.   And who else was present --
10        A.   Betty Ellen.
11        Q.   -- aside from obviously Ms. Scott?
12        A.   Betty Ellen.
13        Q.   And did you make a special trip to New York
14   to be there when Ms. Scott was terminated?
15        A.   Yes.
16        Q.   Why is that?
17        A.   Because I was to be in the termination
18   meeting.  I was asked to be in the termination meeting.
19        Q.   Who asked you to?
20        A.   In-house counsel.
21        Q.   Was Ms. Maye at the meeting?
22        A.   No.
23        Q.   Was she asked to be at the meeting?
24        A.   No.
25        Q.   Do you know why she was not at the meeting?
```

86

```
 1        A.   They were peers.
 2        Q.   Did you prepare anything in advance of the
 3   meeting?
 4             MR. CERASIA:  Objection to form.  You can
 5   answer.
 6             THE WITNESS:  Yes.
 7   BY MR. RUBINSTEIN:
 8        Q.   And what did you prepare?
 9        A.   I helped put the script together for
10   Betty Ellen.
11        Q.   And why was a script necessary?
12        A.   Well, in situations like these, which can be
13   very emotional, very trying for both individuals,
14   particularly if there's been a long working
15   relationship between the manager and the employee,
16   in-house counsel has always advised us and we've
17   advised the managers to keep it short.  Best to follow
18   a script, you know, to ensure that things aren't said
19   that will be regretted -- may be regretted later.
20        Some employees are very upset.  I've been in
21   meetings where employees start crying and screaming.
22   And we try to keep it just very short and still trying
23   to be -- make sure that the person is being treated
24   with dignity and not put through any undue -- undue
25   stress even though those are stressful situations.  So
```

92

```
1   said they would work that -- I think Betty Ellen told
2   her we'll work that out.  We'll work through that and
3   what the departure date would possibly be.  I know she
4   was concerned because she was going on -- on vacation
5   or going away for the weekend to Martha's Vineyard.
6   So she was very concerned what was going to be said to
7   the -- to the newsroom.
8       Q.  How many times did you say to Karen during
9   the meeting that she should talk to a lawyer?
10      A.  You know what?  Two or three times probably
11  at the beginning -- at the beginning of the
12  conversation explaining that I'm not a lawyer by no
13  means, you know, that -- and that's part of our -- when
14  I say our, human resources, in-house counsel in how we
15  handle reviewing separation agreements with the
16  person.  And then probably if --
17      THE WITNESS:  And I don't remember the
18  questions you asked me, Karen.  I -- I don't remember
19  if they were questions.  As I said, I know that you
20  were numb.  And at the end because the -- the agreement
21  itself at the end once again repeats that, you know,
22  you should seek outside -- outside counsel.  So I may
23  have said that at the end of the conversation as well.
24      Now, if the individual asks me questions and
25  what I was getting at in between and that's really a
```

99

```
1   to be used and things of that nature?
2       A.  I'll be honest, I don't remember.  He sent
3   out a lot of memos, but I don't -- I don't remember.
4       Q.  After Ms. Scott was terminated, did you have
5   any discussions with her?  Aside from the day that you
6   met with her, after that date, did you have any further
7   discussions with Ms. Scott?
8       A.  Yeah, it was a very emotional conversation.
9   Karen called me from vacation very upset because
10  somehow in some form, her pending departure had
11  leaked.  So she called me.
12      THE WITNESS:  I think you were in
13  Martha's Vineyard.  Very upset, and which I could
14  totally understand that.
15  BY MR. RUBINSTEIN:
16      Q.  And what did she say, and what did you say?
17      A.  Once again, I can't remember exactly what was
18  said.  I know she told me about I'm getting phone calls
19  from the newsroom from people asking about my
20  departure.  And I probably said, oh, shit.  Excuse the
21  expression.  No offense to anyone.  Because we had
22  guaranteed Karen -- when I say we, Betty Ellen and I
23  had guaranteed that nothing would be said until she and
24  Betty Ellen agreed in terms of what was going to be
25  said.  And she returned from vacation.  And she
```

100

```
1   returned from vacation.
2       Q.  And tell me, you know, on that conversation
3   with Karen, what Karen said and what you told her.
4       A.  Well, she told me that, and my response to
5   her was like, oh, my God, how's that possible.  Let
6   me -- let me handle it.  Let me call Betty Ellen.  Let
7   me find out, you know, what -- what happened.  But --
8   and I think I may have said, too, that --
9       THE WITNESS:  I think I said this to you.
10  They probably know nothing.  Employees speculate.  They
11  may have seen me in the building, again, because I was
12  trying to be as inconspicuous as possible.  And so they
13  may have seen me in the building, and someone just
14  started drawing conclusions and -- but they know --
15  they really know nothing.  But people will speculate, I
16  said, so that could have happened.  I don't know.  But
17  let me -- let me get to the bottom of it.
18  BY MR. RUBINSTEIN:
19      Q.  And aside from that conversation, did you
20  have any further conversations with Ms. Scott after she
21  was terminated?
22      A.  Not that I remember.
23      THE WITNESS:  I don't know if I called you
24  back.  I don't -- I don't remember if I called her
25  back.  I know I did talk to Betty Ellen and said, oh,
```

104

```
1       Q.  Did you ever have any conversations with
2   Jean Maye about the fact that -- strike that.
3       Did you ever have -- did you ever have any
4   conversations with Jean Maye about the ages of
5   employees at WPIX that were being terminated or
6   eliminated or had their jobs modified?
7       MR. CERASIA:  Objection.
8       THE WITNESS:  You know, Mr. Rubinstein, I
9   remember related once again to the staffing analysis
10  that Steve was asking for that -- and I don't know if I
11  told Jean.  I can't remember.  But once again, part of
12  that analysis is laying out the entire newsroom.  If
13  you're doing a staff analysis for potential position
14  eliminations, you know, you lay out your organizational
15  chart, and you take a look at all the individuals, you
16  know, without their names necessarily but their titles
17  and their hire dates and their birth dates, their
18  gender, their ethnicity, any performance issues to help
19  make an informed decision.
20  BY MR. RUBINSTEIN:
21      Q.  Did Jean Maye ever say to you in sum or in
22  substance that WPIX had a pattern of terminating older
23  employees?
24      A.  Not that I -- that I remember.
25      Q.  Did anyone ever say that to you?
```

106

1    Q.   And you never had any discussions with anyone

2   about the pattern of terminating or modifying the jobs

3   of older employees at WPIX?

4        MR. CERASIA:  Objection.  You can answer.

5        THE WITNESS:  Can I answer?

6        MR. CERASIA:  You can, yeah.

7        THE WITNESS:  Repeat that for me.

8   BY MR. RUBINSTEIN:

9    Q.   Sure.  Did you ever have any discussion with

10  anyone about the pattern of WPIX in terminating or

11  modifying the jobs of older employees in 2008 and 2009?

12        MR. CERASIA:  Objection.  You can answer.

13        THE WITNESS:  I don't want to say it's a

14  pattern.  You know, once again, it's a -- it's staff

15  that had a pretty large percentage of people over the

16  age of 40 whose jobs either were going to be eliminated

17  or whose jobs are going to be modified.  I wouldn't say

18  it was a pattern.  Was it a concern, a concern.

19        MR. RUBINSTEIN:  Thank you, Ms. Ramirez.  I

20  have no further questions at this time.

21        THE WITNESS:  Okay.  Thank you.

22        MR. RUBINSTEIN:  You're free.

23        THE VIDEOGRAPHER:  We are now off the video

24  record at 12:29 p.m.

25        (Deposition concluded at 12:29 p.m.)