# EXHIBIT T

**Berlamino, Betty Ellen**

**From:**     Berlamino, Betty Ellen
**Sent:**     Tuesday, August 04, 2009 12:39 PM
**To:**        Scott, Karen
**Subject:** FW: Allegations

Karen, I asked Jean to forward your response to me regarding some of the items that have most recently been brought to light regarding Amy's recent behavior.

First of all, you need to relay to Amy that she should stay home if she feels sick. If she has the flu and is so ill that she needs to sleep at work, then it is better that she stays home and recuperates. A manager that is so sick that they have to sleep in their office is most likely ineffective. In addition, if her staff is not aware that she is sick, her behavior appears to be that of, "A manager who is sleeping on the job," and therefore, can certainly taint her ability to be an effective leader going forward.

I also noticed that you have stated that Emily is trying to make a case against Amy. As you are aware, there are many people that have recently come forward to address their concerns about Amy's leadership skills; Emily is hardly the lone person in this case. In your e-mail, you have also made some serious allegations against Emily: coming in late, not listening to direction and sleeping on the job. I asked Jean to show me her file and I see no evidence of this. I'm assuming that these instances are documented? If so, please forward them to me as this behavior is clearly unacceptable and needs to be addressed immediately.

**From:** Scott, Karen
**Sent:** Tuesday, August 04, 2009 9:42 AM
**To:** Maye, Jean
**Subject:** Allegations

I spoke with Amy about the allegations of sleeping at her desk on July 27th and arriving late to work on July 31st. Amy was quite upset when I told her this because on July 27th she came to work feeling sick and remained at work throughout the show. When she told me she was feeling dizzy, I told her to go sit in her office and I really wanted her to go home, but she lives on Long Island so the idea of her driving home was not safe at the time. So she may have put her head down at her desk, but she was sick.

As for arriving after 4:30 am on July 31st, Amy said she spoke with Adam, the assignment editor, at 2am to discuss live shots and the show for that morning. She said she then laid down for a few more minutes and fell back asleep. She's never done that before. She woke up at 3:45 and rushed into work, but lives on Long Island so it takes a little a while to get here. She still wasn't feeling 100% from the flu hanging on so that probably added to her falling back to sleep.

I know for a fact that Emily Frances is trying to make a case against Amy, but as far Emily is concerned, if I started here to tell you everything that Emily does, including coming in late for her shifts, not listening to directions and sleeping while at work, this letter would be 20 pages long.

Karen

8/4/2009

CONFIDENTIAL

WPIX000297

**Berlamino, Betty Ellen**

**From:**     Scott, Karen
**Sent:**     Tuesday, August 04, 2009 4:36 PM
**To:**       Berlamino, Betty Ellen
**Subject:** RE: Allegations

I am there... in the pit and control room and studio all morning long... ...I am excited about changing some of the show parts and people...,,, and will share all the ideas with you by Friday...some good news... just talked to Jackie;s agent and she is good to start the morning show in Tiffany's slot aug. 26th ... so things are coming together... Karen

**From:** Berlamino, Betty Ellen
**Sent:** Tuesday, August 04, 2009 3:36 PM
**To:** Scott, Karen
**Cc:** Maye, Jean
**Subject:** RE: Allegations

Great, please send them up...You are correct.   Amy IS on a Last & Final Warning, but it has nothing to do with Emily...it has do with her ability to manage and lead people.  Karen, you'll obviously need to stay on top of the situation in Morning News.  None of these situations are helping to grow our audience and we are in need of strong leadership and the ability to make difficult decisions.

**From:** Scott, Karen
**Sent:** Tuesday, August 04, 2009 3:32 PM
**To:** Berlamino, Betty Ellen
**Cc:** Maye, Jean
**Subject:** RE: Allegations

Amy lives about an hour and a half away from work in Farmingdale LI.. She drives in to work.... She felt a little sick when she was getting ready to come in ...but nothing bad...and she started to get sick after she was at work after being here several hours... She left the control room and rested at her desk... until she felt strong enough to drive herself home,

Yes I am well aware of other people who have come forward regarding Amy.  However, Emily seems to be constantly talking about it whenever she sees me... I did ask AMY today if she ever talked to Emily and documented the conversations...she said yes... I said why didn't you tell me... she says she is afraid it would end up in human resources and she would be fired. So today she showed me her files...  and I am sending them to you and Jean.

**From:** Berlamino, Betty Ellen
**Sent:** Tuesday, August 04, 2009 12:39 PM
**To:** Scott, Karen
**Subject:** FW: Allegations

Karen, I asked Jean to forward your response to me regarding some of the items that have most recently been brought to light regarding Amy's recent behavior.

First of all, you need to relay to Amy that she should stay home if she feels sick.  If she has the flu and is so ill that she needs to sleep at work, then it is better that she stays home and recuperates.  A manager that is so sick that they have to sleep in their office is most likely ineffective.  In addition, if her staff is not aware that she is sick, her

CONFIDENTIAL                    **WPIX000315**

behavior appears to be that of, "A manager who is sleeping on the job," and therefore, can certainly taint her ability to be an effective leader going forward.

I also noticed that you have stated that Emily is trying to make a case against Amy. As you are aware, there are many people that have recently come forward to address their concerns about Amy's leadership skills; Emily is hardly the lone person in this case. In your e-mail, you have also made some serious allegations against Emily: coming in late, not listening to direction and sleeping on the job. I asked Jean to show me her file and I see no evidence of this. I'm assuming that these instances are documented? If so, please forward them to me as this behavior is clearly unacceptable and needs to be addressed immediately.

---

**From:** Scott, Karen
**Sent:** Tuesday, August 04, 2009 9:42 AM
**To:** Maye, Jean
**Subject:** Allegations

I spoke with Amy about the allegations of sleeping at her desk on July 27th and arriving late to work on July 31st. Amy was quite upset when I told her this because on July 27th she came to work feeling sick and remained at work throughout the show. When she told me she was feeling dizzy, I told her to go sit in her office and I really wanted her to go home, but she lives on Long Island so the idea of her driving home was not safe at the time. So she may have put her head down at her desk, but she was sick.

As for arriving after 4:30 am on July 31st, Amy said she spoke with Adam, the assignment editor, at 2am to discuss live shots and the show for that morning.
She said she then laid down for a few more minutes and fell back asleep. She's never done that before. She woke up at 3:45 and rushed into work, but lives on Long Island so it takes a little a while to get here. She still wasn't feeling 100% from the flu hanging on so that probably added to her falling back to sleep.

I know for a fact that Emily Frances is trying to make a case against Amy, but as far Emily is concerned, if I started here to tell you everything that
Emily does, including coming in late for her shifts, not listening to directions and sleeping while at work, this letter would be 20 pages long.

