UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KAREN SCOTT,

                           Plaintiff,

              -against-

WPIX, INC.

                           Defendant.

10-CV-4622 (WHP)

**PLAINTIFF KAREN SCOTT'S MEMORANDUM OF LAW IN OPPOSITION TO WPIX, INC.'S MOTION FOR SUMMARY JUDGMENT**

HAYNES AND BOONE LLP
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF UNDISPUTED FACTS .......................................................... 3

   Ms. Scott's Employment with WPIX .......................................................... 3

   Ms. Scott's Annual Evaluations and Compensation .................................. 4

   The Termination of Ms. Scott's Employment ............................................ 5

   Berlamino's Ageist Comments and Actions ............................................... 8

ARGUMENT .......................................................................................................... 9

I.    Applicable Standards ...................................................................................... 9

II.    Ms. Scott Has Established A *Prima Facie* Claim For Age Discrimination ........................ 12

     (1)   *Ms. Scott's Performance.* ................................................................ 13

     (2)   *Significant Inconsistencies in Defendant's Story.* .......................... 15

III.    Defendant's Attempt To Justify That Ms. Scott Was Terminated Due To Performance Fails .......................................................................................... 18

     (1)   *Ms. Scott's Alleged "Unsatisfactory" Performance.* ..................... 18

     (2)   *The Relationship Between Ms. Scott and Berlamino does not Support Defendant's Position.* .............................................................. 21

     (3)   *It is of no Consequence that Berlamino is in the Same Protected Class as Ms. Scott.* ................................................................................ 22

     (4)   *Carey's Retention does not Impact Ms. Scott's Claims.* ................ 23

     (5)   *Armstrong's Termination is Insignificant.* ..................................... 23

     (6)   *The EEOC Decision is not Probative.* ............................................ 24

     (7)   *Berlamino's Ageist Comments and Actions are Admissible and Significant.* ....... 26

CONCLUSION ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Canon USA, Inc.*,
   No. 07 Civ. 3512, 2009 U.S. Dist. LEXIS 86722 (E.D.N.Y. Sept. 22, 2009) ....................... 23

*Allen v. J.P. Morgan Chase & Co.*,
   No. 06 Civ. 8712, 2009 U.S. Dist. LEXIS 29116 (S.D.N.Y. Mar. 30, 2009) ............ 14, 17, 22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................. 9

*Byrnie v. Town of Cromwell Bd. of Educ.*,
   243 F.3d 93 (2d Cir. 2001) ................................................................................. 10, 11

*Catalano v. Lynbrook Glass & Architectural Metals Corp.*,
   No. 06 Civ. 2907, 2008 U.S. Dist. LEXIS 589 (E.D.N.Y. Jan. 4, 2008) ................................. 15

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................................. 9

*Chambers v. TRM Copy Ctrs. Corp.*,
   43 F.3d 29 (2d Cir. 1994) ....................................................................................... 10

*Coburn v. Rockwell Automation, Inc.*,
   238 Fed. App'x 112 (6th Cir. 2007) ........................................................................ 17

*Collins v. Cohen Pontani Lieberman & Pavane*,
   No. 04 Civ. 8983, 2008 U.S. Dist. LEXIS 58047 (S.D.N.Y. July 30, 2008) ......................... 15

*Cook v. Arrowsmith Shelburne, Inc.*,
   69 F.3d 1235 (2d Cir. 1995) ............................................................................. 28-29

*D'Cunha v. Genovese/Eckerd Corp.*,
   479 F.3d 193 (2d Cir. 2007) ................................................................................... 23

*Dais v. Lane Bryant, Inc.*,
   No. 97 Civ. 2011, 2001 U.S. Dist. LEXIS 17210 (S.D.N.Y. Oct. 22, 2001) ......................... 29

*Danzer v. Norden Sys., Inc.*,
   151 F.3d 50 (2d Cir. 1998) ............................................................................... 22, 28

*E.E.O.C. v. Ethan Allen, Inc.*,
   44 F.3d 116 (2d Cir. 1994) ..................................................................................... 17

*George v. Mobil Oil Corp.*,
    739 F. Supp. 1577 (S.D.N.Y. 1990)..................................................................15

*Giannone v. Deutsche Bank Sec., Inc.*,
    392 F. Supp. 2d 576 (S.D.N.Y. 2005)..........................................................17, 29

*Gorzynski v. JetBlue Airways Corp.*,
    596 F.3d 93 (2d Cir. 2010)..........................................................................11

*Harris v. Niagra Mohawk Power Corp.*,
    No. 95 Civ. 788, 1998 U.S. Dist. LEXIS 22009 (N.D.N.Y. Dec. 5, 1998 )...........19

*Herbert v. Nat'l Amusements, Inc.*,
    No. 08 Civ. 1945, 2011 U.S. Dist. LEXIS 65914 (D. Conn. June 16, 2011)........11

*Hird-Moorehouse v. Belgian Mission to the United Nations*,
    No. 03 Civ. 9688, 2010 U.S. Dist. LEXIS 106276 (S.D.N.Y. Oct. 4, 2010)........10, 11, 12, 27

*Holtz v. Rockefeller & Co.*,
    258 F.3d 62 (2d Cir. 2001)..........................................................................10

*Leibowitz v. Cornell Univ.*,
    584 F. 3d 487 (2d Cir. 2009)........................................................................28

*Mandell v. County of Suffolk*,
    316 F.3d 368 (2d Cir. 2001)........................................................................10

*Manning v. New York Univ.*,
    98 Civ. 3300, 2000 U.S. Dist. LEXIS 19606 (S.D.N.Y. July 28, 2000)...........25-26

*Mattera v. J.P. Morgan Chase Corp.*,
    740 F. Supp. 2d 561 (S.D.N.Y. 2010)...........................................................21

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)..................................................................................11

*Messer v. Fahnestock & Co.*,
    No. 03 Civ. 4989, 2008 U.S. Dist. LEXIS 93572 (E.D.N.Y. Nov. 17, 2008)..........13-14

*Nathe v. Weight Watchers Int'l, Inc.*,
    No. 2010 U.S. Dist. LEXIS 76623 (S.D.N.Y. July 26, 2010)...........................12

*Nuwesra v. Merrill Lynch Fenner & Smith, Inc.*,
    174 F.3d 87 (2d Cir. 1999)..........................................................................25

*Okeke v. Southside Hosp.*,
    No. 02 Civ. 5935, 2005 U.S. Dist. LEXIS 40902 (E.D.N.Y. Aug. 9, 2005)..........14, 21

*Paolitto v. John Brown E.&C., Inc.*,
    151 F.3d 60 (2d Cir. 1998)..................................................................................25, 27

*Park v. Seoul Broad. Sys. Co.*,
    No. 05 Civ. 8956, 2008 U.S. Dist. LEXIS 17277 (S.D.N.Y. Mar. 3, 2008) ..........................10

*Pergament v. FedEx*,
    No. 03 Civ. 1106, 2007 U.S. Dist. LEXIS 23732 (E.D.N.Y. Mar. 30, 2007) ........................21

*Phillips v. Centrix, Inc.*,
    No. 07 Civ. 1455, 2009 U.S. Dist. LEXIS 11065 (D. Conn. Dec. 1, 2009) ...........................23

*Pilgrim v. McGraw-Hill Cos., Inc.*,
    599 F. Supp. 2d 462 (S.D.N.Y. 2009)................................................................................29

*Quinby v. WestLB AG*,
    No. 04 Civ. 7407, 2007 U.S. Dist. LEXIS 28657 (S.D.N.Y. Apr. 19, 2007) ...................14, 21

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)........................................................................................... 10, 14-15

*Riley v. HSBC United States, Inc.*,
    No. 08 Civ. 919, 2011 U.S. Dist. LEXIS 36728 (W.D.N.Y. Feb. 3, 2011).......................17, 28

*Roge v. NYP Holdings, Inc.*,
    257 F.3d 164 (2d Cir. 2001)...........................................................................................17

