UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAREN SCOTT, <br><br> Plaintiff, <br><br> -against- <br><br> WPIX, INC., <br><br> Defendant. | 10 CV 4622 (WHP) <br><br> **ECF Case** |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S RULE 56.1 STATEMENT

Plaintiff Karen Scott ("Plaintiff" or "Scott"), by her counsel, Haynes and Boone LLP, submits the following response to defendant's statement pursuant to Rule 56, F.R.C.P. and Local Civil Rule 56.1:

1.      Admit and states that in 1993, Scott began working at WPIX as the Executive Producer for WPIX news.  (Declaration of Karen Scott ("Scott Decl."), annexed as Exhibit 1, ¶ 4)  Within a year, Ms. Scott was promoted to Assistant News Director, and in 1996, Ms. Scott was promoted to News Director, a position which she held until her employment was terminated on August 26, 2009.  (Scott Decl., Ex. 1, ¶¶ 2, 4-5)  Between December 2000 and the time of her termination, Ms. Scott reported to Betty Ellen Berlamino ("Berlamino"), the General Manager of WPIX.  (Scott Decl., Ex. 1, ¶ 7; transcript from deposition of Betty Ellen Berlamino, annexed as Ex. 2, "Berlamino Dep.," p. 7:18-23)

2.      Admit.

3.      Upon information and belief, admit.

4.      Denies the characterization of Ms. Scott's position as News Director.  As the News Director, Ms. Scott was responsible for the content of news programs, as well as for recruiting personnel for the News Department, including on-air talent and off-air staff.

Berlamino had the final say over all employment-related decisions within the News Department. (Scott Decl., Ex, 1, ¶¶ 5, 7; Berlamino Dep., Ex. 2, p. 219:5-10; Ex. 3)

     5.     Admit that the News Department staff reported to Ms. Scott directly, but denies the characterization of Ms. Scott's responsibilities as News Director.  As the News Director, Ms. Scott was responsible for the content of the news and news-related programming, including the morning and nightly news.  (Scott Decl., Ex. 1, ¶ 5-6; Ex. 3)

     6.     Denies the characterization of Ms. Scott's responsibilities as News Director.  As News Director, Ms. Scott shared responsibility with Berlamino for making employment decisions for both on-air talent and off-air staff for the News Department.  Ms. Scott could not make any final employment-related decisions without Berlamino's approval or consent.  (Scott Decl., Ex. 1, ¶¶ 5, 7)

     7.     Admit.

     8.     Upon information and belief, admit.

     9.     Upon information and belief, admit that Berlamino was promoted in December 2000 and denies knowledge or information sufficient to form a belief as to the truth of the allegation concerning who Berlamino reported to.

     10.     Admit and states that Berlamino was also responsible for oversight of all department heads, the station's annual budget, overall day-to-day operations, news content, marketing, promoting and selling the news, and ratings; in Berlamino's own words, she was "responsible for everything." (Berlamino Dep., Ex, 2, pp. 8:9-17; 12:2-5; 19:2-6; 49:13-21; Ex. 3)

     11.     Deny.  Upon information and belief, Berlamino was terminated in June 2010 resulting from issues that arose with Bill Carey ("Carey").  (Berlamino Dep., Ex. 2, pp. 24:23-

29:19; 37:23-39:8; 315:8-317:15; 376:17-377:6)  Berlamino had presented complaints compiled

from several employees related to Carey's conduct and behavior in the workplace to Tribune

management.  (Berlamino Dep., Ex. 2, pp. 32:7-37:11; 263:7-265:5; 315:12-23; 319:4-322:14)

An investigation into Carey was subsequently conducted and following the investigation, Steve

Charlier ("Charlier"), the Senior Vice President for News and Operations, asked Berlamino

whether she could continue to work with Carey.  (Berlamino Dep., Ex. 2, pp. 36:9-39:8; 316:14-

317:14; transcript from deposition of Steven Charlier, annexed as Ex. 4 hereto, "Charlier Dep.,"

pp. 102:4-105:17)  Berlamino stated that she could not.  (Berlamino Dep., Ex. 2, pp. 38:10-11;

316:14-317:14)  Berlamino was terminated approximately five weeks after this conversation.

(Berlamino Dep., Ex. 2, pp. 38:10-29:8; 315:12-317:14)  Berlamino was told that her termination

was not performance related.  (Berlamino Dep., Ex. 2, pp. 24:21-25:6)  Following her

termination, Berlamino threatened to sue WPIX for wrongful termination.  (Berlamino Dep., Ex.

2, pp. 313:6-318:7; 376:17-378:5)  WPIX and Berlamino entered into a Separation Agreement

wherein Berlamino agreed not to sue WPIX in exchange for certain consideration.  (Ex. 5)

Denies knowledge or information sufficient to form a belief as to the truth of the statements

concerning what Berlamino was told regarding Tribune senior management.

      12.    Denies knowledge or information sufficient to form a belief as to the truth of the

statements concerning what Berlamino's emotions were concerning her termination but denies

that Berlamino communicated her "prediction" to Ms. Scott and refers to response to paragraph

11 above as to the reason Berlamino was terminated.

      13.    Denies the characterization of the relationship between Berlamino and Ms. Scott

and states that during her employment and until the time she was terminated, Ms. Scott believed

that she had a functional working relationship with Berlamino, however, the facts and

information that were learned after Ms. Scott was terminated reveal that the working relationship was not as Ms. Scott believed.  Ms. Scott felt that Berlamino created a negative work environment through, among other things, the tone of her e-mails and through her lack of understanding of the news industry.  (Scott Decl., Ex. 1, ¶¶ 9, 27)

14.     Denies knowledge or information sufficient to form a belief as to the truth of the statements concerning Berlamino's decisions as they related to Ms. Scott during that time period.

15.     Admits that during that time period, Ms. Scott believed that Berlamino wanted her to perform well in her role as News Director.

16.     Denies knowledge or information sufficient to form a belief as to the truth of the statements concerning how WPIX measures the profitability of the news department, but admits that revenue from advertisements is a factor.

17.     Admits that the statements attributed to Ms. Scott reflect her opinions or beliefs, but denies knowledge or information sufficient to form a belief as to the truth of the statements concerning Nielsen.

18.     Admits that the statements reflect Charlier's opinion, but denies knowledge or information sufficient to form a belief as to the truth of the statements.  Charlier also testified that content was the most important factor for the news programs and that other factors that were important to ratings, including lead-in programming, promotions, and placement of commercial breaks.  (Charlier Dep., Ex. 4, pp. 37:18-42:11)

19.     Admits that the general consensus was that there were flaws with the Nielsen ratings system and denies knowledge or information sufficient to form a belief as to the truth of the statements concerning how advertisers valued the Nielsen ratings system.  In addition, Berlamino and others believed that there were flaws in the Nielsen ratings system and did not

believe that the Nielsen system accurately reflected viewership.  (Berlamino Dep., Ex. 2, pp.

213:7-216:21; 225:3-226:4; Exs. 6-9)

20.     Admit.

21.     Admits that February, May, July, and November are referred to as "sweeps," and

adds that October was also referred to as a "sweep" month.  (Transcript from deposition of Karen

Scott ("Scott Dep."), Ex. 10, p. 59:4-14)  Denies knowledge or information sufficient to form a

belief as to the truth of the statements concerning what advertisers rely on.

22.     Deny and states that the cited testimony refers only to the Nielsen ratings for

WPIX News programs in February 2005.  The ratings for WPIX news programs fluctuated

throughout the time period that Ms. Scott was News Director.  (Exs. 11-42)   There are numerous

examples of positive ratings in the period between 2005 and August 2009.  (Exs. 11-42)  These

include: (i) August 2008, Steve Schussel ("Schussel"), head of WPIX's Research and Ratings

Department, e-mailed that WPIX's evening news was "ranked as the #1 *10pm News in New York*

. . ."  (Ex. 33); (ii) November 2008, Charlier remarked "Great numbers, Karen!" (Ex. 35); (iii)

March 2009, Berlamino remarked "GREAT NEWS AT TEN numbers last night!!!!!" (Ex. 36);

(iv) April 2009, Schussel e-mailed that WPIX was "experiencing continued growth" and was

continuing "to see an uptick in ratings performance in most key demos." (Ex. 40)

Furthermore, Nielsen ratings did not properly account for minority audiences WPIX

aimed to attract and were of limited utility in determining the true audience for the news.  (Scott

Decl., Ex. 1, ¶ 22)

In addition, a report prepared for WPIX and Tribune in June 2009 indicated that, in June

2009 (as compared to June 2008), the 10:00 news was holding its position or *doing better* across

all viewer demographics.  (Ex. 85, p. 15)

23.     Admits that Ms. Scott understood how revenue was generated but denies knowledge or information sufficient to form a belief as to the truth of the speculative statements concerning ratings and ability to sell advertising.