Karen

CONFIDENTIAL

WPIX000316

# EXHIBIT U

REDACTED

-----Original Message-----
From: Scott, Karen
Sent: Monday, August 10, 2009 12:42 PM
To: Berlamino, Betty Ellen
Subject: RE: Weekend news....

SATURDAY'S SHOW WAS GREAT ! BUT SUNDAY'S SHOW WAS A MESS  A LOT OF
ENGINEERING ISSUES WITH TONS..BUT THE SHOW WAS WEAK... last week I TALKED WITH
NOREEN...I ALSO TALKED WITH HMH... THEY COULD REALLY USE NOREEN 5 DAYS A
WEEK...RIGHT NOW SHE DOES THE WEEKENDS AND IS ON HMH 3 DAYS...I THINK WE
SHOULD MOVE HER THERE WHERE SHE DOES GREAT FIELD PRODUCER WORK 5 DAYS A
WEEK  AND TAKE JASON GOODWIN OUR NEWS EDITOR  ON NEWS AT TEN... MAKE HIM THE
WEEKEND PRODUCER AND 3 DAYS A WEEK NEWS EFITOR... AND FILL-IN WITH A WRITER
FROM NEWS AS EDITOR 2 DAYS A WEEK...

I WILL ALSO LET MARY KNOW  NOT TO USE THE WORD WEEKEND

KAREN


T
-----Original Message-----
From: Berlamino, Betty Ellen
Sent: Monday, August 10, 2009 11:29 AM
To: Scott, Karen
Subject: Weekend news....

Is pretty bad.....I had to turn off last night's broadcast after about 15 minutes....it was hard to
watch.....what can we do to make it better??? (And can you please tell mary to stop calling in pix news
at ten weekend.....our viewers know that it's the weekend

1

WPIX000322

# EXHIBIT V

**From:** Berlamino, Betty Ellen
**Sent:** Monday, August 17, 2009 7:23 PM
**To:** Scott, Karen; Houseman, John
**Cc:** Surratt, Wil; Growick, Amy
**Subject:** NEWS IN THE YEAR 2009

First there was one screen, then there were three and now there are (minimally) FIVE! What do I mean? I want to make this as clear as possible and lay out all the expectations.... It is not enough to simply get news on the air...it has to go on wpix.com, someone has to tweet it, it has to go mobile and someone has to put it on Facebook. This is how writers, producers, assignment editors, reporters, producers, and news directors and General Managers MUST think now. We MUST be giving people the most up to date information on EVERY SCREEN...this is how they EXPECT a news operation to work and if we do not, THEY WILL GO ELSEWHERE.

I believe this informative has been "conveyed" to people, however, it is no being executed. Therefore, please get together and build your action plan immediately and then most importantly, CONVEY IT TO EVERY MEMBER OF YOUR STAFF. We must INSIST that our people work differently than they have in the past....we can't "save" information for the TV screen....it has to be pushed out to all screens! If we become people's source if information on-line, or on Facebook or on Twitter, then they WILL come to us when they eventually sit down to watch TV!

CONFIDENTIAL

WPIX000326

**Berlamino, Betty Ellen**

| | |
|---|---|
| **From:** | Berlamino, Betty Ellen |
| **Sent:** | Tuesday, August 18, 2009 1:18 PM |
| **To:** | Scott, Karen |
| **Cc:** | Zeigler, John |
| **Subject:** | The latest TWITTER from PIX (under the PIX TWITTER) |

Is from August 13th!!!!  PLEASE get on this immediately!

*fixed 4.20pm*

CONFIDENTIAL

WPIX000331

# EXHIBIT W

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

BHUPINDER S. BAWA,                          <u>MEMORANDUM AND ORDER</u>

    Plaintiff,                   CV 95-3472

  -against-                                 (Wexler, J.)

BROOKHAVEN NATIONAL LABORATORY,
ASSOCIATED UNIVERSITIES, INC.,

    Defendant.
------------------------------------X

APPEARANCES:

    LEEDS & MORELLI, ESQS.
    BY: JEFFREY K. BROWN, ESQ.
    Attorneys for Plaintiff
    One Old Country Road
    Carle Place, New York 11514

    SEYFARTH, SHAW, FAIRWEATHER & GERALDSON, ESQS.
    BY: EDWARD CERASIA, ESQ.
    Attorneys for Defendant
    900 Third Avenue
    New York, New York 10022

<u>INTRODUCTION</u>

  This discrimination case arises from the employment of plaintiff Bhupinder S. Bawa by defendant Brookhaven National Laboratory, Associated Universities, Inc. ("BNL"). Plaintiff, who is an Asian Indian and a member of the Sikh religion, contends that BNL intentionally failed to train, promote or transfer him on numerous occasions because of his race, color, national origin and religion. He further alleges to have been reassigned discriminatorily to another position at BNL and denied pay increases. Plaintiff seeks relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"), and the New York Human Rights Law, N.Y. Executive Law §

2

290 et seq. ("HRL").  In an earlier opinion, familiarity with
which is assumed, this Court dismissed Plaintiff's pre-May 12,
1992 Title VII claims as time barred and his post-March 8, 1993
Title VII claims because he failed to bring such claims before
the Equal Employment Opportunity Commission ("EEOC").  See Bawa
v. Brookhaven National Laboratory, Associated Universities, Inc.,
968 F. Supp. 865 (E.D.N.Y. 1997) ("Bawa I").

BNL now moves for summary judgment dismissing the
balance of Plaintiff's Title VII claims and all HRL claims.
Plaintiff cross-moves for partial summary judgment regarding his
HRL claim that he was discriminatorily denied promotion and
training during the period March 8, 1992 and May 12, 1992.  For
the reasons that follow, BNL's motion for summary judgment is
granted and Plaintiff's cross-motion for summary judgment is
denied.

DISCUSSION

I.   Applicable Law

   A.   Summary Judgment

A motion for summary judgment may not be granted unless
the court determines that no genuine issue of material fact
exists and the moving party is entitled to judgment as a matter
of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 250 (1986).  The burden of showing the absence of
any genuine dispute as to a material fact rests on the party
seeking summary judgment.  McLee v. Chrysler Corp., 109 F.3d 130,
134 (2d Cir. 1997).  In reviewing the record to determine whether

there exists a genuine issue of material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.  Id.  Although the Court is mindful that it must be cautious in granting summary judgment in employment discrimination claims where intent is genuinely at issue, nevertheless "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact."  Id. at 135.

B.   Title VII

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part: "It shall be an unlawful employment practice for an employer -- (1) to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion . . . or national origin . . . ."  42 U.S.C. § 2000e-2(a).  Claims of discrimination under Title VII are subject to the familiar three-step burden-shifting analysis first set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802-04 (1973), and further developed in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) and St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-08 (1993).  See Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996) (applying burden-shifting analysis in context of summary judgment), cert denied, 117 S. Ct. 1819 (1997).