*Schreiber v. Worldco, LLC*,
    324 F. Supp. 2d 512 (S.D.N.Y. 2004)..........................................................................27, 28

*Sklaver v. Casso-Solar Corp.*,
    No. 02 Civ. 9928, 2004 U.S. Dist. LEXIS 24934 (S.D.N.Y. May 14, 2004)....................13, 19

*Tomassi v. Insignia Fin. Group, Inc.*,
    478 F.3d 11 (2d Cir. 2007)........................................................................................27, 28

*Weber v. Parfums Givenchy, Inc.*,
    49 F. Supp. 2d 343 (S.D.N.Y. 1999)............................................................................ 9-10

*Weiss v. JPMorgan Chase & Co.*,
    No. 06 Civ. 4402, 2010 U.S. Dist. LEXIS 2505 (S.D.N.Y. Jan. 13, 2010)..............................12

*Woodell v. United Way*,
    357 F. Supp. 2d 761 (S.D.N.Y. 2005)..............................................................................25

*Worowski v. Nashua Corp.*,
    31 F.3d 105 (2d Cir. 1994).............................................................................................28

*Zimmermann v. Assocs. First Capital Corp.*,
    251 F.3d 376 (2d Cir. 2001)............................................................................................11, 19

**OTHER AUTHORITIES**

FED. R. CIV. P. 56(c) .............................................................................................................9

FED. R. EVID. 801(d)(2)(D)..................................................................................................29

Karen Scott ("Scott") submits this memorandum of law in opposition to defendant WPIX Inc.'s motion for summary judgment.

## PRELIMINARY STATEMENT

Ms. Scott was terminated on August 26, 2009 from her position as News Director at WPIX, Inc. ("WPIX"), a position she held for 13 years. At the time of her termination, Ms. Scott was 60 years old and was one of the most respected and decorated women in television news. During Ms. Scott's tenure as News Director, the WPIX News Department received over 100 local and national awards for excellence in reporting, news coverage, public affairs, news specials, and features, including numerous New York Emmy Awards and Edward R. Murrow Awards (the most prestigious award in the news industry). The recognition that the WPIX News Department received during Ms. Scott's tenure was a quantum leap for its reputation and standing in the broadcast news industry.

When the decision to terminate Ms. Scott was made, she had an unblemished performance record. There was nothing in Ms. Scott's personnel file that reflected any issues with her performance or with her conduct in the workplace. In fact, when Betty Ellen Berlamino, the General Manager of WPIX and Ms. Scott's supervisor, advised human resources that a decision had been made to terminate Ms. Scott, Berlamino was instructed to document the reasons supporting the termination because there was nothing in WPIX's files to support such a decision.

This instruction resulted in Berlamino drafting an e-mail which underscored the pretextual nature of the purported "performance" issues which defendant alleges was the basis for Ms. Scott's termination. The e-mail refers to purported performance-related events in 2004 and 2005 -- over four years before the decision was made to terminate Ms. Scott -- and is then

silent with respect to any performance issues until late 2008.  It picks up with the mention of a November 2, 2008 meeting at which Berlamino alleged she warned Ms. Scott that her job was in jeopardy.  This meeting, however, never occurred.  During her deposition, Berlamino was forced to concede that there was never any such meeting on November 2, 2008.  In fact, defendant has not identified any documents reflecting that, prior to her termination, any meeting or discussion regarding Ms. Scott's job status ever took place.  Jean Maye, Director of Human Resources for WPIX, contradicted Berlamino's account that a meeting concerning Ms. Scott's job status occurred in late 2008.  In her desperate attempt to paper the record to establish a legitimate basis for Ms. Scott's termination, Berlamino sought to rewrite history.

In a similar vein, defendant's version as to how and why Ms. Scott was terminated has changed over time.  At the time she was terminated, Ms. Scott was told that she was being fired because of "ratings."  In response to Ms. Scott's EEOC filing, defendant shifted course and stated that Ms. Scott was terminated because of various performance-related issues.  Now, in an obvious effort to shift the focus away from Berlamino, defendant has again changed its story.  Defendant's current version of events points to Steve Charlier, Tribune's Senior Vice President of News and Operations, as a decision-maker behind Ms. Scott's termination.  However, this account differs from the story defendant recounted to the EEOC in March 2010 -- in which Charlier is never mentioned -- and there is no contemporaneous evidence demonstrating that Charlier was in any way involved in the decision to terminate Ms. Scott.

It is not surprising that defendant's version of events is fraught with inconsistencies and contradictions, because the true motivation for Ms. Scott's termination was her age.  This conclusion is consistent with Berlamino's ageist remarks and actions in the months leading up to

Ms. Scott's termination. Indeed, the Vice President of Human Resources at Tribune testified about her "concerns" with Berlamino's pattern of treatment towards older employees.

As the evidence demonstrates, at the time Ms. Scott was terminated, she remained highly qualified to perform her duties as News Director, and age was the "but for" cause of her termination.

Accordingly, defendant's motion for summary judgment should be denied.

## STATEMENT OF UNDISPUTED FACTS

The facts set forth herein are derived from plaintiff's response to defendant's Rule 56.1 Statement (the "56.1 Resp.").

Ms. Scott's Employment with WPIX

Ms. Scott was employed by WPIX from May 1993 until her termination on August 26, 2009. (56.1 Resp., ¶ 1) Initially, Ms. Scott was hired as an Executive Producer. (*Id.*) Within a year, she was promoted to Assistant News Director. (*Id.*) In 1996, Ms. Scott was promoted to News Director. (*Id.*)

As News Director, Ms. Scott was responsible for news-related programming at WPIX including the morning and nightly news, and all news-related events. (56.1 Resp., ¶¶ 4, 5)

During Ms. Scott's tenure as News Director, WPIX received over 100 local and national awards for excellence in reporting, news coverage, public affairs, news specials, and features, including numerous New York Emmy Awards and Edward R. Murrow Awards. (56.1 Resp., ¶ 24) During the last five years under Ms. Scott's leadership, the WPIX news department received awards including New York Emmy Awards, the Edward R. Murrow Award, New York State Associated Press Broadcasters Association Awards, and New York Press Club awards for both the morning and the evening newscasts. (*Id.*; Exs. 43-60)

In 2009 alone -- the year Ms. Scott was terminated -- the National Academy of Television Arts and Sciences nominated WPIX for 32 Emmy Awards, more nominations than any of WPIX's competitors.  (*Id.*)

Between December 2000 and the time of her termination, Ms. Scott reported to Betty Ellen Berlamino, the General Manager of WPIX.  (56.1 Resp., ¶ 1)  As General Manager, Berlamino was responsible for oversight of all department heads, the station's annual budget, overall day-to-day operations, news content, marketing, promoting, and selling the news, and ratings; in Berlamino's own words, she was "responsible for everything."  (56.1 Resp., ¶ 10; Exs. 2-3)

Berlamino, as well as others at the station, acknowledged the importance of receiving news-related awards.  (56.1 Resp., ¶ 24)  For example, after WPIX won awards for both best morning and evening newscast, Berlamino noted: "We were THE BIG winners last night at the Emmy Awards! We became the first local station to win BOTH the morning and evening awards for BEST NEWSCAST! . . . It takes the hard work and dedication of the entire staff to allow our product to shine and rise above our competitors.  This is truly an amazing accomplishment . . . A special thanks, of course, goes out to Karen Scott . . . for [her] leadership and [her] commitment to excellence . . ." (emphasis in original)  (*Id.*; Ex. 44)

In April 2008, after WPIX won the Edward R. Murrow Award for best newscast, Berlamino wrote: "This is the one that counts!!!! This is truly the most prestigious award in journalism . . . CONGRATULATIONS to everyone.  This is really something to feel proud about . . . WE had the BEST newscast in THE REGION!" (*Id.*; Ex. 49)

Ms. Scott's Annual Evaluations and Compensation

As Ms. Scott's supervisor, Berlamino was responsible for completing annual evaluations of Ms. Scott's performance.  (56.1 Resp., ¶ 47)  These evaluations consistently reflected Ms.