24.     Denies the characterization as to the importance of winning awards and that it had no impact on the profitability of WPIX, and denies knowledge or information sufficient to form a belief as to the truth of the statements concerning how advertisers make decisions.  The awards obtained by WPIX news under Ms. Scott's leadership were reflective of the content of the news programs under Ms. Scott's direction and the personnel that operated under Ms. Scott's leadership.  (Scott Decl., Ex. 1, ¶¶ 10-12; Berlamino Dep., Ex. 2, pp. 139:20-141:17; Exs. 43-60)

During the period 2005 to 2009, the News Division was nominated and received a significant number of local and national awards.  (Scott. Decl., Ex. 1, ¶ 10; Exs. 43-60)  Notably, in 2009, the National Academy of Television Arts and Sciences nominated WPIX for 32 Emmy Awards, more nominations than WPIX's competitors, WCBS, WNBC, WABC, WNYW, and WWOR.  (Scott Decl., Ex. 1, ¶ 11)  The nominations included, Best Morning Newscast, Best Evening Newscast, Best Breaking News, Best Hard News Series, Best Investigative Series, Best Sports Coverage, and Best On Camera Talent.  (Scott Decl., Ex. 1, ¶ 11)  (A list of awards received during the period 2005 through 2009 can be found at Exs. 43-60.)

Berlamino and others at WPIX and Tribune repeatedly acknowledged the importance of receiving awards.  For example, after WPIX won both the morning and evening awards for best newscast, Berlamino sent out an e-mail to all WPIX employees stating, "We were THE BIG winners last night at the Emmy Awards! We became the first local station to win BOTH the morning and evening awards for BEST NEWSCAST! . . . It takes the hard work and dedication of the entire staff to allow our product to shine and rise above our competitors.  This is truly an

amazing accomplishment . . . A special thanks, of course goes out to Karen Scott . . . for [her] leadership and [her] commitment to excellence . . ."  (Ex. 44)

After Ms. Scott received a Tribune Management & Values award for her work on the "Christmas in Iraq" series, Berlamino noted that it was "one of the most prestigious awards in our company," bestowed only on "employees that make outstanding contributions to the company and community."  (Ex. 45)

In April 2008, after WPIX won the Edward R. Murrow award for best newscast, Berlamino sent an e-mail stating "This is the one that counts!!!! This is truly the most prestigious award in journalism . . . CONGRATULATIONS to everyone.  This is really something to feel proud about . . . WE had the BEST newscast in THE REGION!"  (Ex. 49; Berlamino Dep., Ex. 2, pp. 325:1-326:15)

Despite the number of awards the News Department received during Ms. Scott's tenure, Berlamino failed to properly promote such recognition. (Scott Decl., Ex. 1, ¶ 23)

25.     Admits that ratings were one of many factors that went into how Ms. Scott's performance was judged.

26.     Denies knowledge or information sufficient to form a belief as to the truth of the statements concerning what Berlamino did.

27.     Denies knowledge or information sufficient to form a belief as to the truth of the statements concerning what Zell and Tribune Management did or wanted, or that it is relevant to the claims and issues surrounding Ms. Scott's wrongful termination.

28.     Denies knowledge or information sufficient to form a belief as to the truth of the statements concerning what "pressure" general managers of Tribune stations perceived and as to

what the "new senior management" expressed, or that those matters are relevant to the claims and issues surrounding Ms. Scott's wrongful termination.

29.     Denies the characterization that Tribune's new senior management's "vision" and demand for change at WPIX put any additional pressure on Ms. Scott to make the News Department profitable through increased ratings, and states that the Tribune's new senior management "vision" was never communicated to Ms. Scott.  (Scott Decl., Ex. 1, ¶ 29)  Indeed, there are no contemporaneous documents reflecting such a "vision."  Ms. Scott further states that following the bankruptcy filings, there was a reduction in operating expenses, the budget for the news was cut, and staff reductions were made, all of which were beyond Ms. Scott's control. (Scott Decl., Ex. 1, ¶ 25)

30.     Upon information and belief, the Tribune and WPIX filed for bankruptcy in December 2008, but Ms. Scott denies knowledge or information sufficient to form a belief as to the truth of the statements concerning what "pressure" department heads perceived as a result.

31.     Denies knowledge or information sufficient to form a belief as to the truth of the statements concerning when Charlier assumed his role and title and what his duties and responsibilities were.

32.     Denies knowledge or information sufficient to form a belief as to the truth of the statements concerning who Charlier's official "primary point of contact" was.

33.     Denies knowledge or information sufficient to form a belief as to the truth of the statements concerning Charlier's involvement or his interplay with Berlamino concerning personnel decisions.

34.     Denies knowledge or information sufficient to form a belief as to the truth of the statements concerning the frequency of Charlier's visits or as to what he did to monitor WPIX.

Ms. Scott's interaction with Charlier was limited to a few brief face-to-face meetings and was primarily limited to staffing and personnel issues. Charlier did not provide much, if any, content-related suggestions for the news. (Scott Decl., Ex. 1, ¶ 29)

35.     Admit.

36.     Denies knowledge or information sufficient to form a belief as to the truth of the statements concerning Berlamino's true beliefs and refers to the evaluations for the opinions expressed therein.

37.     Refers to the document referenced for the statements contained therein, but denies that Ms. Scott did not effectively manage her staff.

38.     Refers to the document referenced for the statements contained therein and refers to the e-mails and other documents reflecting the positive ratings and feedback received by Ms. Scott after this e-mail was received. (Exs. 11-42)

39.     Refers to the document referenced for the statements contained therein and to the e-mails and other documents reflecting the positive ratings and feedback received by Ms. Scott after this evaluation was received. (Exs. 11-42) In addition, Ms. Scott's 2005 performance evaluation stated that Ms. Scott "must be commended . . . for the outstanding series of reports from Iraq" which were "innovative, unique and deeply moving" and for which she was "recognized with the Values Reward," and noted that Ms. Scott "provides an excellent example of professionalism and integrity." (Ex. 61)

40.     Refers to the document referenced for the statements contained therein and refers to the e-mails and other documents reflecting the positive ratings and feedback received by Ms. Scott after this e-mail was received. (Exs. 11-42)

41.    Refers to the document referenced for the statements contained therein and refers to the e-mails and other documents reflecting the positive ratings and feedback received by Ms. Scott after this e-mail was received.  (Exs. 11-42)

42.    Refers to the document referenced for the statements contained therein and refers to the e-mails and other documents reflecting the positive ratings and feedback received by Ms. Scott after this e-mail was received.  (Exs. 11-42)  Denies that Ms. Scott understood and agreed with Berlamino's concern that WPIX's News Department would be outsourced because it was losing money and admits that Ms. Scott did not believe that Berlamino's e-mail was discriminatory because of her age.

43.    Refers to the document referenced for the statements contained therein and refers to the e-mails and other documents reflecting the positive ratings and feedback received by Ms. Scott after this e-mail was received.  (Exs. 11-42)

44.    Refers to the document referenced for the statements contained therein and refers to the e-mails and other documents reflecting the positive ratings and feedback received by Ms. Scott after this e-mail was received.  (Exs. 11-42)

45.    Refers to the document referenced for the statements contained therein and refers to the e-mails and other documents reflecting the positive ratings and feedback received by Ms. Scott after this e-mail was received.  (Exs. 11-42)

46.    States that the e-mails referenced in paragraphs 39-45 of defendant's 56.1 Statement were from 2004 and 2005 and notably, there are no e-mails or other documents referenced by defendant which reflect negatively on Ms. Scott's performance or on the ratings of the news programs under Ms. Scott's supervision between 2005 and late 2008.  To the contrary, during that time period the e-mails and documents reflect that Ms. Scott was excelling in her

position. (Exs. 11-63)  The fact that defendant has gone back to 2004 – *five years before Ms. Scott was terminated* – to search for e-mails in an attempt to justify her termination underscores the fact that Ms. Scott's performance in the years leading up to her termination did not justify termination based on "performance."