The employee initially bears the burden of proving a prima facie case of discrimination by a preponderance of the evidence. McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 252-53; Scaria v. Rubin, 117 F.3d 652, 653 (2d Cir. 1997); Holt, 95 F.3d at 129. The employee's burden at this stage is "not onerous," Burdine, 450 U.S. at 253, and frequently has been described as "minimal." Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997) (citing cases). To establish a prima facie case of discriminatory failure-to-promote, the employee must show that he is 1) a member of a protected class, 2) applied for the positions at issue, 3) was qualified for such positions, and 4) the positions were filled by someone outside of the protected class. See Holt, 95 F.3d at 129; Ali v. Bank of New York, 934 F. Supp. 87, 94 (S.D.N.Y. 1996). The parties do not dispute that Plaintiff is a member of a protected class. By establishing a prima facie case, the employee creates a rebuttable presumption that the employer unlawfully discriminated against him. Scaria, 117 F.3d at 654.

The second stage under McDonnell Douglas commences once the employee demonstrates a prima facie case -- the burden of production shifts to the employer to articulate a legitimate, specific, non-discriminatory reason for its decision not to promote the employee. See Holt, 95 F.3d at 129. If the employer satisfies this burden of production, the rebuttable presumption is discharged from the case, Scaria, 117 F.3d at 654, setting the stage for the third step of the McDonnell Douglas analysis.

At the third step, the burden of production shifts back to the employee to prove by a preponderance of the evidence that the employer's articulated reason is pretextual, i.e., that the employer's decision was the result of an impermissible discriminatory motive. Hicks, 509 U.S. at 507-08; Holt, 95 F.3d at 129. The plaintiff may meet this burden either directly, by demonstrating that a discriminatory reason was more likely than not the motivation for the employer's decision, or indirectly, by showing that the employer's proffered explanation is unworthy of credence. See Burdine, 450 U.S. at 255. To the extent that the employer goes beyond merely articulating a nondiscriminatory reason "to substantiating that reason by proving it has a sound and factually supported basis, the employee's task of showing that this reason was a pretext will be more difficult." Halbrook v. Reichhold Chem., Inc., 766 F. Supp. 1290, 1295 (S.D.N.Y. 1991), aff'd, 956 F.2d 1159 (2d Cir. 1992).

The ultimate burden of persuading the trier of fact of intentional discrimination remains at all times with the plaintiff. Scaria, 117 F.3d at 654. In an employment discrimination case, the task of the court in weighing a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive by the employer. Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995). If the employee fails to set forth adequate evidence, summary judgment in favor of the employer is

appropriate.  Scaria, 117 F.3d at 654; Holt, 95 F.3d at 132.  An employee's conclusory allegations of discrimination, without more, are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985); see also Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988) (to defeat motion for summary judgment, employee must put forth "concrete evidence").

## II.  Plaintiff's Title VII Claims

### A.  Promotion and Transfer Claims

Plaintiff began his employment with BNL in 1985 and is presently a Senior Standards Inspector in the Central Shops Division.  During the course of his employment, he filed for promotion or transfer on numerous occasions without success. Plaintiff concludes that BNL's refusal to promote or transfer him demonstrates BNL's discriminatory intent.  The evidence submitted by the parties in connection with this motion, however, makes clear that, for most of the positions at issue, Plaintiff was not promoted because he lacked the minimum qualifications to hold the job.

Moreover, for each position where Plaintiff does raise a genuine issue of material fact regarding his qualifications, BNL articulates a legitimate, nondiscriminatory reason for not promoting or transferring him -- namely, BNL chose to select a more qualified candidate.  Under McDonnell Douglas, the burden shifts to Plaintiff to put forward some evidence from which a rational jury might conclude that BNL's articulated reason is

pretextual and that the true reason for BNL's decisions is an unlawful discriminatory intent.  Plaintiff fails to put forward such evidence.

The only direct evidence Plaintiff proffers as to BNL's discriminatory intent is his averment that one of his supervisors, Michael Palumbo, made several comments regarding Plaintiff's turban, a symbol of the Sikh religion.  Bawa Aff. ¶¶ 63-65.  There is no evidence, however, that Palumbo was a decisionmaker in the promotion/transfer process or was involved in that process in any way.  Consequently, as a matter of law, Palumbo's comments are not evidence of BNL's alleged discriminatory animus.  See Price Waterhouse v. Hopkins, 490 U.S. 228, 278 (1989) (O'Connor, J., concurring) (noting, in mixed-motive case, that statements by nondecisionmakers are not by themselves sufficient to satisfy burden of proving pretext); Burrell v. Bentsen, No. 91-2654, 1993 WL 535076, at *8 (S.D.N.Y. Dec. 21, 1993) (applying Price Waterhouse rule in pretext case).  Moreover, even if the remarks of a nondecisionmaker could, under some circumstances, be probative of an employer's discriminatory animus, the Court does not find Palumbo's remarks to create a genuine issue of fact regarding his promotion/transfer claims or any other claim asserted in this action.

Plaintiff advances an additional argument that BNL's promotion/transfer decisions were pretextual.  He contends that, on certain occasions, BNL offered interviews to candidates who, he asserts, were less qualified than himself.  From this indirect

evidence, Plaintiff concludes that BNL's articulated reason for denying him promotion or transfer, i.e., that BNL hired a more qualified candidate, is pretextual. Plaintiff's argument is misguided because the dispositive fact at issue is not whether BNL interviewed some candidate it should not have, but whether BNL awarded a position to someone less qualified than Plaintiff. As to BNL's internal decision whether to interview a particular employee or not, "this Court does not sit as a super-personnel department that reexamines an entity's business decisions." Scaria, 117 F.3d at 655 (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)). Plaintiff submits no evidence tending to show that BNL's decisions not to interview him resulted from an impermissible discriminatory intent rather than a legitimate business decision not to extend an interview to an unqualified candidate.

Turning to the dispositive issue, an examination of each position in controversy reveals that Plaintiff either was unqualified to hold the position or was passed over in favor of a more qualified individual. As noted above, Plaintiff's Title VII claims are limited to the period May 12, 1992 through March 8, 1993. During this period of time, Plaintiff applied for ten positions, three of which were later cancelled. The facts regarding each of these ten positions are set forth below.