Scott's stellar performance.  For example, in the 2006 performance evaluation (the most recent evaluation produced by WPIX),[1] Berlamino noted that Ms. Scott "is focused on producing a quality product and understands our external customers more than ever through the help and acceptance of the various research tools we have used.  She has also made great strides in understanding her peers and fostering more teamwork and collaboration.  She has effectively mended a strained relationship with Creative Services which has resulted in a higher quality of work."  (*Id.*; Ex. 62)  Berlamino also commended Ms. Scott for "effective[ly] intiat[ing] changes that have improved the quality of our newscasts" and for leading by example "by embracing input from her peers and fostering corroboration amongst multiple departments" which earned her "an elevated level of respect within the station."  (*Id.*; Ex. 62)

Berlamino was also responsible for making compensation determinations for Ms. Scott. (56.1 Resp., ¶ 114)  Until 2009, Ms. Scott received annual compensation raises, which also are a positive reflection on her performance as News Director.[2]  (56.1 Resp., ¶ 115)

The Termination of Ms. Scott's Employment

The decision to terminate Ms. Scott was made by Berlamino on or about July 14, 2009. (56.1 Resp., ¶ 92; Exs. 2, 4, 63, 72)  Berlamino wanted to wait until she returned from her planned two-week vacation to advise Ms. Scott that she was being terminated.  (*Id.*; Ex. 2)

Following Berlamino's return from vacation, she spoke to Myrna Ramirez ("Ramirez"), the Vice President of Human Resources for Tribune, about her decision to terminate Ms. Scott.

---

[1]      WPIX did not produce performance evaluations for Ms. Scott for 2007 or 2008 despite the fact that Berlamino testified that she completed evaluations for Ms. Scott during these years.  (56.1 Resp., ¶ 47; Ex. 2)

[2]      Ms. Scott's compensation did not increase between 2008 and 2009 as a result of the bankruptcy filings of Tribune and WPIX (in December 2008), which negatively impacted salaries and other compensation metrics.  (56.1 Resp., ¶ 116)

(56.1 Resp., ¶ 96; Exs. 2, 63)  Ramirez instructed Berlamino to prepare a document providing the basis for her decision to terminate Ms. Scott because there was nothing in Ms. Scott's file to support a decision to terminate her based on performance and because no prior warning had been given to Ms. Scott about her job status.  (*Id.*; Exs. 2, 63)

In response to Ramirez's directive, Berlamino prepared an e-mail which she presented to Ramirez on or about August 17, 2009.  (56.1 Resp., ¶¶ 89, 96; Exs. 72-73)  This e-mail outlined alleged deficiencies with Ms. Scott's performance.  (56.1 Resp., ¶¶ 96, 102; Exs. 72-73)  Of note, in the e-mail, Berlamino mentioned purported performance-related issues dating back to 2004 as support for her decision to terminate Ms. Scott *five* years later, and there was a three-year gap (between 2005 and late 2008) in which Berlamino failed to raise a single issue with respect to Ms. Scott's performance.[3]  (56.1 Resp., ¶ 102)

Within the e-mail, Berlamino highlighted a purported November 2, 2008 meeting during which Berlamino alleged that she told Ms. Scott that her "job was in jeopardy."  (*Id.*; Ex. 74)  During Berlamino's deposition, however, it was revealed that no such meeting occurred on November 2, 2008.[4]  (56.1 Resp., ¶ 64; Ex. 2)  Furthermore, there is no contemporaneous

---

[3]      Berlamino testified that, in July 2009, she discussed with Steve Charlier ("Charlier"), Tribune's Vice President of News and Operations, the possibility of placing Ms. Scott on a "performance improvement plan," which she then suggested to Ramirez.  (56.1 Resp., ¶ 89; Ex. 2)  Ramirez discounted Berlamino's story.  Ramirez testified that Berlamino did not bring up the issue of a "performance improvement plan" until *mid-August* 2009, and that was only *after* Berlamino had presented Ramirez with the August 17 e-mail.  (*Id.*)  It was after receipt of this e-mail (which referenced the fictitious November 2, 2008 "job in jeopardy" meeting) that Ramirez told Berlamino that a "performance improvement plan" was not necessary.  (56.1 Resp., ¶ 89, Ex. 63)

[4]      Only during Berlamino's continued deposition one month later did she offer an explanation as to the purported meeting, claiming that the meeting actually took place on December 2 (and not November 2 as she documented).  (56.1 Resp., ¶ 64; Ex. 2)

evidence to demonstrate that such a meeting ever took place. In fact, there is no evidence

demonstrating when the November 2, 2008 memo was even drafted.[5] (*Id.*)

Berlamino's testimony regarding the purported November (or December) 2008 meeting

was contradicted by Jean Maye, WPIX Director of Human Resources. (*Id.*; Exs. 2, 66)

Berlamino testified that after she met with Ms. Scott in November or December 2008, she

informed Maye of the alleged meeting and Maye advised Berlamino to memorialize the meeting

with a memo to be placed in Ms. Scott's file. (*Id.*; Ex. 2) Maye completely discounted

Berlamino's testimony. Maye testified that Berlamino never advised her that any such meeting

or discussion occurred at that or at any other time. (*Id.*; Ex. 66) Indeed, Maye testified that she

was "shocked" when Ms. Scott was terminated. (*Id.*; Ex. 66)

At the time she was terminated, Ms. Scott was told that she was being fired because of

"ratings." (56.1 Resp., ¶ 108; Ex. 1) The ratings of any given news program, however, are

based on a multitude of factors that were beyond Ms. Scott's control, including, among other

things, the ratings of the lead-in programming, promotional efforts for the programming, and

resources allotted to the news programs and News Department.[6] (56.1 Resp., ¶ 127; Exs. 1, 2, 4)

During Ms. Scott's tenure, the ratings for WPIX news programs fluctuated from week-to-week,

month-to-month, and year-to-year. (56.1 Resp., ¶¶ 22, 87) In fact, a report prepared for WPIX

and Tribune in June 2009 acknowledged that, in June 2009 (as compared to June 2008), the

10:00 news was holding its position *or doing better* across all viewer demographics. (56.1

Resp., ¶ 59; Ex. 85)

---

[5]     In addition, the August 17, 2009 e-mail referenced various events that occurred in August 2009 as
purported support for Berlamino's decision to terminate Ms. Scott. However, the decision to terminate Ms. Scott
was made weeks earlier. (56.1 Resp., ¶ 92)

[6]     WPIX struggled with both lead-in programming and promotions, as Charlier testified and as recognized by
documents. (56.1 Resp., ¶ 59, 127; Exs. 4, 85)

Furthermore, in late 2008 into 2009, WPIX faced many daunting economic issues resulting from the bankruptcy filings of WPIX and its parent company, Tribune.  (56.1 Resp., ¶¶ 29, 116)  This resulted in reduced operating expenses and a reduced budget, as well as staff reductions, all of which were beyond Ms. Scott's control.[7]  (*Id.*)

Berlamino's Ageist Comments and Actions

Berlamino's actions with respect to Ms. Scott were consistent with her treatment and behavior towards other older WPIX employees.  By way of example:

- Berlamino remarked that Sal Marchiano "doesn't look good on the air" due to his advanced age and was "too old," and did not renew his contract into 2009 (Mr. Marchiano was 68 years old at the time). (56.1 Resp., ¶ 152; Ex. 1)

- Berlamino remarked that Mary Murphy was "too old," and demoted her from weekend anchor to general assignment reporter in June, 2009 (Ms. Murphy was 50 years old at the time).   (56.1 Resp., ¶ 160; Ex. 1)

- Berlamino terminated Larry Hoff (age 58) in 2009 about whom she frequently made age-related comments.  (56.1 Resp., ¶ 134; Ex. 1)

- Berlamino remarked that Marvin Scott (age 72) looked "too old" and questioned "why doesn't he just retire already?" and demoted him from weekday to weekend reporting duties. (56.1 Resp., ¶ 146; Exs. 1, 83)

- Berlamino remarked that Kaity Tong (age 60) was "too old for anchoring all of the time," and thereafter demoted her. (56.1 Resp., ¶ 167; Exs. 1, 84)

Berlamino also noted her age-based concerns and actions in e-mails.  (56.1 Resp., ¶ 105; Exs. 76, 78-80)  For example, after making the decision to not renew Mr. Marchiano's contract, Berlamino noted that she thought Mr. Marchiano would sue WPIX for age discrimination and that she therefore did "not think that replacing some of the 'older talent' (Kaity [Tong] is 56, with two face lifts and Mary [Murphy] is 49 with none) at this time would be wise."  (*Id.*; Ex. 79)

---

[7]     WPIX's economic situation was not a stated reason for why Ms. Scott was terminated.