47.     Refers to the document referenced for the statements contained therein. Berlamino completed annual evaluations for Ms. Scott. (Berlamino Dep., Ex. 2, pp. 117:12-119:21; 122:22-25)  As an example, the 2006 performance evaluation stated that Ms. Scott "is focused on producing a quality product and understands our external customers more than ever through the help and acceptance of the various research tools we have used.  She has also made great strides in understanding her peers and fostering more teamwork and collaboration.  She has effectively mended a strained relationship with Creative Services which has resulted in a higher quality of work."  (Ex. 62)  Ms. Scott was also commended in the 2006 performance evaluation for "effective[ly] intiat[ing] changes that have improved the quality of our newscasts" and for leading by example "by embracing input from her peers and fostering corroboration amongst multiple departments" which earned her "an elevated level of respect within the station."  (Ex. 62)  Ms. Scott further states that WPIX did not produce her 2007 or 2008 performance evaluations despite the fact that Berlamino testified that she completed evaluations for Ms. Scott during these years.  (Berlamino Dep., Ex. 2, pp. 122:22-124:21)

48.     Admits that the Internet became a more important tool for disseminating news and denies knowledge or information sufficient to form a belief as to how "vital" it was and what impact it had on revenue.

49.     Admit.

50. Refers to the document referenced for the statements contained therein and refers to e-mails after that date regarding positive ratings for the Morning News. (Exs. 34, 37-42)

51. Refers to the document referenced for the statements contained therein.

52. Denies that Berlamino told Ms. Scott that her job "was on the line" and denies the characterization of Ms. Scott's testimony. Ms. Scott testified that Berlamino stated in an e-mail to Ms. Scott (and others) that *Berlamino's* "tail was on the line" if the news department did not produce a profit. (Scott Dep., Ex. 10, pp. 233:22–234:2)

53. Denies knowledge or information sufficient to form a belief as to the truth of what Charlier "wondered" or "believed" and states that Charlier never communicated these opinions to Ms. Scott. (Scott Decl, Ex. 1, ¶ 29)

54. Admits that Ms. Scott occasionally interacted with Charlier and that there was no animosity or hostility between them and that while she was employed by WPIX, Ms. Scott never believed that Charlier acted unfairly or in a discriminatory manner towards her.

55. Denies knowledge or information sufficient to form a belief as to the truth of what Charlier "believed" and states that Charlier never communicated these opinions to Ms. Scott. (Scott Decl, Ex. 1, ¶ 29)

56. Admit that Charlier told Ms. Scott that she should try and build a better relationship with John Ziegler ("Ziegler"), and states that Ms. Scott constantly gave Ziegler content to promote WPIX's News programs, but that the promotions of the news programs were limited. Denies knowledge or information sufficient to form a belief as to the truth of what Charlier "believed."

57.     Denies knowledge or information sufficient to form a belief as to the truth of what
Charlier "believed" and denies that Ms. Scott did not implement suggestions made by Charlier.
(Scott Decl, Ex. 1, ¶ 29)

58.     Denies knowledge or information sufficient to form a belief as to the truth of what
was "apparent to Tribune management" or as to what they "thought," and states that these
purported opinions were never communicated to Ms. Scott.  (Scott Decl, Ex. 1, ¶ 29)  Denies the
characterization of Ramirez's testimony.  Ramirez testified that Tribune senior management
wanted certain changes made, including reduction of staff.  (Transcript from deposition of Myrna
Ramirez, annexed as Ex. 63, "Ramirez Dep.," pp. 13:17-15:7)

59.     Refers to the document referenced for the statements contained therein and states
that the lead-in programming for the news programs negatively impacted ratings for the news
programs during the relevant time period.  (Scott Decl., Ex. 1, ¶ 21; Berlamino Dep., Ex. 2, pp.
95:5-9; 97:19-22; 206:9-208:15; Charlier Dep., Ex. 4, pp. 38:22-40:14; 112:21-24)  In fact,
Berlamino explicitly acknowledged in July 2009 -- two weeks before the decision to terminate
Ms. Scott was made -- "Right now, prime is KILLING us! . . .  Once we get some prime
numbers, life is going to be a hell of a lot easier."  (Ex. 64 (emphasis in original); Berlamino
Dep., Ex. 2, pp. 106:1-107:13)  Furthermore, a report prepared for WPIX and Tribune in June
2009 acknowledged that "Fox 5 starts out with about 50% more aware of their 10 PM case than
ours" and "ends up with a huge advantage over us for primary viewership" and that "PIX
primary viewers are the least likely to be there from the lead-in."  (Ex. 85, pp. 6, 67)  This report
further indicated that, in June 2009 (as compared to June 2008), the 10:00 news was holding its
position or *doing better* across all viewer demographics.  (Ex. 85, p. 15)

60.    Refers to the document referenced for the statements contained therein and denies the characterization of Ms. Scott's testimony. Ms. Scott testified that many factors contribute to viewership. (Scott Dep., Ex. 10, pp. 129:2-130:23)

61.    Admits that Berlamino told Ms. Scott that she wanted to fire Tim Armstrong and that Ms. Scott did not agree with this decision. Denies that Armstrong was a poor performer.

62.    Refers to the document referenced for the statements contained therein.

63.    Refers to the documents referenced for the information contained therein.

64.    Denies that such a conversation ever took place or that Berlamino ever made such a statement. (Scott Decl., Ex. 1, ¶ 14) Denies that Berlamino ever documented such a conversation or any similar conversation. The document referenced was a document created by Berlamino as part of her attempt to justify Ms. Scott's termination. There was never any meeting or discussion between Ms. Scott and Berlamino where Berlamino advised Ms. Scott that her "job was in jeopardy" (or anything to that effect) prior to August 26, 2009. (Scott Decl., Ex. 1 ¶ 14)

Furthermore, there is no evidence reflecting when this purported memo was created. Berlamino testified that after she purportedly met with Ms. Scott on November 2, 2008, she informed Maye of the alleged meeting and Maye advised Berlamino to document the conversation and place a memo in Ms. Scott's file. (Berlamino Dep., Ex. 2, pp. 157:19–160:12; 162:8-18; 164:12-19; 166:4-172:23) However, Maye testified that Berlamino never told her about any meeting and that she never told Berlamino to document any meeting. (Transcript from deposition of Jean Maye, annexed as Ex. 66, "Maye Dep.," pp. 58:22–59:20; 87:9–88:5) Further, Maye testified that she never knew of any occasion where Ms. Scott received a warning about her job security prior to her termination. (Maye Dep., Ex. 66, pp. 58:22–59:20; 87:9–88:5)

Indeed, Maye testified that she was "shocked" when Ms. Scott was terminated.  (Maye Dep., Ex. 66, pp. 40:9–41:8)

During Berlamino's deposition that it was confirmed that there was never any meeting on November 2, 2008.  (Berlamino Dep., Ex. 2, pp. 157:19–160:12; 162:8-18; 163:12-19; 166:4–173:23; 305:4–307:3)  Only during Berlamino's continued deposition one month later did she offer an explanation as to the purported meeting and memo, claiming that the meeting actually took place on December 2 (not November 2 as she documented).  (Berlamino Dep., Ex. 2, pp. 304:25-305:22)  Even then however, Berlamino could not identify any documents or e-mails to support that such a meeting ever took place.