### 1.   The Three Cancelled Positions

Plaintiff contends that three positions for which he applied (NS 0644, LS 0182, and LS 5096) were cancelled by BNL

with the intent of preventing him from securing these positions.
Apart from his conclusory allegation that the positions were
cancelled with discriminatory intent, Plaintiff presents no
evidence that such was the case.  It is undisputed that no one
was hired to fill these cancelled positions.  Consequently,
Plaintiff is unable to demonstrate the fourth element of a prima
facie case of discrimination, namely, that the position was
filled by someone outside the protected class. See Holt, 95 F.3d
at 129 (affirming summary judgment in favor of employer and
holding that plaintiff failed to establish a prima facie case
where position in question was not filled).  Plaintiff's Title
VII claims as to the cancelled positions are dismissed.

      2.  The Seven Uncancelled Positions

In assessing whether Plaintiff's claims survive summary
judgment, the Court has reviewed the facts pertaining to each
position in the light most favorable to Plaintiff.  Upon review,
it is clear that Plaintiff lacked the educational or work
experience requirements for five of the seven positions and,
hence, failed to establish a prima facie case of discrimination.
In the two instances where his educational and employment history
satisfied the posted requirements of the job opening, BNL has
articulated a legitimate, nondiscriminatory reason for not
promoting Plaintiff, namely, BNL chose to promote a more highly
qualified individual.  In response, Plaintiff offers no evidence
from which a rational jury could conclude that BNL's decision was
a pretext masking BNL's alleged discriminatory intent.

Consequently, there is no genuine issue of material fact requiring trial. The particulars of each position are set forth below.

NS 8148   The duties of this training position in BNL's Safety and Environmental Protection Division included "performing all aspects of TSD-based instruction for hazardous and radioactive waste management issues." Pltfs. Counter-Rule 56.1 Statement [hereafter "Pltfs. Rule 56.1"], Exh. D (NS 8148). The job posting required, inter alia, a minimum of two years' professional training experience. Id. Plaintiff's resume, submitted with his application, does not indicate any experience as an instructor. Id. Plaintiff also admitted at his deposition that he had no experience as a professional training instructor, nor had he ever provided training in environmental matters, hazardous and radioactive waste management issues, or radiation safety. Deposition of Bhupinder S. Bawa ("Bawa Dep.") at 247, 266-67. Plaintiff fails to make out a prima facie case for this position.

Even if Plaintiff were qualified for this position, BNL has articulated a legitimate, non-discriminatory business reason for refusing to promote him: BNL chose to fill the slot with Phillip Harrington, an engineer who possessed a master's degree in education, ten years' experience in designing adult education courses at the Vanderbilt Planetarium, and a year of teaching experience at the university level. Affidavit of Nancy Sobrito

("Sobrito Aff.") at ¶ 11.[1]  Plaintiff puts forward no evidence to suggest that BNL's proffered reason is pretextual or that its refusal to promote him was motivated by discriminatory intent. Plaintiff's claim as to this position is dismissed.

NS 8163   The posted requirements for this engineering position called for the applicant to have "several years emergency planning experience."  Pltfs. Rule 56.1, Exh. D (NS 8163).  Plaintiff's resume indicates that he has no experience in emergency planning, id., a fact he confirmed during his deposition.  Bawa Dep. at 213.  Because Plaintiff fails to set forth a prima facie case, this claim is dismissed.

LS 8165   The posted requirements for this position in BNL's Safety and Environmental Protection Division called for the applicant to possess "experience in investigation and analysis of safety incidents."  As indicated on the resume he submitted with his application, Plaintiff's work history shows no such experience.  Pltfs. Rule 56.1, Exh. D (LS 8165).  During his deposition, Plaintiff conceded he did not have any job experience in investigating safety matters or in analyzing environmental safety and health issues.  Bawa Dep. at 224.  Because Plaintiff fails to set forth a prima facie case, this claim is dismissed.

LF 8155   As with LS 8165, this position required "some pertinent professional safety experience."  Pltfs. Exh. D (LF 8155).  Plaintiff's admitted lack of job experience in safety

---

[1]      Sobrito, a Senior Human Resources Representative in the Employment group at BNL, acts as a recruiter for job openings there.  Sobrito Aff. ¶ 2.

12

matters, as noted above, rendered him unqualified for the position. Because Plaintiff fails to set forth a prima facie case, this claim is dismissed.

NS 8140   This position in BNL's Department of Environmental Restoration required at least a B.S. degree in "geology, chemistry or a related field and at least three years' experience in geochemical assessments utilizing CERCLA/RCRA protocols."[2]  Pltfs. Rule 56.1, Exh. G (NS 8140).  Assuming that Plaintiff's master's degree in environmental science could be considered a related field,[3] thereby satisfying the educational requirement, Plaintiff nevertheless concedes that he lacks the requisite experience in geochemical assessments.  Bawa Dep. at 230.  Because Plaintiff fails to set forth a prima facie case, this claim is dismissed.

LF 8141   This engineering position required experience in safety analysis, particularly electrical safety analysis. Bawa Dep., Exh. 21.  Because Plaintiff has a master's degree in electro-mechanical engineering (Pltfs. Rule 56.1, Exh. D at NS 8148) and some work experience involving safety hazard assessment

---

[2]     CERCLA is the acronym for the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601-9675 (1988).  RCRA is the acronym for the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6999k (1988). CERCLA's provisions address the cleanup of released hazardous waste and impose financial responsibility upon the party responsible for the release.  RCRA's provisions set forth standards for the proper disposal of hazardous waste.

[3]     Significantly, Plaintiff conceded during his deposition that he had no degree in any field related to geology or chemistry.  Bawa Dep. at 230.

(Bawa Dep. at 276-77), he was interviewed by BNL for the post. Plaintiff has established a prima facie case regarding this position.  BNL decided not to promote Plaintiff and awarded the position to Terence Monahan.  BNL contends that Monahan was more qualified than Plaintiff because of his greater work experience and training in electrical safety.  Deposition of Steven Hoey at 17, 19-20.

Having articulated a legitimate, non-discriminatory reason for denying promotion to Plaintiff, the burden shifts to Plaintiff to put forth evidence that BNL's reasons are pretextual and that BNL's decision was motivated by a discriminatory intent. Plaintiff fails to meet that burden.  Although he notes that Monahan "did not amass the highest score based on the evaluation criteria used by the interviewers," Pltfs. Rule 56.1 at ¶ 6, the evaluation scorecard submitted by Plaintiff indicates that his score was significantly lower than Monahan's.  See Pltfs. Rule 56.1, Exh. D (LF8141).  Indeed, of the seven candidates scored, Plaintiff ranked sixth and Monahan second.  Plaintiff's evidentiary showing falls short of creating a genuine issue of material fact as to BNL's alleged discriminatory intent.