In June 2009 -- one month before she decided to terminate Ms. Scott -- Berlamino relayed her awareness that, "within the past year," there were "four layoffs or job-eliminations of employees over the age of 40," one "downgrade" of an employee over age 40 (Ms. Murphy), and another employee over 40 was slated for elimination (Mr. Hoff). (*Id.*; Ex. 76)

Against this backdrop, defendant moves for summary judgment.

# ARGUMENT

## I.

## <u>Applicable Standards</u>

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Weber v. Parfums Givenchy, Inc.*, 49 F. Supp. 2d 343, 352 (S.D.N.Y. 1999).

"The burden on showing that no genuine factual dispute exists rests on the party seeking summary judgment, here, the defendants." *Weber*, 49 F. Supp. 2d at 352. "In evaluating the record to determine whether there is a genuine issue as to any material fact, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor." *Weber*, 49 F. Supp. 2d at 353 (quoting *Anderson*, 477 U.S. at 255). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is

improper." *Weber*, 49 F. Supp. 2d at 353 (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).

 "Courts are directed to exercise 'an extra measure of caution' before granting summary judgment in a discrimination case 'because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence . . .'" *Hird-Moorehouse v. Belgian Mission to the United Nations*, No. 03 Civ. 9688, 2010 U.S. Dist. LEXIS 106276, at *8 (S.D.N.Y. Oct. 4, 2010) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)). The Second Circuit has cautioned that, "[i]n discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2001) (citations omitted).

 In employment discrimination cases in particular, the court "should examine the record as a whole to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." *Park v. Seoul Broad. Sys. Co.*, No. 05 Civ. 8956, 2008 U.S. Dist. LEXIS 17277, at *28 (S.D.N.Y. Mar. 3, 2008) (citing *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001)). A motion for summary judgment may be defeated where "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Park*, 2008 U.S. Dist. LEXIS 17277, at *28-29 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000)).

 Ms. Scott's claims pursuant to the Age Discrimination in Employment Act ("ADEA"), the New York State Human Rights Law ("NYHRL"), and the New York City Human Rights

Law ("NYCHRL"), are to be analyzed in accordance with the three-step burden shifting

framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Initially, "the plaintiff must establish a prima facie case of age discrimination." *Hird-*

*Moorehouse*, 2010 U.S. Dist. LEXIS 106276, at *9. "The burden of establishing a prima facie

ADEA case has been characterized as 'minimal' and 'de minimis.'" *Hird-Moorehouse*, 2010

U.S. Dist. LEXIS 106267, at *9 (citing *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d

376, 381 (2d Cir. 2001)). To establish a *prima facie* case of age discrimination in connection

with her termination, Ms. Scott must show that she was "(1) within the protected age group, (2)

qualified for the position, and (3) subject to an adverse employment decision, and that (4) such

decision occurred under circumstances giving rise to an inference of unlawful discrimination."

*Hird-Moorehouse*, 2010 U.S. Dist. LEXIS 106297, at *10; *see also Byrnie*, 243 F.3d at 101.

"The burden then shifts to the defendant to articulate a legitimate, non-discriminatory

reason for its employment decision." *Hird-Moorehouse*, 2010 U.S. Dist. LEXIS 106276, at *9.

"Once the defendant articulates a legitimate reason for the employment action, the plaintiff must

demonstrate that the proffered reason was a mere pretext for the discriminatory motive." *Id.*

In order to demonstrate pretext, a plaintiff asserting an ADEA claim must show that age

was the "but-for" cause of the challenged adverse employment action. *See, e.g., Gorzynski v.*

*JetBlue Airways Corp.*, 596 F.3d 93, 105-06 (2d Cir. 2010). In assessing whether age-related

bias was the "but-for" cause of a termination decision, "it is important to examine the chain of

events that led to the actual termination . . ." *Herbert v. Nat'l Amusements, Inc.*, No. 08 Civ.

1945, 2011 U.S. Dist. LEXIS 65914, at *23 (D. Conn. June 16, 2011).

District courts applying *McDonnell Douglas* have found that claims pursuant to the

NYHRL and NYCHRL are subject to the more lenient "motivating factor" analysis, pursuant to

which a plaintiff must demonstrate that age was merely a motivating factor in the termination

decision. *See, e.g., Hird-Moorehouse*, 2010 U.S. Dist. LEXIS 106276, at *15, n.1 (the "but for"

causation standard "does not apply to age discrimination claims brought under the NYCHRL");

*Nathe v. Weight Watchers Int'l, Inc.*, No. 2010 U.S. Dist. LEXIS 76623, at *19 (S.D.N.Y. July

26, 2010) ("although the analysis of Plaintiff's NYHRL claims would likely be largely similar to

the foregoing analysis of its ADEA claims . . . the causation standards for ADEA and NYHRL

age discrimination claims have been found to differ."); *Weiss v. JPMorgan Chase & Co.*, No. 06

Civ. 4402, 2010 U.S. Dist. LEXIS 2505, at *1-2 (S.D.N.Y. Jan. 13, 2010) ("[T]he NYCHRL

requires only that a plaintiff prove that age was a 'motivating factor' for an adverse employment

action.").

## II.

### Ms. Scott Has Established A *Prima Facie* Claim For Age Discrimination

The evidence adduced during discovery establishes that Ms. Scott has set forth a *prima*

*facie* case of age discrimination and that her age was the "but for" cause of her termination.[8]

Defendant does not dispute that Ms. Scott was within the protected age group or that she was

subject to an adverse employment decision.  Defendant argues that Ms. Scott's termination was

not unlawful because she was terminated due to performance-related issues and not because of

age.  As set forth below, the assertion that Ms. Scott was terminated because of her performance

is mere pretext and defendant's arguments to the contrary are unavailing.  At a minimum, at this

stage of the litigation, there are various disputed issues of material fact that preclude summary

judgment.

---

[8]    As noted above, Ms. Scott need only demonstrate that age was the "but-for" cause of her termination to
establish a claim under the ADEA, while Ms. Scott's claims pursuant to the NYHRL and NYCHRL are to be
analyzed under the less stringent "motivating factor" test.  Because Ms. Scott has satisfied the more stringent "but-
for" ADEA standard, *a fortiori*, her claims pursuant to the NYHRL and NYCHRL also survive this motion.