65.     Refer to document referenced for statements contained therein.

66.     Refer to document referenced for statements contained therein and states that the News Department was using the Internet to deliver news, as reflected by web traffic and usage reports.  (Exs. 67-70)  For example, a May 2008 web traffic report stated that there was "a substantial increase in sitewide traffic, especially unique visitors."  (Ex. 67)  An October 17, 2008, TV web metric indicated that there were more daily unique visits to the WPIX website than any other station website.  (Ex. 68)  An October 23, 2008 e-mail stated that the "WPIX site looks great" and the team did "an amazing job" in developing the website to one of the "very best."  (Ex. 69)  Lastly, a March 20, 2009 e-mail stated that WPIX was "heading for [a] new record" with visits to the morning news blog, and that WPIX had set records with other news-related blogs.  (Ex. 70)

67.     Refer to the document referenced for statements contained therein and denies that Berlamino had to bring Ms. Scott's attention to the fact that there was a protest outside the Israeli

mission and states that WPIX was covering this news story in advance of Berlamino's directives to do so.  (Scott Decl., Ex. 1, ¶ 27)

68.     Denies knowledge or information sufficient to form a belief as to the truth of what Charlier "believed" and states that Charlier never communicated anything to Ms. Scott or had any discussions with Ms. Scott about her employment status or job security.  (Scott Decl., Ex. 1, ¶ 14)

69.     Denies knowledge or information sufficient to form a belief as to the truth of what Charlier communicated to Berlamino and states that Charlier never had communications or discussions with Ms. Scott concerning these beliefs.  (Scott Decl., Ex. 1, ¶ 29; Charlier Dep., Ex. 4, pp. 66:17-69:17)

70.     Denies that Charlier ever had such communications with Ms. Scott.  (Scott Decl., Ex. 1, ¶ 29)

71.     Denies knowledge or information sufficient to form a belief as to the truth of what Charlier's opinion were and states during the 16 years Ms. Scott was at WPIX, she negotiated numerous union contracts and was very familiar with such contracts.  (Scott Decl., Ex. 1, ¶ 29)

72.     Denies knowledge or information sufficient to form a belief as to the truth of what Jerry Kersting told Berlamino or as to how Berlamino felt this impacted her position.

73.     Refers to the document referenced for statements contained therein.

74.     Refers to the document referenced for statements contained therein.

75.     Refers to the document referenced for statements contained therein and refers to e-mails regarding positive developments within the News Department during this time period. (Exs. 36-42)

76.     Refers to the document referenced for statements contained therein and states that the referenced deposition testimony has been mischaracterized.  Ms. Scott testified that she did not have any knowledge as to whether any other news station other than WPIX fell for the practical joke referenced in this paragraph and that the incident with the April Fool's joke was an isolated, one-time incident.  (Scott Dep., Ex. 10, pp. 185:18-187:16)  Ms. Scott further states that Berlamino purposefully overreacted to this incident in an attempt to justify terminating Mr. Armstrong.  (Scott Decl., Ex. 1, ¶ 27)

77.     Refers to the document referenced for statements contained therein and states that the referenced deposition testimony has been mischaracterized.  Ms. Scott testified that the practical joke occurred because several individuals in the News Department did not verify the facts.  (Scott Dep., Ex. 10, pp. 185:8–186:20)

78.     Refer to the document referenced for statements contained therein and state that Ms. Scott contacted Charlier regarding the April Fool's joke and Charlier thought it was amusing.  (Scott Decl., Ex. 1, ¶ 27, n. 2)

79.     Refers to the documents referenced for the contents therein and refers to e-mails regarding positive developments within the news department during this time period.  (Exs. 38-42)

80.     Denies knowledge or information sufficient to form a belief as to the truth of what Charlier "vocalized" and as to the substance of communications between Charlier and Berlamino, and states that neither Charlier nor Berlamino expressed such doubts or concerns to Ms. Scott.  (Scott Decl. Ex. 1, ¶ 14)  In addition, there are no contemporaneous documents reflecting such beliefs on the part of Charlier or to substantiate that there were any such communications between Charlier and Berlamino.  In defendant's Position Statement that was

submitted to the EEOC in March 2010, Charlier's name does not appear and he is not even mentioned as an individual that played any role in connection with the assessment of Ms. Scott's performance or in the decision to terminate Ms. Scott.  (Ex. 71)

81.     Denies that Charlier was spending "increased time" at WPIX by June 11, 2009, and denies knowledge or information sufficient to form a belief as to the truth as to what Charlier's opinions or beliefs were or as to what "reports" he received from his "bosses," and states that that there are no contemporaneous documents reflecting that Charlier had such opinions or belief regarding Ms. Scott or that he shared these opinions or beliefs with anyone.

82.     Denies knowledge or information sufficient to form a belief as to what, if any, communications there were between Berlamino and Charlier, and states that that there are no contemporaneous documents reflecting that such discussions ever took place.

83.     Refers to the documents referenced for the contents therein and states that similar issues were raised by Berlamino years before in a similar fashion and were not raised again for several years.  (Ex. 72)

84.     Denies knowledge or information sufficient to form a belief as to what, if any, communications there were between Berlamino and Charlier but states that that there are no contemporaneous documents reflecting that such discussions ever took place.

85.     Denies knowledge or information sufficient to form a belief as to what Charlier "had decided," and states that that there are no contemporaneous documents reflecting that Charlier had decided anything or that he had the authority to make such personnel decisions.  In fact, Charlier testified that he did not.   (Charlier Dep., Ex. 4, pp. 22:9-16; 25:9-11)

86.     Denies knowledge or information sufficient to form a belief as to what, if any, communications there were between Berlamino and Charlier, and states that that there are no contemporaneous documents reflecting that such a discussion ever took place.

87.     Refers to documents related to the ratings which reflect that ratings fluctuated and denies knowledge or information sufficient to form a belief as to what loss was purportedly suffered by the News Department and how that loss was calculated.  (Exs. 36-42)

88.     Denies knowledge or information sufficient to form a belief as to what was discussed between Berlamino and Charlier, and states that that there are no contemporaneous documents reflecting the content or substance of such discussions or that support the statement made regarding the sum and substance of the discussions.

89.     Denies knowledge or information sufficient to form a belief as to what was discussed between Charlier, Berlamino, and Ramirez, but states that Ramirez testified that Berlamino told her in August 2009 that Ms. Scott may be terminated.  (Ramirez Dep., Ex. 63, p. 34:4-6)  Ramirez informed Berlamino that if termination was a possibility, she would need to see documentation supporting the termination.  (Ramirez Dep., Ex. 63, pp. 34:10-37:4; 43:4-47:1) Ramirez testified that she did not discuss putting Ms. Scott on a performance improvement plan until *mid-August*, 2009 -- *after* Berlamino provided her with a summary related to Ms. Scott, at which point Ramirez told Berlamino that a "performance improvement plan" was unnecessary. (Ramirez Dep., Ex. 63, pp. 38:17-39:7; 43:4-46:18)  This was approximately one month after the decision had been made by Berlamino to terminate Ms. Scott.  (Berlamino Dep., Ex. 2, pp. 151:20-157:12; 309:13-312:24)  Ramirez's testimony therefore contradicts Berlamino's testimony regarding the events leading up to Ms. Scott's termination.  (Berlamino Dep., Ex. 2, pp. 128:4-129:2; 134:14-135:12; 154:25-157:12)

90.     Denies knowledge or information sufficient to form a belief as to Ramirez's responsibilities with Tribune and involvement with WPIX personnel decisions.  Upon information and belief, Maye was the Director of Human Resources for WPIX.