NS 1081[4]  This position required a B.S. in mechanical engineering and five years' experience in quality assurance

_____

[4]    The parties dispute whether Plaintiff, in fact, applied for this position.  BNL contends it has no record of his application while Plaintiff states that he did apply and further points to BNL's statement in its Second Amended Pretrial Order, listing "Plaintiff's Resume Submitted in Connection with NS 1081."  Pltfs. Rule 56.1, ¶ 66.  We resolve this ambiguity in favor of Plaintiff.

("QA") in an industrial/manufacturing environment. Plaintiff's educational accomplishments satisfy the degree requirement, though the parties dispute whether he had adequate work experience. Resolving this ambiguity in Plaintiff's favor, as is necessary in this summary judgment motion, the Court finds that Plaintiff sets forth a prima facie case of discrimination.

BNL articulates a legitimate, non-discriminatory reason for refusing to promote Plaintiff, namely, that it awarded the position to Christopher Porretto, a quality assurance engineer with five years' experience in QA in an industrial environment, because he was the most qualified applicant for the position. Sobrito Aff. ¶ 14. Plaintiff sets forth no evidence that BNL's explanation is a pretext to cover discriminatory intent.

B.   The Training Claim

In his Complaint, Plaintiff contends that he was discriminatorily denied training, specifically, full-face respirator training. Compl. ¶¶ 29-31. Plaintiff stated in his deposition that he does not recall when he was denied this training, other than that the denial took place sometime in 1992. Bawa Dep. at 54. However, on March 8, 1993, Plaintiff filed a charge of discrimination in training and promotion with the EEOC. In a contemporaneous affidavit filed with the EEOC in support of the charge of discrimination, Plaintiff affirmed that the denial of respirator training took place on March 20, 1991. Bawa Dep., Exh. 1. Consequently, Plaintiff's Title VII claim based on the denial of respirator training is time-barred for the reasons

stated in _Bawa I_.

Even if his claim were not time barred, the evidence proffered by the parties indicates that there is no genuine issue of material fact requiring trial. Plaintiff concedes that he received full-face respirator training on May 21, 1992, and was not denied such training thereafter. Bawa Dep. at 56-57. Finally, there is convincing evidence, unrebutted by Plaintiff, that this claim is without merit. EEOC referred Plaintiff's charge of discrimination to the New York State Division of Human Rights ("NYSDHR") for investigation. On July 13, 1995, NYSDHR issued a Determination and Order After Investigation, finding that Plaintiff had been offered training and that there was no probable cause to believe that BNL had engaged in an unlawful discriminatory practice. Bawa Dep., Exh.2. In the face of this undisputed evidence, no jury could rationally conclude that Plaintiff had been discriminatorily denied respirator training. This claim is dismissed.

In an affidavit served on September 2, long after briefing on Defendant's motion for summary judgment had concluded, Plaintiff amplified his denial of training claim to include an alleged denial of welding training, said to have taken place at some unspecified time in 1992. Bawa Aff. ¶¶ 1-7. Because Plaintiff did not raise this issue before the EEOC in his administrative complaint dated March 8, 1993, this claim is dismissed for failure to exhaust administrative remedies.

C.    The September 1992 Harassment Claim

In his Complaint, Plaintiff alleged that in or about September 1992, BNL harassed him by reducing his responsibilities to doing simple tasks such as calibrating and cleaning instruments, and that BNL replaced him with a white individual. He further alleges that he was harassed for using his sick days. Complaint ¶¶ 35-40.  Plaintiff's workplace harassment claims are dismissed for failure to raise them in the March 8, 1993 EEOC filing.

D.    The Pay Increase Claim

Plaintiff alleges that he was deprived of full salary increases by BNL.  Complaint ¶¶ 35-40.  The only evidence proffered by Plaintiff is a letter dated September 28, 1990 that he received from his supervisors, Edward Jackle and Richard Spellman, informing him that a portion of his discretionary raise was to be withheld because of his poor attendance record over the preceding three years.  Bawa Aff. ¶ 39, Exh. B.  Plaintiff's claim is barred under Title VII both because it occurred prior to March 1992, and because it was not raised in the administrative action filed with the EEOC.

III. Plaintiff's State Law Claims

Relying upon this Court's power to exercise supplemental jurisdiction, Plaintiff asserts numerous claims under New York State's Human Rights Law.  The exercise of supplemental jurisdiction over state law claims is a matter within the court's discretion and, when all federal claims have

17

been dismissed before trial, the balance of factors guiding the court's discretion points toward declining to exercise supplemental jurisdiction. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7; Block v. First Blood Assocs., 988 F.2d 344, 351 (2d Cir. 1993). Accordingly, because all of Plaintiff's Title VII claims are dismissed, this Court declines to exercise its supplemental jurisdiction. See Carrasco v. New York City Off-Track Betting Corp., 858 F. Supp. 28, 33 (S.D.N.Y. 1994) (dismissing pendent state law claims after all Title VII claims were dismissed). Plaintiff's state law claims are dismissed and Plaintiff's cross-motion for summary judgment is denied.

### CONCLUSION

The Court has reviewed the remaining contentions of Plaintiff and finds them without merit. For the above reasons, Defendant's motion for summary judgment is granted. Plaintiff's cross-motion for summary judgment is denied. The Clerk of the Court is directed to close the case.

SO ORDERED

LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated:   Hauppauge, New York
         October 15, 1997

# EXHIBIT X

JUDGE PAULEY

10 — 4622

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAREN SCOTT,<br><br>                    Plaintiff,<br><br>          -against-<br><br>WPIX, INC.,<br><br>                    Defendant. | 10 CV _____<br><br>**COMPLAINT and<br>JURY DEMAND**<br><br>**ECF Case** |

U.S.D.C. S.D.N.Y.
CASHIERS

Karen Scott, by her attorneys, Haynes and Boone, LLP, for her Complaint against

defendant WPIX, Inc. ("WPIX" or the "Company"), alleges as follows:

## Nature of Action

1.     This action arises out of the unlawful discrimination on the basis of age by WPIX.

Karen Scott, one of the most decorated women in television news, was wrongfully terminated as

the News Director of WPIX (Channel 11 in the New York Metropolitan area) due to her age.

After 13 noteworthy years as News Director, Ms. Scott was terminated in late August 2009.  At

that time, the purported reason provided for Ms. Scott's termination was "ratings" (a position

WPIX has since modified).  As described below, however, age was the true motivating factor for

terminating Ms. Scott.  As a result of its actions, WPIX is liable for age discrimination in

employment against Ms. Scott in violation of (a) the Age Discrimination in Employment Act

("ADEA"); (b) the New York City Human Rights Law; and (c) the New York State Human

Rights Law, and for damages which have resulted from the Company's unlawful discriminatory

practices.

## The Parties

2.     Karen Scott is an individual who resides in New York, New York.  She is

currently 60 years old.