### *(1)    Ms. Scott's Performance.*

At the time she was terminated, Ms. Scott had an unblemished employment record, a history of favorable evaluations, annual compensation increases, and had never received any warning concerning her job status or security.  (56.1 Resp., ¶¶ 46-47, 96, 107, 114-115)

The respective heads of WPIX and Tribune's human resources departments, Jean Maye and Myrna Ramirez, confirmed that at the time Berlamino made the decision to terminate Ms. Scott, there was nothing in her employment file to arguably support a decision to terminate based on performance.  (56.1 Resp., ¶¶ 96, 107; Exs. 63, 66)  To the contrary, Ms. Scott's favorable performance evaluations and annual increased compensation, and a record replete with awards and achievements, reflected her stellar performance.  (56.1 Resp., ¶¶ 24, 46-47, 114-115; Exs. 11-63)

Ms. Scott's performance history and the lack of any evidence documenting performance deficiencies (or warnings regarding her job status) provides evidence that the proffered explanation for her termination is pretextual.  At a minimum, there are issues of fact regarding whether Ms. Scott's performance was actually deficient so as to warrant termination.  *See, e.g., Sklaver v. Casso-Solar Corp.*, No. 02 Civ. 9928, 2004 U.S. Dist. LEXIS 24934, at *27 (S.D.N.Y. May 14, 2004) (plaintiff's history of good performance and lack of evidence documenting that plaintiff was informed that his employment was in jeopardy prior to his termination provided evidence that defendant's explanation for plaintiff's termination was pretextual); *Messer v. Fahnestock & Co.*, No. 03 Civ. 4989, 2008 U.S. Dist. LEXIS 93572, at *55 (E.D.N.Y. Nov. 17, 2008) (citations omitted) (denying motion for summary judgment where there was a "paucity of record evidence underlying defendants' assertion that [plaintiff] was a poor worker" and that "as far as the Court can tell, [plaintiff] never received from [his supervisor] a negative written performance evaluation or formal warning," which "indicate that[,] as a reason for [his] firing[,]

poor job performance may have been an afterthought."); *Quinby v. WestLB AG*, No. 04 Civ.
7407, 2007 U.S. Dist. LEXIS 28657, at *24 (S.D.N.Y. Apr. 19, 2007) (denying motion for
summary judgment where there were "issues of fact regarding whether Plaintiff's job
performance was actually deficient."); *Okeke v. Southside Hosp.*, No. 02 Civ. 5935, 2005 U.S.
Dist. LEXIS 40902, at *9 (E.D.N.Y. Aug. 9, 2005) ("Because there remain questions of fact as to
whether Plaintiff satisfactorily performed his job, summary judgment is denied.").

        At the time she was terminated, Ms. Scott had never received any warning regarding her
job status or security.  (56.1 Resp., ¶¶ 64, 96, 107; Exs. 1, 63, 66)  Maye testified that it was
WPIX's policy to provide a warning or notice to employees prior to terminations based on
performance.  (56.1 Resp., ¶ 96; Ex. 66)  In fact, when Berlamino advised Ramirez that the
decision to terminate Ms. Scott had been made, the lack of any performance-related issues in Ms.
Scott's file or that had been brought to Ramirez's attention led Ramirez to instruct Berlamino to
document the reasons supporting her decision to terminate Ms. Scott.  (56.1 Resp., ¶ 89; Ex. 63)

        As a result, Berlamino drafted an August 17, 2009 e-mail in her effort to paper the record
to justify that performance was a valid reason for Ms. Scott's termination.  As discussed above,
this e-mail failed to cite any performance-related issues between late 2005 and late 2008 and
highlighted a purported meeting where Berlamino allegedly warned Ms. Scott about her job
status -- a meeting which was proven to have never occurred.  (56.1 Resp., ¶ 102; Exs. 72-74)
Defendant's reliance on this e-mail underscores the fact that "performance" was a pretextual
reason for Ms. Scott's termination.  *See, e.g.*, *Allen v. J.P. Morgan Chase & Co.*, No. 06 Civ.
8712, 2009 U.S. Dist. LEXIS 29116, at *27 (S.D.N.Y. Mar. 30, 2009) ("[E]vidence of an
employer's dishonesty about a material fact, combined with a prima facie case of discrimination,
may permit the trier of fact to infer a discriminatory purpose."); *Reeves v. Sanderson Plumbing*

*Prods, Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

While a jury may credit defendant's concocted story that Ms. Scott was fired because of performance issues, "it is not the role of the Court to make these credibility determinations on summary judgment . . ." *Catalano v. Lynbrook Glass & Architectural Metals Corp.*, No. 06 Civ. 2907, 2008 U.S. Dist. LEXIS 589, at *27, n.5 (E.D.N.Y. Jan. 4, 2008); *see also Collins v. Cohen Pontani Lieberman & Pavane*, No. 04 Civ. 8983, 2008 U.S. Dist. LEXIS 58047, at *39 (S.D.N.Y. July 30, 2008) ("Defendant's assertion that Plaintiff had inconsistent work quality . . . requires a credibility determination that is properly made by a jury."); *George v. Mobil Oil Corp.*, 739 F. Supp. 1577, 1583 (S.D.N.Y. 1990) (denying summary judgment and finding that defendant's contention "cannot, without a credibility determination inappropriate on summary judgment, overcome the inference favorable to plaintiff that plaintiff's performance was satisfactory.")

### (2) *Significant Inconsistencies in Defendant's Story.*

There are material inconsistencies in defendant's version of events related to Ms. Scott's termination which taken separately or collectively preclude summary judgment.

*First*, Berlamino and Maye provided conflicting testimony regarding the purported November 2, 2008 meeting during which Berlamino allegedly warned Ms. Scott about her job status. (56.1 Resp., ¶ 64; Exs. 2, 66) Berlamino testified that after she purportedly met with Ms. Scott on November 2, 2008, she informed Maye of the meeting and Maye advised Berlamino to document the meeting for Ms. Scott's file. (*Id.*; Ex. 2) Maye testified that Berlamino never mentioned to her that such a meeting took place (regardless of whether it allegedly occurred in

November or December) and that she never knew of any occasion where Ms. Scott received a warning about her job security prior to her termination.  (*Id.*; Ex. 66)

*Second*, there are inconsistencies in Berlamino's and Ramirez's testimony regarding Ms. Scott's termination.  As noted above, while Berlamino testified that she suggested to Ramirez in July 2009 that Ms. Scott be put on a "performance improvement plan," rather than be terminated, Ramirez testified that Berlamino did not raise the possibility of a "performance improvement plan" until *mid-August* 2009 and only *after* Berlamino presented Ramirez with the August 17 e-mail.  (56.1 Resp., ¶ 89; Exs. 2, 63)  It was after receipt of this e-mail (which referenced the fictitious November 2, 2008 meeting) that Ramirez testified that she told Berlamino a "performance improvement plan" was not necessary as Ramirez believed the fictitious account presented by Berlamino.  (*Id.*; Ex. 63)

*Third*, while defendant asserts that Berlamino cited various deficiencies with Ms. Scott's performance "dating back to at least 2004" (*five years* before Ms. Scott was terminated), defendant simultaneously posits that Berlamino treated Ms. Scott favorably during this time period by approving annual raises and that Berlamino did not favor the decision to terminate Ms. Scott -- a position that is wholly inconsistent with the stated "poor performance" basis for Ms. Scott's termination, with defendant's statements in its EEOC position statement that Berlamino made the termination decision, with Ramirez's testimony concerning Berlamino's position with respect to terminating Ms. Scott, and which is not supported by any contemporaneous documentation.

Lastly, while defendant now suggests that Charlier played a key role in the decision to terminate Ms. Scott, there are no contemporaneous documents establishing his purported involvement.  In fact, Charlier's name *does not once appear* in defendant's submission to the

EEOC and Charlier is not even mentioned as an individual who played any role in assessing Ms. Scott's performance or in the decision to terminate Ms. Scott's employment.  (56.1 Resp., ¶ 181; Ex. 86)

Inconsistent explanations regarding the circumstances of termination are independently sufficient to infer pretext.  *See, e.g., Riley v. HSBC United States, Inc.*, No. 08 Civ. 919, 2011 U.S. Dist. LEXIS 36728, at *77-78 (W.D.N.Y. Feb. 3, 2011) ("Discrepancies between the reason a defendant provides in response to an EEOC discrimination charge, as compared to the reason asserted in employment discrimination litigation action can support a reasonable jury's inference that one of the answers was false, and thus, a pretext for discrimination."); *Allen*, 2009 U.S. Dist. LEXIS 29116, at *27 ("[E]vidence of an employer's dishonesty about a material fact, combined with a prima facie case of discrimination, may permit the trier of fact to infer a discriminatory purpose."); *Giannone v. Deutsche Bank Sec., Inc.*, 392 F. Supp. 2d 576, 588 (S.D.N.Y. 2005) ("inconsistent explanations [as to the reason for plaintiff's termination] creates an issue of fact as to whether the reason it currently asserts is pretextual."); *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001) ("a jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations" regarding a plaintiff's termination); *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (inconsistent testimony of one of the decision-makers reasonably indicated pretext); *Coburn v. Rockwell Automation, Inc.*, 238 Fed. App'x 112, 122 (6th Cir. 2007) (holding, in an age discrimination suit, that "[a] reasonable jury could infer that if [the employer] cannot even give a straight answer about who recommended [the plaintiff] for [termination], it is trying to hide something.").