91.     Denies knowledge or information sufficient to form a belief as to what Ramirez's opinions were and states that Ramirez's testimony regarding the discussions concerning Ms. Scott's termination contradict Berlamino's testimony (as noted above).  (Ramirez Dep., Ex. 63, pp. 38:17-39:7; Berlamino Dep., Ex. 2, pp. 151:20-157:12)

92.     Denies knowledge or information regarding why Ms. Scott was not terminated in July when the decision to terminate her was made, but admits that Berlamino's and Charlier's testimony was that the decision to terminate Ms. Scott was made on or about July 14, 2009, and that the termination decision was not communicated to Ms. Scott until August 26, 2009. (Berlamino Dep., Ex. 2, pp. 151:20-157:12; 187:8-189:20; 309:13-312:24; Ramirez Dep., Ex. 63, pp. 31:22-32:2; 35:2-36:20; 38:17-39:7; Charlier Dep., Ex. 4, pp. 52:7-56:9; Exs. 72-74) Berlamino testified that she wanted to wait until she returned from her planned two-week vacation before telling Ms. Scott that she was being terminated.  (Berlamino Dep., Ex. 2, p. 157:6-12)

93.     Admit and states that at the time this situation arose, as noted above, the decision to terminate Ms. Scott had already been made; therefore, the allegations related to this matter are not relevant to the claims and issues to be determined on this motion or at trial.  In addition, Berlamino had been critical of Emily Frances, stating that her "current mode of dress is unacceptable" and if she continued to dress inappropriately she would be subject to "more drastic, formalized action."  (Ex. 75)

94.    Denies that Ms. Scott did not address the situation, denies knowledge and information as to why Amy Growick and Emily Frances approached Human Resources, and states that at the time this situation arose, as noted above, the decision to terminate Ms. Scott had already been made; therefore, the allegations related to this matter are not relevant to the claims and issues to be determined on this motion or at trial.  (Scott Decl., Ex. 1, ¶ 27)

95.    Denies that "Berlamino had to direct" Ms. Scott to "address the conflict," denies knowledge and information as to what Berlamino "believed," and states that at the time this situation arose, as noted above, the decision to terminate Ms. Scott had already been made; therefore, the allegations related to this matter are not relevant to the claims and issues to be determined on this motion or at trial.  Denies allegations that Ms. Scott allowed the issues between Frances and Growick to "fester too long."  (Scott Decl., Ex. 1, ¶ 27)

96.    Admits that Ms. Scott was not terminated until August 26, 2009, and denies that Berlamino "hoped" she would not have to terminate Ms. Scott as there is no evidence to support that assertion.  To the contrary, after deciding in mid-July that Ms. Scott would be terminated, in August, pursuant to instructions given by Ramirez, Berlamino began preparing a summary to support the decision to terminate Ms. Scott.  (Ramirez Dep., Ex. 63, pp. 28:21-30:16; 32:24-37:4; 43:4-47:7; 49:3-50:3; Berlamino Dep., Ex. 2, pp. 151:20-257:12; 187:8-189:20; 309:13-312:24)  As a result, Berlamino drafted the August 17, 2009 e-mail (Ex. 72), discussed above, an earlier draft of which was provided to Ramirez.  (Ex. 73)

After providing the e-mail to Ramirez, Berlamino and Ramirez made plans to meet with Ms. Scott to terminate her employment.  (Berlamino Dep., Ex. 2, pp. 189:2-11; 256:21-258:14; Ramirez Dep., Ex. 63, pp. 53:6:54:6; 86:2-88:21)  There is no contemporaneous evidence that supports the allegations WPIX now makes that, at any point after July 14, there were any

discussions or consideration concerning not going through with Ms. Scott's termination. The only discussions after July 14 were that there was a need to paper Ms. Scott's file because, as of July 14, 2009, there was nothing in Ms. Scott's personnel file or otherwise which could support the decision to terminate her employment based on her performance. (Ramirez Dep., Ex. 63, pp. 21:19-23:11; 35:2-37:4; Berlamino Dep., Ex. 2, pp. 202:23-203:7; Maye Dep., Ex. 66, pp. 28:13-22; 53:10-13)  Furthermore, Maye testified that WPIX had a policy to give warnings or notice to an employee about their performance prior to a termination based on performance.  (Maye Dep., Ex. 66, pp. 55:23-56:18)

97.     Refers to the referenced documents for the contents therein and states that at the time this e-mail was sent, as noted above, the decision to terminate Ms. Scott had already been made; therefore, this e-mail and the substance of the subject discussed therein is not relevant to the claims and issues to be determined on this motion or at trial.  Furthermore, the timing of the e-mail -- several weeks after the decision to terminate Ms. Scott had been made, and after Ramirez advised Berlamino that she need to created a document to support her decision to terminate Ms. Scott -- raises questions as to its true motivation and purpose.

98.     Admits that Ms. Scott had conversations with Berlamino about evaluating staff and improving ratings as a routine part of her job as News Director, but denies that any of these discussions were unusual within their respective positions at WPIX.  (Scott Decl., Ex. 1, ¶ 29) During the nine years Ms. Scott worked as News Director under Berlamino, they routinely discussed such subject matters, among others, as that was an integral part of their interaction. (Scott Decl., Ex. 1, ¶ 29)

99.     Refers to the referenced document for the contents therein and denies that Ms. Scott "recommended" that Mr. Hoff's contract not be renewed.  Mr. Hoff was included in Ms.

Scott's report based solely upon Berlamino's instructions to Ms. Scott not to renew Mr. Hoff's contract, a decision with which Ms. Scott disagreed.  (Scott Dep., Ex. 10, pp. 211:19-213:14; 221:7-24)  Moreover, in a June 17, 2009 e-mail, Berlamino noted that Hoff was "slated for elimination," evidence that Berlamino had already made the decision to terminate Mr. Hoff.  (Ex. 76)  In addition, Ms. Scott states that at the time Berlamino made her request to Ms. Scott, as noted above, the decision to terminate Ms. Scott had already been made; therefore, the timing of the request -- several weeks after the decision to terminate Ms. Scott had been made -- raises questions as to its true motivation and purpose.

    100.    Refers to the document referenced for the content therein and states that at the time this e-mail was sent, as noted above, the decision to terminate Ms. Scott had already been made; therefore, this e-mail and the substance of the subjects discussed therein is not relevant to the claims and issues to be determined.  Furthermore, the timing of the e-mail -- several weeks after the decision to terminate Ms. Scott had been made, and after Ramirez advised Berlamino that she need to created a document to support her decision to terminate Ms. Scott -- raises questions as to its true motivation and purpose.

    101.    Refers to the documents referenced for the contents therein and states that at the time these e-mails were sent, as noted above, the decision to terminate Ms. Scott had already been made; therefore, these e-mails and the substance of the subjects discussed therein are not relevant to the claims and issues to be determined.  Furthermore, the timing of these e-mails -- several weeks after the decision to terminate Ms. Scott had been made, and after Ramirez advised Berlamino that she need to created a document to support her decision to terminate Ms. Scott -- raises questions as to their true motivation and purpose.  In fact, these e-mails (August 17, 2009) were sent on the *same day* as the "final" version of the e-mail Berlamino drafted at

Ramirez's direction which provided the pretextual support for the decision to terminate Ms. Scott. (Ex. 72)

102.    Denies knowledge or information as to any discussions between Ramirez and Berlamino and states that the August 17 e-mail provided pretextual reasons why Berlamino wanted Ms. Scott terminated. Among other things, it noted purported issues with Ms. Scott's performance in 2004 and 2005 and *failed to note a single issue with Ms. Scott's performance between late 2005 and late 2008* -- a fact that Ramirez found to be "odd." (Ramirez Dep., Ex. 63, p. 57:20-58:22; Berlamino Dep., Ex. 2, pp. 296:7-198:22; 205:17-20) This memo also prominently included the fabricated November 2, 2008 meeting during which Berlamino alleged she advised Ms. Scott that her "job was in jeopardy," but which meeting was revealed during discovery to *have never occurred.* (Ex. 72-74; Ramirez Dep., Ex. 63, p. 62:4-14; Berlamino Dep., Ex. 2, pp. 157:24-160:20; 164:12-19; 166:4-173:3; 305:4-307:3) The August 17 e-mail also included several blatant attempts at papering the record with events that post-dated July 14 -- the date on which Berlamino and Charlier testified the decision to terminate Ms. Scott was made. (Exs. 72-73)

103.    Denies that Berlamino "concluded" *after* August 17, 2009 that Ms. Scott's employment would be terminated. As noted above, the decision to terminate Ms. Scott was made on or about July 14, 2009. (Berlamino Dep., Ex. 2, pp. 151:20-257:12; 309:13-312:24; Charlier Dep., Ex. 4, pp. 52:7-53:15)

104.    Admits that, while she was employed by WPIX, Ms. Scott never had an issue with Ramirez's behavior or conduct towards her.