3.     Upon information and belief, WPIX, Inc., is a corporation organized under the laws of the State of Delaware with a principal place of business located at 220 East 42nd Street, New York, New York 10017.  WPIX is owned by Tribune Broadcasting, a division of the Tribune Company.  Upon information and belief, as of September 2009, WPIX had over 400 employees.  On or about December 8, 2008, the Tribune Company and each of its affiliated entities, including WPIX, filed a petition for bankruptcy relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court, District of Delaware.  The bankruptcy proceeding remains pending.

## Jurisdiction and Venue

4.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367.

5.     Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to Ms. Scott's claims occurred within this District.

6.     Ms. Scott filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 14, 2010.  Ninety days have elapsed since Ms. Scott's EEOC filing.  Copies of this Complaint are being served upon the EEOC, the New York City Commission on Human Rights, and the Corporation Counsel.

## Factual Allegations Relevant to Claims for Relief

7.     Ms. Scott was employed by WPIX from May 1993 until her employment was terminated on August 26, 2009.  In terminating Ms. Scott's employment, WPIX discriminated against Ms. Scott based on her age.

8.     Throughout the course of her employment with WPIX, Ms. Scott was qualified for her position and performed her duties in a professional and competent manner.

2

N-80517_1.DOC

Employment History and Achievements

9.      Ms. Scott is one of the most respected and decorated newspersons in the United

States.  For over 35 years, Ms. Scott worked in television news and, as more fully described

below, personally received numerous national and local awards, and was largely responsible for

the receipt of numerous awards by her employers.

10.     Ms. Scott received a Bachelor of Arts degree in journalism from Ohio State

University in 1971.  Following graduation, Ms. Scott began her career in broadcast journalism

for television stations in Detroit where she worked for approximately six years.

11.     Following a four year stint as producer for the 6:00 p.m. and 11:00 p.m. news at

the CBS affiliate in Hartford, Connecticut, Ms. Scott was hired by WNBC-TV in New York in

1983.  After beginning as a freelance writer, Ms. Scott was promoted to weekend news producer

for the 6:00 p.m. and 11:00 p.m. news broadcasts.  Shortly thereafter, Ms. Scott was again

promoted to producer for the 6:00 p.m. news and executive producer for special projects.

12.     During Ms. Scott's 10-year career at WNBC, the station received the Emmy

Award for "Best Newscast" a record-setting five straight years.

13.     After WNBC received an Emmy Award for best newscast in 1993, Michael

Eigner, General Manager of WPIX, and John Corporon, the News Director for WPIX, offered

Ms. Scott a position as the Executive Producer for WPIX news.

14.     In May 1993, Ms. Scott accepted WPIX's offer and within a year, she was

promoted to Assistant News Director.  During her first year of employment with WPIX, Ms.

Scott produced various specials such as the St. Patrick's Day Parade and the Macy's July Fourth

Fireworks Show as well as "Schindler: The Real Story," which received the Gabriel Award (the

highest broadcast award given by the Catholic Broadcasters Association) for broadcast

excellence.

3

15.     Between 1994 and 1996, WPIX received two New York Emmy Awards and two Edward R. Murrow Awards (one of the most prestigious national broadcast journalism awards), from the Radio-Television News Directors Association for "Best Newscast" and "Best Spot News."

16.     In 1996, Ms. Scott was promoted to News Director. As News Director, Ms. Scott was responsible for overseeing the entire news organization, including all news coverage, with general supervision and oversight for over 200 employees.

17.     In addition, Ms. Scott was responsible for recruiting news related personnel, including writers, associate producers, producers, executive producers, managing editors, assistant news directors, anchors, reporters, and freelance staff. The majority of current WPIX news on-air personnel, reporters, writers, and producers were hired by Ms. Scott during her tenure, many of whom were lured from other prominent stations by Ms. Scott, which helped to elevate WPIX's news profile.

18.     Ms. Scott changed the face of the news division at WPIX. At the time she began as News Director, WPIX only had a one hour 10:00 p.m. news program. At the time of Ms. Scott's termination, WPIX was producing approximately 30 hours of news coverage each week.

19.     Ms. Scott was instrumental in creating a morning news show (the "Morning Show"), which airs five days a week for four and a half hours per day, and covers news, entertainment, weather, traffic, sports, and includes live guests,[1] and was a driving force behind the formation of WPIX news bureaus in Washington, D.C., New Jersey, and Long Island, New York.

20.     During her tenure as News Director, WPIX received over 100 local and national awards for excellence in reporting, news coverage, public affairs, news specials, and features,

---

[1]   The Morning Show format developed by Ms. Scott was used as the template for the creation of morning shows for other nationwide stations owned by Tribune.

N-80517_1.DOC

including numerous New York Emmy Awards and Edward R. Murrow Awards.  The following is a partial list of awards and recognition received by WPIX during the last five years under Ms. Scott's stewardship:

2009:   New York State Associated Press Broadcasters Association: "Best Regularly Scheduled Local News Program," "Best Spot News," and "Best Continuing News Coverage"

New York Press Club: "Best Regularly Scheduled Local Newscast"

2008:   Edward R. Murrow Award: "Best Newscast"

New York Press Club: "Best Regularly Scheduled Local Newscast"

Congressional Record for Leadership as News Director

2007:   New York Emmy Awards: "Outstanding Single Newscast," "Best Spot News," and "Best Breaking News Story"

Associated Press New York State Broadcaster Association Grand Prize Television Award

2005:   New York Emmy Awards: "Best Newscast" for the morning *and* evening news, "Outstanding Single Newscast," and "Outstanding Single News Program"

21.     In 2009, the New York Chapter of the National Academy of Television Arts and Sciences nominated WPIX for 32 Emmy Awards, more nominations than WCBS, WNBC, WABC, WNYW, and WWOR.  The nominations included, Best Morning Newscast, Best Evening Newscast, Best Breaking News, Best Hard News Series, Best Investigative Series, Best Sports Coverage, and Best On Camera Talent.

22.     The recognition WPIX news received during Ms. Scott's tenure was a quantum leap for its reputation and industry-wide standing in broadcast news.

23.     Ms. Scott's achievements were also recognized in various other ways.  For example, following WPIX's coverage of September 11, 2001, the Television Quarterly (Journal of the National Academy of Television Arts and Sciences) requested that Ms. Scott write about her experience, which became the cover story for that national publication.  In addition, Ms. Scott was the only news director who was asked to testify before the Federal Communications Commission concerning the media's coverage of September 11.

24.     Ms. Scott was able to bring the WPIX news division to new heights despite facing significantly greater hurdles than competing local news stations.  As compared to its peers, WPIX had far less resources and staff at its disposal.  WPIX news had fewer reporters, fewer trucks for live shots, less camera equipment, and fewer camera operators.  Furthermore, despite the numerous awards and recognition the news division received, WPIX's promotional efforts for the news was minimal and, at times, non-existent.