## III.

### Defendant's Attempt To Justify That Ms. Scott Was Terminated Due To Performance Fails

Defendant asserts the following reasons for why Ms. Scott's termination was not unlawful: (i) Ms. Scott's performance was unsatisfactory; (ii) Ms. Scott had a "good working relationship" with Berlamino while she was employed at WPIX; (iii) Berlamino treated Ms. Scott favorably by giving her raises and bonuses; (iv) Berlamino is a member of the same protected class as Ms. Scott; (v) Ms. Scott cannot show that her "replacement" was younger; (vi) Berlamino terminated other younger employees and Ms. Scott did not offer evidence that she was treated less favorably than other younger employees; (vii) the EEOC found that there was no discrimination; and (viii) Berlamino's ageist comments are insignificant because they are "stray" and inadmissible.  Taken alone or collectively, each argument fails.

#### *(1)    Ms. Scott's Alleged "Unsatisfactory" Performance.*

Defendant claims that Ms. Scott's "unsatisfactory work performance" led to her termination.  In support of its position, defendant asserts that ratings for news programming decreased over the last two years of Ms. Scott's employment as News Director.

Initially, as addressed above, defendant's position is undercut by Ms. Scott's documented record of performance and achievement and the lack of any performance-related issues in Ms. Scott's file at the time the decision to terminate her was made.  In addition, the evaluations in Ms. Scott's personnel file were favorable and defendant did not produce Ms. Scott's more recent 2007 and 2008 evaluations despite the fact that Berlamino testified that she completed evaluations for Ms. Scott during these years.  (56.1 Resp., ¶ 47, Exs. 61-62)

It can therefore be inferred that the 2007 and 2008 evaluations would have supported that Ms. Scott's performance was not sub-par (as defendant claims) during these years.  *See, e.g.,*

*Harris v. Niagra Mohawk Power Corp.*, No. 95 Civ. 788, 1998 U.S. Dist. LEXIS 22009, at *32
(N.D.N.Y. Dec. 5, 1998 ) ("Since Plaintiff's ability to prove his case has been impaired by the
lack of employment records, the Court finds that, for purposes of the instant Motions for
Summary Judgment, Plaintiff is entitled to an inference that, were those records still in existence,
they would contain evidence favorable to his case.").

      Defendant's argument that the Court may not consider evidence of Ms. Scott's historical
job performance is spurious.  "When a defendant claims that it took adverse employment action
against plaintiff because of poor job performance, evidence of previously good job performance
may be used to show that the claimed non-discriminatory reason is pretextual." *Sklaver*, 2004
U.S. Dist. LEXIS 24934, at *25; *see also Zimmermann*, 251 F.3d at 382-83 ("To the extent that
the Defendant proffered [Plaintiff's] alleged poor performance as the reason for her discharge,
she provided ample evidence of good performance and the complete absence of any negative
evaluations.").

      In any event, defendant's position that a "ratings" decline supported Ms. Scott's
termination is factually inaccurate and misguided.   The evidence demonstrates that ratings for
WPIX news programs fluctuated throughout the time period that Ms. Scott was News Director,
including during 2008 and 2009.  (56.1 Resp., ¶¶ 22, 87; Exs. 11-42)  While defendant cites a
few e-mails in 2009 regarding a concern over ratings, the fluctuation with ratings are evidenced
by numerous other e-mails.  (56.1 Resp., ¶ 22; Exs. 11-42)

      For example: (i) in August 2008, Steve Schussel ("Schussel"), head of WPIX's Research
and Ratings Department, e-mailed that WPIX's evening news was "ranked as the #1 *10pm News
in New York . . .*" (*Id.*; Ex. 35); (ii) in November 2008, Charlier remarked "Great numbers,
Karen!" about the nightly news; (iii) in March 2009, Berlamino remarked "GREAT NEWS AT

TEN numbers last night!!!!!" (*Id.*; Ex. 36) (emphasis in original); (iv) in April 2009, Schussel noted that WPIX was "experiencing continued growth" and was continuing "to see an uptick in ratings performance in most key demos." (*Id.*; Ex. 40)  There are numerous other e-mails that reflect that ratings for the news programs in 2008 and 2009 (as well as in prior years) often had wide fluctuations depending on a variety of factors.  (56.1 Resp., ¶ 22)  In fact, a report prepared for WPIX and Tribune in June 2009, acknowledged that, as compared to June 2008, the nightly news was maintaining its position or *doing better* across all viewer demographics.  (56.1 Resp., ¶ 59; Ex. 85)

Charlier acknowledged that content was the most important factor for the news programs. (56.1 Resp., ¶ 18; Ex. 4)  The number of awards and outside recognition the news programs received under Ms. Scott's leadership, including in 2008 and 2009, reflect that the content of the news programs was of a high quality.  (56.1 Resp., ¶ 24)

Charlier further acknowledged that the ratings of any given news program are based on a multitude of factors, including ratings of lead-in programming, promotional efforts, and resources allocated to news-related programming, all of which were beyond Ms. Scott's control. (56.1 Resp., ¶ 127; Ex. 4)  As Charlier conceded, WPIX was lacking in each of these key areas that contribute to ratings, none of which could be attributed to Ms. Scott.  (*Id.*; Ex. 4)

Charlier testified that the lead-in programming from late 2008 through the summer of 2009 was a "negative" factor for the ratings, that promotional efforts "could [have been] improved," and that the "general manager" -- Berlamino -- should have prioritized promotion. (*Id.*; Ex. 4)  Notably, a June 2009 report that was prepared for WPIX and Tribune noted that "Fox 5 starts out with about 50% more aware of their 10 PM case than ours," and "PIX primary viewers are the least likely to be there from the lead-in."  (56.1 Resp., ¶ 59)

Defendant's reference to *Mattera v. J.P. Morgan Chase Corp.*, 740 F. Supp. 2d 561, 577-78 (S.D.N.Y. 2010) and *Pergament v. FedEx*, No. 03 Civ. 1106, 2007 U.S. Dist. LEXIS 23732, at *12 (E.D.N.Y. Mar. 30, 2007) as purported support is unavailing.  In *Mattera*, plaintiff "pit[ted] merely his *claim* to have received good reviews in the past against very specific and very well-documented performance failings in the present," 740 F. Supp. 2d at 577 (emphasis in original), and in *Pergament*, plaintiff did not contest the fact that she had received a "dismally low [score] in her most recent performance evaluation, nor that she had also received three warning/reminder letters, in addition to at least two documented counseling letters, within a six-month period . . ." 2007 U.S. Dist. LEXIS 23732, at *39.  Further, the previous positive evaluations on which the *Pergament* plaintiff sought to rely were issued by *a previous supervisor* -- not the supervisor who had issued the recent negative evaluations.  *Id.*

By contrast, here, Ms. Scott has pointed to specific documentary evidence of her stellar performance, no prior warning regarding her job status, and the complete absence of any contemporaneous evidence supporting the decision to terminate her employment.