105.    Denies knowledge and information as to what Ramirez may have done and states that there are no contemporaneous documents to substantiate that any such analysis was

performed.  Furthermore, Ramirez testified that because Berlamino was terminating or negatively impacting a number of older employees in 2008 and 2009, she had "concerns." (Ramirez Dep., Ex. 63, pp. 69:11-70:22; 74:12-76:3; 104:21-106:8)

On June 17, 2009, Berlamino sent an e-mail to Ramirez concerning contract renewals which contained a list of individuals that were laid off, demoted, eliminated, or slated for elimination within the past year along with the ages of those individuals.  (Ex. 76; Ramirez Dep., Ex. 63, pp. 80:2-82:16)  The next day, Ramirez requested from Ms. Scott information concerning the ages of certain individuals because of her concern that Berlamino was targeting older employees.  (Ramirez Dep., Ex. 63, pp. 71:2-76:3; Ex. 77)  Ramirez was only involved with employment matters for upper-level WPIX employees, yet she was expressing concerns with the treatment of older employees by Berlamino prior to Berlamino's decision to terminate Ms. Scott. (Ramirez Dep., Ex. 63, pp. 71:2-76:3)

Other e-mails reflect Berlamino's focus on age.  (Exs. 76, 78-80)   For example, in November 2008, Berlamino sent an e-mail to Ed Wilson and Steve Charlier stating that she thought Mr. Marchiano would sue WPIX for age discrimination and she did "not think that replacing some of the 'older talent' (Kaity [Tong] is 56, with two face lifts and Mary [Murphy] is 49 with none) at this time would be wise." (Ex. 79)  And, in June 2009, Berlamino sent an e-mail to Wilson and Charlier relaying her concern for how it would be perceived that, in the past year, there were four layoffs or job-eliminations of on-air talent over the age of 40, one "downgrade" of an employee over age 40 (Ms. Murphy), and Mr. Hoff, also over 40, was slated for elimination.  (Ex. 76)

106.    Admit.

107.     Denies knowledge or information as to why Ramirez was there instead of Maye and as to what Maye's "beliefs" were, and states that, directly contrary to defendant's assertions, Maye testified that she was "shocked" that Ms. Scott was terminated. (Maye Dep., Ex. 66, p. 40:9-15) Maye further testified that, prior to Ms. Scott's termination, she never had any indication that Ms. Scott's job was in jeopardy or that she may be terminated, and that there was nothing in Ms. Scott's personnel file to support a decision to terminate her employment. (Maye Dep. Ex. 66, pp. 18:15-20:13; 28:13-22; 53:10-13; 56:4-8)

108.     Admits that Berlamino told Ms. Scott that she was being terminated on August 26, 2009, denies knowledge or information concerning the "script" or its origins or as to the instructions given to Berlamino. Denies the description as to what Berlamino said to Ms. Scott during the meeting. Berlamino simply told Ms. Scott that she was being fired because of "ratings." (Scott Decl., Ex. 1, ¶ 15)

109.     Admits that Ms. Scott requested that no one be informed of her termination until she returned from vacation and that while she was on vacation, Ms. Scott was contacted with inquiries about her departure from WPIX.

110.     Admits that Berlamino sent Ms. Scott a draft e-mail related to Ms. Scott's departure, refers to the referenced document for the contents therein, and admits that Ms. Scott did not want her departure characterized as a "resignation" because it would have been inaccurate. Ms. Scott further states that Berlamino sent the e-mail without Ms. Scott's approval. (Scott Decl., Ex. 1, ¶ 16)

111.     Admits that a farewell party was held for Ms. Scott and denies knowledge and information as to who authorized and paid for the party.

112.    Denies knowledge or information as to discussions between Charlier and
Berlamino regarding the retention of Bill Carey and as to Carey's alleged employment
background, and states that, upon information and belief, Carey's date of birth is correct and that,
at the time Carey was retained in late November 2009, defendant was aware of Ms. Scott's
claims of wrongful termination due to age discrimination (Berlamino Dep., Ex. 2, pp. 261:2-
262:2; 369:6-370:20)

In addition, Berlamino was not in favor of hiring Carey.  (Berlamino Dep. Ex. 2, pp.
28:12-29:19; 32:18-34:15)  Carey had a checkered employment history which included charges
of burglary, battery, and hit-and-run as a result of his involvement in a hit-and-run accident,
resulting in his placement on administrative leave by his former employer.  (Ex. 81, ¶ 41, n. 8)
Carey's employment and management related issues continued after he assumed the position as
News Director which included, among other incidents, clashes with various WPIX employees
due to Carey's personality, conduct, management style, and interpersonal communication skills.
(Berlamino Dep., Ex. 2, pp. 32:18-33:15; Maye Dep., Ex. 66, pp. 79:15-84:3; Charlier Dep., Ex.
4, pp. 100:18-105:17; Ex. 82)

In fact, within five months of Carey's retention Berlamino wanted to fire him.
(Berlamino Dep., Ex. 2, pp. 28:12-29:19; 38:4-39:8)  Berlamino levied complaints to Tribune
management about Carey as a result of Carey's conduct in the workplace.  (Berlamino Dep., Ex.
2, pp. 36:12-37:9; 263:2-264:19; 316:3-317:14; 320:14-322:24)   This ultimately led to
*Berlamino* being terminated by WPIX.  (Berlamino Dep., Ex. 2, pp. 37:5-39:8)

113.    Denies knowledge and information as to what Berlamino "believed" and states
that, as noted above, Berlamino was not in favor of hiring Carey, (Berlamino Dep., Ex. 2, p.
29:14-16), and did so only after she was aware that Ms. Scott was claiming that she was

wrongfully terminated as a result of her age, (Berlamino Dep., Ex. 2, pp. 261:20-262:18; 369:6-370:20), and otherwise refers to the response to paragraph 112 above for additional relevant information.

114.   Admits that Ms. Scott received such compensation in 2007 and denies knowledge and information as to what the "target" for "incentive pay" was.  Ms. Scott further states that Berlamino was responsible for making compensation determinations for Ms. Scott.  (Berlamino Dep., Ex. 2, pp. 142:24-143:3)

115.   Admits that Ms. Scott received increased compensation in 2008 and states that the increased compensation is reflective of the fact the Ms. Scott's performance warranted an increase in compensation, and denies knowledge and information as to what the "target" for "incentive pay" was.

116.   Admits that Ms. Scott's salary was not increased in 2009, denies knowledge and information as to what the "target" for "incentive pay" was, and states that as a result of the bankruptcy filings by the Tribune and WPIX in December 2008, salaries and other compensation metrics were negatively impacted. (Scott Decl., Ex. 1, ¶ 25)

117.   Admits that Ms. Scott does not believe that her 2008 pay was based on discriminatory reasons, denies knowledge and information as to how her pay scale was set, and states that her increased annual compensation (until the bankruptcy filings of the Tribune and WPIX) was reflective of her performance warranting an annual increase in compensation.

118.   Admits that Ms. Scott believed that during certain periods of the referenced time period she believed that the lead-in programming for the news was sub-par, as is confirmed by ratings reports, which was a sentiment that Charlier shared.  (Scott Decl. Ex. 1, ¶ 20; Ex. 64; Charlier Dep. Ex. 4, pp. 38:22-40:14; 112:21-24)

119.    Admits that Ms. Scott believed that the lead-in programming for the news was inferior to its main competitors and that this had an impact on the ratings for the news.  (Scott Decl., Ex. 1, ¶ 20)  Charlier echoed this sentiment.  (Charlier Dep. Ex. 4, p. 38:22-40:14; 112:21-24)

120.    Denies knowledge and information as to the ultimate responsibility for the selection of lead-in programming and as to what input WPIX had.

121.    Denies knowledge and information as to the lead-in programming of other Tribune stations and as to reasons underlying the ratings received by other Tribune stations, and refers to the document referenced for the contents therein.  Ms. Scott further states that it is misleading to compare stations solely on ratings because there are many variables which have to be considered including, without limitation, promotional efforts, on and off-air talent, and resources devoted to the news.  (Scott Decl., Ex. 1, ¶ 20; Berlamino Dep., Ex. 2, pp. 94:11-97:22; 207:22-208:18; Charlier Dep., Ex. 4, pp. 38:6-42:9)

122.    Denies the characterization that there was a "decline in ratings between 2007 and 2008" and refers to documents which reflect increased ratings during portions of this time period.  (Exs. 20-30; Berlamino Dep., Ex. 2, p. 184:11-21)

123.    Admits that Ms. Scott believes that the lead-in programming was an important factor that contributed to the ratings for the news programs, refers to the referenced documents for the contents therein, and states that what defendant refers to as having taken place *in 2005 –* four years prior to Ms. Scott's wrongful termination – is not relevant to the claims and issues to be resolved on this motion or at trial.