25.     Of great significance, and the subject of ongoing discussions, the lead-in programming for WPIX news was substantially inferior to other local stations.  By way of example, while WPIX news at 10:00 received numerous awards, the lead-in programming was rarely, if ever, mentioned or recognized in a positive light.

26.     In addition, the Tribune's financial condition, which resulted in a bankruptcy filing in December 2008 (which included WPIX), adversely impacted WPIX's ability to operate competitively.

27.     In the face of the aforementioned obstacles, Ms. Scott continued to excel in her job and WPIX news continued to receive acclaim for its coverage.

28.     During her tenure, Ms. Scott's annual performance reviews and evaluations consistently reflected her stellar performance, significant contributions, and value-added to

WPIX. Indeed, Ms. Scott was never issued a single "corrective notice" with regard to her performance.

The Termination of Ms. Scott's Employment

29.    On August 26, 2009, Betty Ellen Berlamino, then General Manager of WPIX[2], advised Ms. Scott that her employment was being terminated due to "ratings." No additional explanation or information was provided by Ms. Berlamino, or by anyone else at WPIX.

30.    As General Manager of WPIX, Ms. Berlamino was responsible for programming decisions, promotional efforts, and the station's budget, and was directly responsible for the ratings. In connection therewith, Ms. Berlamino was charged with providing her staff, including Ms. Scott, with the necessary resources to ensure that programming could be competitively managed. Ms. Scott's job was to produce the news programming for WPIX, a job she excelled at until the date she was terminated.

31.    After being informed of her termination, Ms. Scott reiterated to Ms. Berlamino that, even with significantly less resources at her disposal and markedly inferior lead-in programming and promotional efforts than competitor stations, she was able to keep WPIX's news ratings at a more than respectable level. Of greater import, when taking into account the dismal lead-in programming (especially as compared to its competitors), the ratings for WPIX news was worthy of praise.[3] Ms. Berlamino offered no response and simply left the room.

32.    As Ms. Berlamino was keenly aware, flaws within the "ratings" system, as reflected in complaints lodged against Nielsen Media Research ("Nielsen"), contributed to any purported ratings decline. Since the implementation of a "People Meter" several years ago, Nielsen itself conceded that its ratings have limited accuracy. This change resulted in declining

---

[2]    Upon information and belief, on or about June 8, 2010, Ms. Berlamino was terminated by WPIX.

[3]    Indeed, during a WPIX staff meeting, Tribune's Chief Operating Officer remarked on the significance of lead-in programming.

N-80517_1.DOC

ratings industry-wide and complaints were rampant as declining ratings translated to declining revenues for many stations. WPIX even designated personnel to study this issue and leadership from the major television networks (including Ms. Berlamino) discussed their dissatisfaction with Nielsen and the intent to take action. In its submission to the EEOC, WPIX conceded concerns related to the Nielsen ratings.

33.     In an effort to save face for what was sure to be a wildly unpopular decision, Ms. Berlamino asked Ms. Scott to voluntarily resign. Without Ms. Scott's consent, WPIX issued a statement falsely announcing that Ms. Scott had resigned from her position as News Director, although Ms. Scott clearly did not.

34.     WPIX personnel were reportedly "stunned" by the decision to terminate Ms. Scott. One employee reportedly commented that: "Everyone who knows [Scott], knows she never would have resigned." Numerous employees actually cried after being informed of Ms. Scott's termination.[4]

35.     Ms. Scott's last day of work at WPIX was September 4, 2009. At the time she was terminated, Ms. Scott was the longest running news director at any station in New York City.

36.     On Ms. Scott's last day in the office, her colleagues presented her with a video tribute and an on-air tribute was aired. In the videos, WPIX staff praised Ms. Scott's leadership, people skills, and overall expertise as a news director. In a most telling reflection of her time as News Director, on her last day at WPIX, Ms. Scott received an award from the New York Press Club for the 2009 "Best Regularly Scheduled Local Program."

37.     WPIX provided Ms. Scott with a separation agreement that Ms. Scott refused to execute.

---

[4]   These reported reactions, as well as on-air and off-air video tributes to Ms. Scott, directly contradict WPIX's claim that a reason underlying the decision to terminate Ms. Scott was her inability to "demonstrate leadership."

N-80517_1.DOC

38.     After her termination, Ms. Scott timely filed a Charge of Discrimination with the

EEOC alleging age discrimination.  WPIX apparently realized the weakness of its stated

"ratings" motivated termination, as in its submission to the EEOC -- and in direct contradiction

of its public statements regarding Ms. Scott's termination -- WPIX shifted course and alleged

"performance" was the basis for Ms. Scott's termination.[5]

39.     As purported support for its new contention, WPIX mainly relies on select e-mails

from 2004 and 2005, although it failed to offer any explanation as to why Ms. Scott was neither

terminated nor ever issued any corrective action notice as a result of the purported performance

issues in 2004-2005.[6]

40.     WPIX's actions in terminating Ms. Scott was consistent with its actions in

terminating or significantly modifying the roles of other older employees as well as with Ms.

Berlamino's age-based commentary.  By way of more recent examples: (i) in 2009, WPIX

demoted Marvin Scott (no relation), 72, a well-known and respected reporter, from weekday to

weekend reporting duties, about whom Ms. Berlamino had frequently made age-related remarks

including "why doesn't he just retire already?" (Ms. Scott struggled with Ms. Berlamino over

several years in an effort to retain Mr. Scott in his customary position); (ii) in 2009, WPIX

directed Kaity Tong, 59, and an anchor of WPIX news since 1991, to undertake certain

additional tasks and responsibilities, which differed from other anchors and reporters, as part of a

---

[5]   Interestingly, WPIX appears to concede the unreliability of its manufactured "performance" motivated
reasoning for the termination as it included a footnote disclaimer within its EEOC submission, that its
submission does "not constitute an affidavit and is not intended for use as evidence in any court proceeding."

[6]   As evidence of the alleged "performance" issues, WPIX claims that Ms. Scott failed "to manage and evaluate
her staff" and "discipline her direct reports."  Ironically, as purported support, WPIX relies on e-mails from Ms.
Berlamino which specifically advised Ms. Scott to "issue corrective action to her subordinates" and address
issues in performance reviews.  Although Ms. Berlamino clearly understood the importance of performance
reviews and corrective actions, she apparently never felt that Ms. Scott's performance warranted any corrective
action.  Around the same dates as the e-mails WPIX included in its EEOC submission as purported support for
Ms. Scott's "performance" issues, is an e-mail from Ms. Berlamino to "WPIX *everyone*" in which she gave a
"special thanks" to Ms. Scott for her "leadership" and "commitment to excellence."