The evidence therefore reflects that, at the time Ms. Scott was terminated, she was qualified to perform her duties as News Director and the purported performance-related issues defendant claims were the reason underlying the termination decision are mere pretext.  At a minimum, there are numerous disputed issues of material fact that preclude summary judgment with respect to this issue.  *See, e.g., Quinby*, 2007 U.S. Dist. LEXIS 28657, at *24; *Okeke*, 2005 U.S. Dist. LEXIS 40902, at *9.

### (2) *The Relationship Between Ms. Scott and Berlamino does not Support Defendant's Position.*

Next, defendant suggests that Ms. Scott's age discrimination claims are "speculative" because Ms. Scott testified that she had a "good working relationship" with Berlamino up until

the date of her termination and because Berlamino treated Ms. Scott favorably over the years, including by giving her raises and bonuses.

The favorable performance evaluations and increased compensation reveal that Ms. Scott's performance was anything but "poor" during the time period that defendant alleges her performance was sub-par.  If anything, evidence of favorable performance evaluations and increased compensation support the fact that Ms. Scott's performance warranted such evaluations and compensation increases and that performance-related issues were a pretextual reason for Ms. Scott's termination.  In addition, while Ms. Scott was under the impression that Berlamino treated her fairly, the truth was revealed when she was blindsided with her termination.  As noted above, Berlamino went so far as to fabricate a November 2008 meeting in her desperate attempt to manufacture a legitimate basis for Ms. Scott's termination.

### (3)     It is of no Consequence that Berlamino is in the Same Protected Class as Ms. Scott.

Defendant next suggests that Ms. Scott's age discrimination claims are "doomed" because Berlamino is in the same protected class as Ms. Scott.  The Second Circuit has held, however, that "the proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 55 (2d Cir. 1998); *see also Allen v. J.P. Morgan Chase & Co.*, No. 06 Civ. 8712, 2009 U.S. Dist. LEXIS 29116, at *30 (S.D.N.Y. Mar. 30, 2009) (citing *Danzer*, 151 F.3d at 55) ("[T]he argument that the decision makers behind the plaintiff's review and alleged demotion could not have discriminated against the plaintiff because they were also over the age of forty is, as the Court of Appeals has described such arguments, 'patently untenable.'").

While defendant cites to case law noting that if a decision-maker is a member of plaintiff's protected class, it "weakens" a suggestion of discrimination, that is clearly not the case

here, where as discussed, Berlamino took actions against other individuals in her protected class.[9]

### (4)   *Carey's Retention does not Impact Ms. Scott's Claims.*

In another curious argument, defendant asserts that Ms. Scott's claims fail because she cannot show that her "replacement" was significantly younger.  The evidence establishes, however, that Ms. Scott's replacement, Bill Carey ("Carey"), was hired only *after* WPIX knew that Ms. Scott was alleging that she was wrongfully terminated because of age. (56.1 Resp., ¶ 11; Exs. 2, 4)  Further, Berlamino testified that she was *against* hiring Carey.[10] (*Id.*; Ex. 2)

In any event, even if Carey could be accurately described as Ms. Scott's "replacement," the fact that he is eight years younger than Ms. Scott can be a reliable indicator of age discrimination.  *See, e.g., D'Cunha v. Genovese/Eckerd Corp.,* 479 F.3d 193, 195 (2d Cir. 2007) (where an individual who was offered the position was eight years younger than plaintiff, the "difference in age – though not large – is significant enough to support an inference in [plaintiff's] favor."); *see also Phillips v. Centrix, Inc.*, No. 07 Civ. 1455, 2009 U.S. Dist. LEXIS 11065, at *7 (D. Conn. Dec. 1, 2009) ("Nine years is a substantial age difference and thus raises an inference of discrimination.").

### (5)   *Armstrong's Termination is Insignificant.*

Defendant next argues that, despite Berlamino's ageist comments and record of taking adverse employment action against numerous older employees, her decision to terminate Tim

---

[9]      *Adams v. Canon USA, Inc.*, No. 07 Civ. 3512, 2009 U.S. Dist. LEXIS 86722, at *14 (E.D.N.Y. Sept. 22, 2009), which defendant references, is not even an age-discrimination case; rather, *Adams* involved allegations of sex discrimination, a critical distinction because, unlike age, an employee's gender does not increase over time.

[10]     In an ironic twist, approximately five months after Carey was hired, Berlamino tried to have him fired. Berlamino presented complaints to Tribune management compiled from several employees related to Carey's conduct.  Following an investigation into the allegations regarding Carey's conduct, Charlier asked Berlamino whether she could continue to work with Carey and, when Berlamino replied that she could not, Berlamino was terminated.  Berlamino later threatened to sue WPIX for wrongful termination.  (56.1 Resp., ¶ 11; Ex. 2)

Armstrong ("Armstrong") undercuts Ms. Scott's claims. Berlamino made ageist comments and took negative actions towards at least five other older WPIX employees. The fact that she also fired one younger employee is not indicative of anything.[11]

> **(6)     The EEOC Decision is not Probative.**

Defendant points to the EEOC determination that, "there is insufficient evidence to indicate that Respondent treated you differently due to your disability," as evidence of the lack of merit to Ms. Scott's claims. (56.1 Resp., ¶ 181; Ex. 86) The EEOC decision is of no probative value here.[12]

The EEOC failed to conduct any investigation into Ms. Scott's claims. The EEOC never spoke with Ms. Scott and was not privy to any of the documents or information produced during discovery herein. (56.1 Resp., ¶ 181)

Furthermore, the circumstances surrounding Ms. Scott's termination that defendant presented to the EEOC -- and upon which the EEOC ostensibly relied in making its determination -- were completely different from the version of events defendant now presents. (*Id.*) For example, in defendant's submission to the EEOC, Charlier was *never* once mentioned, although now defendant points to Charlier as a key protagonist behind the decision to terminate Ms. Scott.[13] (*Id.*; Ex. 86)

---

[11]    Defendant's argument that Ms. Scott has not pointed to other "similarly situated" employees is a red-herring as no such employees exist.

[12]    Ms. Scott filed a complaint with the EEOC on January 14, 2010. On June 15, 2010, Ms. Scott notified the EEOC that she filed a complaint in this Court. (56.1 Resp., ¶¶ 180-181) The EEOC did not issue its determination letter until January 7, 2011, seven months after Ms. Scott initiated this action. (56.1 Resp., ¶ 181)

[13]    The EEOC actually mischaracterized Ms. Scott's claim as being based on "disability," despite the fact that her claims were clearly based on age discrimination. (56.1 Resp., ¶ 181; Ex. 86)

The EEOC outright accepted defendant's allegations without conducting any inquiry or investigation. For example, the EEOC stated in its letter of determination that the "record . . . shows that [defendant's] rating decreased," that WPIX "maintains that you were provided with due warnings and Ms. Berlamino did inform you that if the ratings did not increase, your job would be in jeopardy," and that WPIX "denies that Ms. Berlamino made any age discriminatory comments about any current, former or potential employees." (56.1 Resp., ¶ 181; Ex. 86) However, as described above, it was revealed during discovery that, (i) ratings fluctuated throughout the time that Ms. Scott was News Director, (ii) Berlamino never warned Ms. Scott that her job was in jeopardy, and (iii) Berlamino did in fact made age-related comments about numerous WPIX employees.[14] (56.1 Resp., ¶¶ 22, 64, 102, 134, 141, 146, 152, 160, 167; Exs. 1, 2, 11-60, 63, 66, 83, 84)

Courts have often noted that "employment-agency determinations are not homogenous products; they vary greatly in quality and factual detail." *Nuwesra v. Merrill Lynch Fenner & Smith, Inc.*, 174 F.3d 87, 94 n. 4 (2d Cir. 1999) (citations omitted) ("We have seen many employment discrimination cases in which plaintiffs established liability at trial after an agency finding of no probable cause."); *see also Paolitto v. John Brown E.&C., Inc.*, 151 F.3d 60, 62 (2d Cir. 1998) (jury verdict in favor of ADEA plaintiff on all claims after state agency determined that plaintiff's evidence of age discrimination was insufficient); *Woodell v. United Way*, 357 F. Supp. 2d 761, 772 n. 15 (S.D.N.Y. 2005) (citations omitted) (EEOC determination held "no weight in this case because it was 'sparse and conclusory' and provides no indication of what the EEOC's investigation actually involved."); *Manning v. New York Univ.*, 98 Civ. 3300, 2000 U.S. Dist. LEXIS 19606, at *26, 27 (S.D.N.Y. July 28, 2000) ("probative value of the EEOC's

---

[14]     In fact, there are currently two other age discrimination lawsuits pending based on Berlamino's actions. (56.1 Resp., ¶¶ 182-183; Exs. 87-88)

determination is slight" and not dispositive of the issues raised on a summary judgment motion where the letter contained "a bare statement of the EEOC's conclusion, and does not explain the factual or legal basis for the decision.").