124.    Denies and states that there is no objective support for this conclusion and states that, during a meeting in 2008, Randy Michaels, Tribune's Executive Vice President, remarked

on the significance of lead-in programming, in sum and substance, that 50% of the ratings for any programming is dependent on the lead-in programming.  (Scott Decl., Ex. 1, ¶ 21)

125.    Admits that Ms. Scott believed that defendant devoted less resources to its news department than its competitors; compared to its competitors, WPIX had inferior promotions, fewer reporters, fewer trucks for live shots, less camera equipment, and fewer camera operators. (Scott Decl., Ex. 1, ¶ 24)  In addition, compensation for WPIX employees was less than similarly-situated employees at other New York news stations.  (Scott Decl., Ex. 1, ¶ 24) Shockingly, Berlamino claimed ignorance as to the salaries paid by WPIX as compared its competitors.  (Berlamino Dep., Ex. 2, p. 111:6-21)

126.    Refers to the documents regarding ratings.  (Exs. 11-42)

127.    Admits that Ms. Scott believed, as did Charlier, that the lack of promotional efforts for the news programs was a factor in ratings, and states that ratings for lead-in programming and resources allocated to the program or news department were also factors in ratings.  (Scott Decl., Ex. 1, ¶ 20; Charlier Dep., Ex. 4, pp. 38:6-42:9)

128.    Admits that, upon information and belief, the Creative Services Director prepared the budget for promotional efforts, denies that Ms. Scott was ever responsible for marketing, and states that on-air promotions were a collaborative effort between the News Department and Creative Services.  (Scott Decl., Ex. 1, ¶ 23)

129.    Denies knowledge and information as to what the reasons were for the lack of promotional effort, but Ms. Scott admits that she does not believe it was related to her age.

130.    Admit.

131.    Admits that Ms. Scott contends that she was wrongfully terminated based on her age because she was 60 when she was terminated, she was capable and able to perform her duties

as News Director, and her performance did not justify termination.  In addition, the evidence

related to the actions taken by defendant in terminating or modifying the positions held by other

older employees and the various ageist comments made by Berlamino supports Ms. Scott's

claims that she was terminated based on age.  (Scott Decl. Ex. 1, ¶ 26; transcript from deposition

of Marvin Scott, annexed as Ex. 83, "M. Scott Dep.," pp. 10:7-23; 15:3-22:11; errata sheet;

transcript from deposition of Kaity Tong, annexed as Ex. 84, "Tong Dep.," pp. 13:3-22; 17:17-

24:23; 61:13-62:16; Exs. 76, 78-80)

132.     Admits that the various ageist comments made by Berlamino is a factor in Ms.

Scott's claim for wrongful termination based on her age.

133.     Admits that Mr. Hoff was a morning features reporter who was known for, among

other things, stunts in connection with his reporting and states that, upon information and belief,

Mr. Hoff's stated date of birth is correct.

134.     Admits that Berlamino made comments about Mr. Hoff's age dating back several

years, including that he was "too old."  (Scott Decl., Ex. 1, ¶ 26)

135.     Admits that Berlamino frequently complained about Mr. Hoff.  (Scott Decl., Ex.

1, ¶ 26)

136.     Denies that it was Ms. Scott's "recommendation" to "eliminate Hoff's feature

stories and allocate the extensive resources expended on these stories to more serious news" and

states that it was Berlamino who made the determination that defendant should not renew Mr.

Hoff's contract.  Ms. Scott included Mr. Hoff in her August 2009 report as an employee whose

contract should not be renewed solely because Berlamino directed that she do so.  Ms. Scott

further states that defendant mischaracterizes the testimony in that it wrongly suggests that it was

Ms. Scott's recommendation to eliminate Mr. Hoff's stories and allocate resources to more serious news.  (Charlier Dep., Ex. 4, pp. 35:14-36:9; Berlamino Dep., Ex. 2, pp. 277:13-279:9)

In a June 11, 2009 e-mail, Berlamino stated that Mr. Hoff was "slated for elimination." (Ex. 76)  This demonstrates that the decision to terminate Mr. Hoff was made months earlier by Berlamino.

137.    Admit.

138.    Ms. Scott believes that Mr. Hoff was hired in or around 2001 and that his contract was renewed several times prior to his termination, but denies knowledge and information as to Mr. Hoff's age at the time he was hired.

139.    Admit.

140.    Admit that Ms. Scott believes that Berlamino took action to terminate Mr. Cunningham because of his age and states that when Berlamino decided to terminate Mr. Cunningham, Ms. Scott discussed the fact that this was an age-related decision with Maye and Maye told her that she "tried to reason" with Berlamino, but that Berlamino wanted to terminate Mr. Cunningham.  (Scott Decl., Ex. 1, ¶ 26, n. 1)

141.    Admits that Berlamino made comments about Mr. Cunningham including that he was "too old" and did not "look good on-air," and that Ms. Scott spoke with Berlamino about Mr. Cunningham's age at the time his contract was not renewed, but denies that Mr. Cunningham's age was the sole reason Ms. Scott cautioned Berlamino against not renewing the contract.

142.    Admits that Ms. Scott did not agree with the decision not to renew Mr. Cunningham's contract because she believed that he was an asset to the News Department. (Scott Decl, Ex. 1, ¶ 26, n. 1)

143.   Admit.

144.   Admits that comments made by Berlamino about Marvin Scott and actions taken related to Mr. Scott's employment are factors upon which Ms. Scott bases her claim for wrongful termination based on her age, but denies the characterization that the "purported demotion" of Mr. Scott in 2002 is the basis for this belief.  (Scott Decl., Ex. 1, ¶ 26)

145.   Ms. Scott has no knowledge or information to dispute Mr. Scott's stated date of hire and states that, upon information and belief, Mr. Scott's stated date of birth is correct.

146.   Admits that Berlamino made age-related comments about Mr. Scott including that he was "too old" and "why doesn't he retire already?" and took actions regarding Mr. Scott's employment on the basis of his age, an opinion shared by Mr. Scott himself.  (Scott Decl. Ex. 1, ¶ 26; M. Scott Dep., Ex. 83, pp. 10:7-15; 15:3-18:4; 19:14-22:11; errata sheet)

147.   Admits that Mr. Scott's contract was renewed in 2008 and refers to Mr. Scott's testimony wherein he expressed his belief that decisions were made adverse to his employment status with defendant due to his age.  (M. Scott Dep., Ex. 83, pp. 19:14-22:11; 40:25-42:10) Notably, Mr. Scott testified that he believed that Berlamino relieved him of his anchoring responsibilities and changed his reporting responsibilities (both of which he considered to be demotions) because Berlamino "had a desire for a younger skew."  (M. Scott Dep., Ex. 83, pp. 9:5-10:15; 15:3-18:4)  In addition, Mr. Scott's current employment with defendant is as a reporter/senior correspondent, which reflects a demotion from his prior position, a decision which was made by Berlamino.  (M. Scott Dep., Ex. 83, pp. 6:18-20; 9:5-10:15; 15:3-18:4; 40:25-42:10)

Further, Ms. Scott states that Berlamino was opposed to the Iraq trip and only agreed to it after Ms. Scott and her crew secured free transportation and lodging.  The Iraq trip was a huge

success for WPIX and resulted in Ms. Scott and the crew being recognized with the Tribune Values Award, one of the most (if not the most) prestigious awards handed out by the Tribune. (Scott Decl., Ex. 1, ¶ 29)

148.     Denies that the changes made to Mr. Scott's employment in 2009 were not a demotion.  Indeed, Mr. Scott testified that he considered the changes in his responsibilities to be a demotion.  (M. Scott Dep., Ex. 83, pp. 9:5-10:15; 19:14-22:11)

149.     Denies knowledge and information as to what shows Mr. Scott is involved with and states that, although Berlamino continued to approve News Close-Up, she did so reluctantly and only because, upon information and belief, FCC regulations required each station to have a community affairs or political talk show and News Close-up satisfied the FCC requirement. (Scott Decl. Ex. 1, ¶ 26)

150.     Admits that Berlamino was present at Mr. Scott's wedding.

151.     Admits that comments made by Berlamino about Sal Marchiano and actions taken related to Mr. Marchiano's employment are factors upon which Ms. Scott bases her claim for wrongful termination based on her age.  States that, upon information and belief, Mr. Marchiano's stated date of birth is correct.