9

concerted effort aimed at forcing her departure from WPIX; (iii) in December 2008, WPIX

decided not to retain Sal Marchiano, 68, a beloved sports anchor in New York, after Ms.

Berlamino remarked to Ms. Scott that he "doesn't look good on the air" due to his advanced

age[7]; and (iv) in 2009, WPIX decided not to retain Larry Hoff, 58, a feature reporter, about

whom Ms. Berlmaino made age-related comments, despite positive feedback received about Mr.

Hoff through a consultant retained by the Company.

Ms. Scott's Replacement

41.     In November, 2009, William Carey (approximately 10 years Ms. Scott's junior),

was hired by WPIX to replace Ms. Scott as News Director.  Immediately prior to joining WPIX,

Mr. Carey was employed with a station in Moline, Illinois, and prior to that, he worked at local

stations in Tampa and Detroit.[8]  Under any objective analysis, Mr. Carey's work experience and

background paled in comparison to Ms. Scott.[9]

Damages

42.     At the time she was terminated, Ms. Scott's annual base salary was approximately

$247,000.  Ms. Scott's annual compensation (including bonus compensation) for the two years

prior to her termination exceeded $300,000.  In addition, Ms. Scott received substantial benefits

by virtue of her employment and stature within the Company.

43.     In addition, WPIX's conduct, as described herein, has caused Ms. Scott to suffer

severe mental pain and anguish for which she is entitled to be compensated.

---

[7]   Similar to Ms. Scott's termination, WPIX apparently announced that Mr. Marchiano voluntarily resigned when in fact he did not.

[8]   While employed in Tampa, Mr. Carey made the news headlines himself, after being involved in a hit-and-run accident which resulted in burglary, battery, and hit-and-run charges being filed against him.  Mr. Carey was placed on administrative leave by his employer following this incident.  Since becoming News Director at WPIX, Mr. Carey has been in the local headlines as well as a result of his retention of various personnel with checkered pasts.  (There have been no less than four people hired in the five months since Carey assumed the position of News Director that have had prior encounters with the law, including a recent incident in which a reporter hired by Carey was arrested for assaulting a driver to the United Nations ambassador from Bermuda.)

[9]   Upon information and belief, the ratings for WPIX news have declined since Ms. Scott's termination.

N-80517_1.DOC

## First Claim for Relief: Age Discrimination Under the ADEA

44.     Ms. Scott repeats the allegations contained in paragraphs 1 through 43 above.

45.     At all relevant times, Ms. Scott was an "employee" under the ADEA, 29 U.S.C. § 630(f).

46.     WPIX is an "employer" under the ADEA, 29 U.S.C. § 630(b).

47.     As detailed above, WPIX has unlawfully discriminated against Ms. Scott on the basis of her age in violation of the ADEA.

48.     By the reason of the foregoing, Ms. Scott suffered substantial damages. Accordingly, WPIX is liable to Ms. Scott for back pay and reinstatement and/or front pay, in amounts to be determined at trial, but in no event less than $1,500,000, plus interest, fees and costs, including an award for attorneys' fees.

49.     WPIX's conduct was willful, entitling Ms. Scott to liquidated damages pursuant to 29 U.S.C. § 626(b).

## Second Claim for Relief: Age Discrimination in Violation of the New York City Human Rights Law

50.     Ms. Scott repeats the allegations contained in paragraphs 1 through 49 above.

51.     Ms. Scott is a "person" under § 8-102(1) of the New York City Administrative Code.

52.     WPIX is an "employer" subject to the provisions of the New York City Human Rights Law under § 8-102(5) of the Administrative Code.

53.     As detailed above, WPIX has intentionally discriminated against Ms. Scott on the basis of her age in violation of the New York City Human Rights Law.

54.     As a result of the discrimination described above, Ms. Scott has suffered substantial damages.  Accordingly, WPIX is liable to Ms. Scott for back pay and reinstatement and/or front pay and compensatory damages, including those resulting from Ms. Scott's

11

emotional distress and mental anguish, in amounts to be determined at trial, but in no event less than $1,500,000, plus interest, fees and costs, including an award for attorneys' fees.

53.     Based on the foregoing, Ms. Scott is also entitled to an award for punitive damages.

### Third Claim for Relief: Age Discrimination in Violation of the New York State Human Rights Law

54.     Ms. Scott repeats the allegations contained in paragraphs 1 through 53 above.

55.     At all relevant times, Ms. Scott has been an "employee" for purposes of § 296 of the New York State Human Rights Law.

56.     WPIX is an "employer" for purposes of § 292 of the New York State Human Rights Law.

57.     As detailed above, WPIX has unlawfully discriminated against Ms. Scott on the basis of her age in violation of § 296 of the New York State Human Rights Law.

58.     As a result of the discrimination above, Ms. Scott has suffered substantial damages.  Accordingly, WPIX is liable to Ms. Scott for back pay and reinstatement/front pay and compensatory damages, including those resulting from Ms. Scott's emotional distress and mental anguish, in amounts to be determined at trial, but in no event less than $1,500,000, plus interest, fees and costs, including an award for attorneys' fees.

N-80517_1.DOC

**WHEREFORE**, Ms. Scott respectfully requests that this Court enter judgment in her favor and against WPIX, as follows:

(A)     On the First Claim for Relief for violation of the ADEA, for back pay and reinstatement and/or front pay, in amounts to be determined at trial, but in no event less than $1,500,000, plus interest, fees and costs, including an award for attorneys' fees, and an award for liquidated damages;

(B)     On the Second Claim for Relief for violation of the New York City Human Rights Law, for back pay and reinstatement and/or front pay and  compensatory damages, including those resulting from Ms. Scott's emotional distress and mental anguish, in amounts to be determined at trial, but in no event less than $1,500,000, plus interest, fees and costs, including an award for attorneys' fees, as well as an award for punitive damages;

(C)     On the Third Claim for Relief for violation of the New York State Human Rights Law, for back pay and reinstatement and/or front pay and compensatory damages, including those resulting from Ms. Scott's emotional distress and mental anguish, in amounts to be determined at trial, but in no event less than $1,500,000, plus interest, fees and costs, including an award for attorneys' fees; and

(D)     For such other and further relief as this Court may deem just and proper.

N-80517_1.DOC

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims and issues triable by a jury.

Dated: June 14, 2010

> HAYNES AND BOONE, LLP
> *Attorneys for Plaintiff*
>
> By:
>
> Kenneth J. Rubinstein (KR-1410)
> 1221 Avenue of the Americas, 26th Floor
> New York, New York 10020
> (212) 659-7300

14