Accordingly, the EEOC decision bears no relevance to this action.

### (7)     *Berlamino's Ageist Comments and Actions are Admissible and Significant.*

In support of her claims, Ms. Scott has presented evidence regarding age-related comments made by Berlamino and actions Berlamino took due to the ages of employees that evidence a discriminatory animus.  As detailed above, Berlamino made various age-related comments about older WPIX employees, including Mr. Marchiano, Ms. Murphy, Mr. Hoff, Mr. Scott, and Ms. Tong and, subsequent to making these comments, took employment action adverse to the these employees.  (56.1 Resp., ¶¶ 134, 146, 152, 160, 167; Exs. 1, 83, 84)

Mr. Scott and Ms. Tong both testified that they believed Berlamino made employment-related decisions based on age.  Mr. Scott testified that Berlamino relieved him of his anchoring responsibilities and changed his reporting responsibilities (both of which he considered to be demotions) because Berlamino had a "desire for a younger skew." (56.1 Resp., ¶ 147; Ex. 83) Ms. Tong testified that the negative action Berlamino took against her in June 2009 -- including issuance of a "performance expectation memo" and cutting her salary -- was based on her age. (56.1 Resp., ¶ 167; Ex. 84)

Berlamino also revealed her age-based thought process in e-mails.  (56.1 Resp., ¶ 105; Exs. 76, 78-80)  Ramirez testified as to her "concern" that Berlamino was terminating or negatively impacting a disparate number of older WPIX employees in 2008 and 2009.  (56.1 Resp., ¶ 105; Ex. 63)

Defendant makes two ineffectual arguments related to Berlamino's age-based comments. Defendant suggests that the remarks were "stray" and that Berlamino's comments are inadmissible. Neither of these arguments are correct.

Berlamino's age-related comments were clearly not "stray." "In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative 'stray remark,' a court should consider the following factors: (1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.*, whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made." *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004).

The Second Circuit has emphasized that, "although evidence of one stray comment by itself is usually not sufficient proof to show age discrimination, that stray comment may bear more ominous significance when considered within the totality of the evidence." *Schreiber*, 324 F. Supp. at 519 (citations omitted); *see also Tomassi v. Insignia Fin. Group*, Inc., 478 F.3d 111, 116 (2d Cir. 2007) ("The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class. Inoffensive remarks may strongly suggest that discrimination motivated a particular employment action."). Moreover, "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." *Hird-Moorhouse*, 2010 U.S. Dist. LEXIS 106276, at *13, *citing Tomassi*, 478 F.3d at 115.

Here, the remarks at issue were numerous and were made by Berlamino, Ms. Scott's supervisor and the General Manager of WPIX. The content of the remarks -- which, in

substance, were that certain employees were too old to continue in their positions -- could clearly

be viewed by a reasonable juror as discriminatory.  And, Berlamino made these comments in the

context of discussing the continued employment of employees in the News Department.  (56.1

Resp., ¶¶ 134, 146, 152, 160, 167; Exs. 1, 83, 84)

Consequently, in addition to the number of comments and employees impacted, the

content of Berlamino's remarks infer discriminatory intent.[15]  At a minimum, defendant's

"argument that the age-based comments were stray remarks raises issues of fact for a jury to

resolve."  *Schreiber*, 324 F. Supp. 2d at 522; *Riley*, 2011 U.S. Dist. LEXIS 36728, at *71

(discriminatory remarks, "although arguably stray, were not, by themselves, offensive to

Plaintiff, yet, under circumstances presented by the evidence in the record, a reasonable jury

could find the remarks tend to show" discriminatory animus).

Further, Berlamino's comments are indeed admissible.  Berlamino's comments are

clearly relevant as it is "well-settled that an inference of discriminatory intent may be derived

from a variety of circumstances" including an employer's "invidious comments about others in

the employee's protected group."  *Leibowitz v. Cornell Univ.*, 584 F. 3d 487, 502 (2d Cir. 2009)

(citations omitted).  At the time Berlamino made the comments, she was General Manager of

WPIX -- the highest ranking WPIX official -- and the comments concerned matters within the

scope of her employment because they related to WPIX personnel decisions.  Berlamino's

comments are therefore admissions of WPIX.  *See, e.g., Cook v. Arrowsmith Shelburne, Inc.*, 69

---

[15]     Defendant references *Worowski v. Nashua Corp.*, 31 F.3d 105, 109-10 (2d Cir. 1994), but all that *Worowski* held was that comments, *without more*, cannot advance a discrimination suit to a jury.  When, however (as in this case), "other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and a jury has the right to conclude that they bear a more ominous significance." *Danzer*, 151 F.3d at 65.  Moreover, in *Woroski*, there was overwhelming evidence that the plaintiffs were not terminated because of their age; the average age of the employees terminated was 37 and defendant did not replace those terminated.  Even then, the Second Circuit noted that the question of whether summary judgment should be granted was "a close one" because the defendant had made age-based comments.

F.3d 1235, 1238 n.1 (2d Cir. 1995) ("Cook's testimony as to what was said is admissible under FED. R. EVID. 801(d)(2)(D) as a statement by an employee 'concerning a matter within the scope of . . . employment.'"); *Pilgrim v. McGraw-Hill Cos., Inc.*, 599 F. Supp. 2d 462, 483 (S.D.N.Y. 2009) (comments by employee were admissible because they "concerned a matter within the scope of employment" where speaker "worked for McGraw-Hill" and made the statements "in her capacity as the office manager in charge of screening applicants" for a position with the company); *Giannone v. Deutsche Bank Sec., Inc.*, 392 F. Supp. 2d 576, 591 (S.D.N.Y. 2005) (citations omitted) ("Where, as here, the subject matter of the statement is an adverse employment action, statements by co-workers fall within Rule 801(d)(2)(D) if the co-workers were supervisors or significant participants in the decisions at issue."); *Dais v. Lane Bryant, Inc.*, No. 97 Civ. 2011, 2001 U.S. Dist. LEXIS 17210, at *12 (S.D.N.Y. Oct. 22, 2001) (alleged statement was a party admission where it was made by plaintiff's supervisor who was "responsible for evaluating and monitoring" plaintiff).

In sum, defendant cannot establish on summary judgment that there is no fact issue regarding the decision to terminate Ms. Scott. To the contrary, based on the evidentiary record, age was the "but for" factor in defendant's decision to terminate Ms. Scott or, at a minimum, there is a fact issue regarding whether age was the "but for" cause in the decision.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment should be denied, together with such other and further relief as this Court may deem just and proper.

Dated: September 23, 2011

HAYNES AND BOONE, LLP
*Attorneys for Plaintiff*


By: s/ Kenneth J. Rubinstein
    Kenneth J.  Rubinstein (KR-1410)
    Laura E. O'Donnell
    Sarah Jacobson (SJ-2882)
    30 Rockefeller Plaza, 26th Floor
    New York, New York 10112
    (212) 659-7300
    ken.rubinstein@haynesboone.com