152.     Admits that Berlamino said she would not renew Mr. Marchiano's contract beyond December 31, 2008 because he was "too old," "he looks like he's phoning it in," and he "doesn't look good on air."  (Scott Decl. Ex. 1, ¶ 26)

153.     Admits that Mr. Marchiano was replaced by Lolita Lopez and that Ms. Scott was involved in deciding that Ms. Lopez would replace Mr. Marchiano *after* Berlamino advised Ms. Scott that Mr. Marchiano was not going to be retained.  (Scott Decl, Ex. 1, ¶ 26)

154.    Admits that Berlamino was not pleased with Mr. Marchiano's performance, denies the characterization of Ms. Scott's testimony, and states that Ms. Scott testified that Mr. Marchiano's show at Shea Stadium did not go well because of technical difficulties over which Mr. Marchiano had no control, and denies knowledge or information as to what, if any, factor that played in Berlamino's decision not to retain Mr. Marchiano.  (Scott Dep., Ex. 10, pp. 270:4-271:3)

155.    Denies and states that, upon information and belief, Ms. Maslow's stated date of birth is correct.

156.    Denies knowledge or information as to why Ms. Maslow was terminated or as to what role Berlamino had in making the decision to terminate Ms. Maslow and states that, at the time she was terminated, Ms. Maslow was highly qualified to continue in her role and perform the duties and responsibilities associated with that position, and that Ms. Maslow's responsibilities in the News Department were important to the daily operation of the newsroom. (Scott Decl, Ex. 1, ¶ 26, n. 1)

157.    Admits that the treatment of Ms. Murphy is also a factor upon which Ms. Scott bases her claim for wrongful termination based on her age.

158.    Ms. Scott has no knowledge or information to dispute Ms. Murphy's date of hire and admits that Ms. Murphy was an anchor on the weekend news and was a reporter.

159.    States that, upon information and belief, Ms. Murphy's stated date of birth is correct.

160.    Admits that Berlamino made age-related comments about Ms. Murphy that included that she "looked old" and had "frumpy clothing," denies the characterization of Ms. Scott's testimony, and states that Ms. Scott testified that she could not remember exactly when

these comments were made, admits that Ms. Murphy was demoted in 2009 when she was 50

years old, and denies knowledge or information about the status of Ms. Murphy's contract.

(Scott Decl., Ex. 1, ¶ 26)

161.    Denies knowledge and information as to the purported reason why Berlamino

changed Ms. Murphy's position, but states that in a June 11, 2009 e-mail, Berlamino noted that

Ms. Murphy was "downgraded."  (Ex. 76)

162.    Admit.

163.    Admits that the treatment of Ms. Tong is also a factor upon which Ms. Scott bases

her claim for wrongful termination based on her age and states that, upon information and belief,

Ms. Tong's stated date of birth is correct.

164.    Admit.

165.    Admit and refer to Ms. Tong's testimony regarding her employment.  (Tong Dep.,

Ex. 84, pp. 34:10-35:18)

166.    Denies knowledge or information as to what Tribune management "believed,"

and states that there was a report generated in or around June 2009 and refers to that report for

responsive information.  (Ex. 85)

167.    Denies knowledge or information regarding Berlamino's opinions regarding the

report and as to what Berlamino's discussions with Tribune management were, but Ms. Scott

states that Berlamino made several comments about Ms. Tong, including that she was "too old,"

and was "too old for anchoring all of the time," and that Berlamino instructed Ms. Scott to draft a

warning letter to be placed into Ms. Tong's file.  (Scott Decl., Ex. 2, ¶ 26)  Ms. Tong testified

that she believed that the negative action Berlamino took against her in June 2009 -- including

issuance of a "performance expectation memo" and cutting her salary -- was based on her age. (Tong Dep., Ex. 84, pp. 11:10-17:22)

168.    Ms. Scott admits that she did not agree with issuing a memo to Ms. Tong or with any of the purported "research" that reflected negatively on Ms. Tong, and denies that Berlamino expressed such opinions to her, and denies knowledge or information regarding the opinions of Tribune management. There are no contemporaneous documents which reflect that the decision to issue a memo to Ms. Tong was made by Tribune management.  To the contrary, documentary evidence indicates that Berlamino was against renewing Ms. Tong's contract in September 2009 and Ms. Tong's contract was only extended because "she wasn't given notice and there was potential of putting [WPIX] at risk . . ."  (Ex. 64)

169.    Denies knowledge or information as to what Ms. Tong and Berlamino discussed directly, denies characterization of Ms. Tong's testimony, and states that Ms. Tong testified that she based her belief on what happened in June 2009 on what Ms. Scott told her.  (Tong Dep, Ex. 84, pp. 36:17-42:9)

170.    Admit and states that this occurred prior to Ms. Scott's termination.

171.    Admit.

172.    Deny.  Based on what Berlamino said about Ms. Tong to Ms. Scott, as well as the actions taken with respect to Ms. Tong's employment, Ms. Tong believed she was discriminated against because of her age.  (Tong Dep., Ex. 84, pp. 13:3-22; 17:17-24:23; 61:13-62:16; 69:19-71:7)

173.    Admit.

174.    Admit.

175.    Admits that the termination of Ms. Tyler's employment is also a factor upon which Ms. Scott bases her claim for wrongful termination based on her age.

176.    Admits that Ms. Tyler was a reporter and that she was terminated in or around July 2009, and states that WPIX could have brought Ms. Tyler to work in New York as a reporter.  (Scott Decl., Ex. 1, ¶ 26, n. 1)

177.    States that, upon information and belief, Ms. Tyler's stated date of birth is correct.

178.    Admit.

179.    Admit.

180.    Admits that Ms. Scott filed a Charge of Discrimination with the EEOC on January 14, 2010, and refers to that document for the contents therein as well as to the Complaint in this action.

181.    Refers to the referenced document for the contents therein and Ms. Scott states that, upon information and belief, aside from receiving Ms. Scott's Charge of Discrimination and defendant's Position Statement, the EEOC did not conduct any investigation into the claims and allegations raised by Ms. Scott and that, *prior* to issuance of the EEOC letter on January 7, 2011, Ms. Scott's counsel advised the EEOC that a complaint was filed in this Court.

In addition, the version of events described in defendant's Position Statement drastically differs from the version of events defendant now presents to this Court.  Most notably, Charlier does not even appear in defendant's EEOC Position Statement, yet defendant now alleges that he was a key driving force behind the decision to terminate Ms. Scott.  Furthermore, many of the key statements and allegations made by defendant in the Position Statement, that were ostensibly relied upon by the EEOC were proven, during discovery, to be false or inaccurate.

The EEOC also demonstrated its lack of investigation and understanding of Ms. Scott's claim through a reference in its letter to Ms. Scott's claim for discrimination based on an alleged "disability" rather than age (which defendant claims was a "typographical error" but which was never corrected or addressed by the EEOC).  (Ex. 86)

**Additional Facts Relevant to Plaintiff's Opposition**

182.    On October 13, 2010, Mr. Marchiano filed an action against Berlamino claiming he was terminated because of his age.  (Ex. 87)

183.    On March 8, 2011, Mr. Hoff filed an action against WPIX, Tribune Company, and Berlamino claiming that he was terminated because of his age.  (Ex. 88)


Dated: September 23, 2011

                                       HAYNES AND BOONE, LLP
                                       *Attorneys for Plaintiff*


                                  By:  s/ Kenneth J. Rubinstein
                                       Kenneth J. Rubinstein (KR-1410)
                                       30 Rockefeller Plaza, 26th Floor
                                       New York, New York  10112
                                       (212) 659-7300